## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RASUL ROE, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>ALEJANDRO N. MAYORKAS, *et al.*,<br><br>    Defendants. | No. 1:22-cv-10808-ADB<br>Leave to file granted, July 15, 2022 |

## PLAINTIFFS' OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS</u>

Dated: July 18, 2022

Susan M.  Finegan (BBO #559156)
Susan J. Cohen (BBO #553353)
John F. Quill (BBO #632216)
Andrew H. DeVoogd (BBO #670203)
Andrew N. Nathanson (BBO #548684)
Kenneth P. Monroe (BBO #696381)
Michael P. Molstad (BBO #707524)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
  AND POPEO, P.C.
One Financial Center
Boston, MA 02111
617-542-6000
SMFinegan@mintz.com

Matthew R. Segal (BBO #654489)
Adriana Lafaille (BBO #680210)
Areeba Jibril*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
617-482-3170
ALafaille@aclum.org

*Licensed to Practice in California.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT.........................................................................................................................3

I.   The Government's Partial Standing Challenge Provides No Basis for Dismissal...3

   A.   The Court Need Not Decide Standing as to a Subset of Plaintiffs Because
        Defendants Concede That Some of Them Do Have Standing.....................3

   B.   The Overseas Afghan Beneficiaries Have Standing For Multiple Reasons 4

   C.   Diana Doe Also Has Standing Because She Is an Applicant to USCIS for
        an Immigration Benefit. ............................................................................7

II.  The APA Applies to USCIS's changes in Humanitarian Parole Policy, and those
     changes are subject to judicial review ...................................................................8

   A.   Title 8, Section 1252(A)(2)(B)(ii) Does Not Strip The Court Of
        Jurisdiction Over Any of Plaintiffs' APA Claims. ....................................8

      1.   Section 1252(a)(2)(B)(ii) applies only to review of individual
           adjudications. ...................................................................................9

      2.   None of Plaintiffs' Claims Are Barred by Section 1252(a)(2)(B)(ii)
           Because They Do Not Seek Review of Individual Adjudications.13

   B.   Title 5, Section 701(a)(2) Does Not Strip The Court Of Jurisdiction Over
        Any of Plaintiffs' APA Claims. ...............................................................15

III. PLAINTIFFS STATE A CLAIM THAT THE GOVERNMENT'S POLICY
     CHANGEs VIOLATED THE APA. .....................................................................17

   A.   Plaintiffs' APA claims cannot be adjudicated until the government
        supplies the administrative record. ..........................................................18

   B.   The Complaint States Claims For Relief Under The APA. .......................19

      1.   Plaintiffs State A Claim That The Government Acted Arbitrarily
           And Capriciously In Implementing New Standards For Afghan
           Parole Applicants. ..........................................................................20

      2.   Count II States a Claim That USCIS Has Violated Its Legal
           Obligation to Decide Parole Applications on an Individualized
           Basis................................................................................................21

      3.   Count III States a Claim That USCIS Violated the Notice-And-
           Comment Requirements of the APA. ..............................................21

      4.   Count IV States A Claim For Unreasonable Delay. .......................22

   C.   The Government's Rule 12(b)(6) Arguments Are Misplaced. ...................24

1.    The "Policy" Claims. ...................................................................24

2.    The "Delay" Claim. ...................................................................25

3.    The "Foreign Affairs Exception"..................................................26

CONCLUSION....................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967).............................................................................................................9

*Abdi v. Chertoff*,
    589 F. Supp. 2d 120 (D. Mass. 2008) ...................................................................................14

*Abdi v. Duke*,
    280 F. Supp. 3d 373 (W.D.N.Y. 2017) ...........................................................................11, 12

*Adams v. Baker*,
    909 F.2d 643 (1st Cir. 1990).................................................................................................7

*Amalkalani v. McAleenan*,
    527 F. Supp. 3d 205 (E.D.N.Y. 2021) .................................................................................22

*Amanullah v. Nelson*,
    811 F.2d 1 (1st Cir. 1987).............................................................................................12, 17

*Aracely, R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018).................................................................11, 12, 13, 16

*Armstrong v. White Winston Select Asset Funds, LLC*,
    No. 16-10666, 2020 WL 10316643 (D. Mass. Mar. 23, 2020) .............................................25

*Asante v. Azar*,
    436 F. Supp. 3d 215 (D.D.C. 2020).....................................................................................26

*Atieh v. Riordon*,
    727 F.3d 73 (1st Cir. 2013).......................................................................................... *passim*

*Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*
    814 F.3d 481 (1st Cir. 2016)................................................................................................12

*Biden v. Texas*,
    142 S. Ct. 2528, 2543-44 (2022)..........................................................................................11

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984)...............................................................................................................9

*Brezinski v. U.S. Dep't of Homeland Sec.*,
    No. 21-376, 2021 WL 4191958 (D.D.C. Sept. 15, 2021)......................................................26

iii

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ..................................................................................26

*City of New York v. Permanent Mission of India*,
  618 F.3d 172 (2d Cir. 2010)...........................................................................................26

*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018) ....................................................................11, 12, 13

*Davis v. Grimes*,
  9 F. Supp. 3d 12 (D. Mass. 2014) .....................................................................................3

*Department of Homeland Security v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020)........................................................................................1, 15, 16

*Dickson v. Sec. of Defense*,
  68 F.3d 1396 (D.C.Cir. 1995) .........................................................................................18

*Doe v. Mayorkas*,
  530 F. Supp. 3d 893 (N.D. Cal. 2021) ...................................................................6, 11, 14

*Doe v. Trump*,
  288 F. Supp. 3d 1045 (W.D. Wash. 2017).................................................................12, 14

*Doe v. Trump*,
  423 F. Supp. 3d at 1046 ..................................................................................................17

*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ..........................................................................................26

*Elgin Assisted Living EB-5, LLC v. Mayorkas*,
  No. 12 cv 2941, 2012 WL 4932661 (N.D. Ill. Oct. 16, 2012)..................................14

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)........................................................................................................17

*Garcia v. U.S. Bd. of Parole*,
  557 F.2d 100 (7th Cir. 1977) ..........................................................................................17

*Gooley v. Mobil Oil Co.*,
  851 F.2d 513 (1st Cir. 1988)...........................................................................................25

*Guerrero-Lasprilla v. Barr*,
  140 S. Ct. 1062 (2020)....................................................................................................10

*Haoud v. Ashcroft*,
  350 F.3d 201 (1st Cir. 2003)...........................................................................................16

*Hassan v. Chertoff*,
593 F.3d 785 (9th Cir. 2010) ...................................................................................12

*Jean v. Nelson*,
727 F.2d 957 (11th Cir. 1984) ................................................................................12

*Kerry v. Din*,
576 U.S. 86 (2015)...................................................................................................17

*King v. Off. For Civ. Rts. Of U.S. Dep't of Health and Human Servs.*,
573 F. Supp. 2d 425 (D. Mass. 2008) .....................................................................26

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)...........................................................................................5, 17

*Kucana v. Holder*,
558 U.S. 233 (2010)......................................................................................9, 10, 14

*Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*,
775 F.3d 1255 (11th Cir. 2014) (per curiam)............................................................5

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015)...................................................................................................9

*Make The Rd. N.Y. v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ..................................................................................9

*Mantena v. Johnson*,
809 F.3d 721 (2d Cir. 2015).......................................................................................5

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991).................................................................................................11

*Mendez v. Wolf*,
No. 3:20-cv-11598-KAR, 2021 WL 877886 (D. Mass. Mar. 9, 2021) ...................19

*Moghaddam v. Pompeo*,
424 F. Supp. 3d 104 (D.D.C. 2020) ........................................................................25

*Mondragon Tinoco v. Mayorkas*,
No. 20-cv-4787, 2021 WL 3603373 (N.D. Ga. Aug. 13, 2021)..............................25

*Mons v. McAleenan*,
No. 19-1593, 2019 WL 4225322 (D D.C. Sept. 5, 2019)........................................11

*Montalvo-Huertas v. Rivera-Cruz*,
885 F.2d 971 (1st Cir. 1989)......................................................................................3

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983)...............................................................................................20

*Musunuru v. Lynch*,
   831 F.3d 880 (7th Cir. 2016) ................................................................................5

*Nat'l Ass'n of Consumer Advos. v. Uejio*,
   521 F. Supp. 3d 130 (D. Mass. 2021) .................................................................4, 6

*Nat'l Venture Capital Ass'n v. Duke*,
   291 F. Supp.3d 5 (D. D.C. 2017)..........................................................................5, 6

*New Mexico v. McAleenan*
   450 F. Supp. 3d 1130 (D.N.M. 2020) ..................................................................13

*New Jersey Dep't of Env't Prot. v. EPA*,
   626 F.2d 1038 (D.C. Cir. 1980)...........................................................................26

*NRDC v. Nat'l Highway Traffic Safety Admin.*,
   894 F.3d 95 (2d Cir. 2018).....................................................................................26

*Paiz v. Decker*,
   2018 U.S. Dist. LEXIS 217604 (S.D.N.Y. Dec. 27, 2018) ......................................11

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007)................................................................................4

*Patel v. U.S.Citizenship & Immigr. Servs.*,
   732 F.3d 633 (6th Cir. 2013) ..................................................................................4

*Perez v. Barr*,
   927 F.3d 17 (1st Cir. 2019).....................................................................................10

*Pitman v. U.S. Citizenship & Immigr. Servs.*,
   No. 17-cv-0166, 2017 WL 5991738 (D. Utah Dec. 1, 2017) ................................19

*R.F.M. v. Nielsen*,
   365 F. Supp. 3d 350 (S.D.N.Y. 2019)................................................................11, 16

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015).........................................................................16

*Ramirez v. U.S. Immigr. & Customs Enforcement*,
   338 F. Supp. 3d 1 (D.D.C. 2018)............................................................................6

*Reddy v. Foster*,
   845 F.3d 493 (1st Cir. 2017)...................................................................................4

*Reed v. Hammond*,
  No. C16-5993, 2020 WL 133191 (W.D. Wash. Jan. 13, 2020)..............................................25

*Samirah v. O'Connell*,
  335 F.3d 545 (7th Cir. 2003) .................................................................................................12

*Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*,
  783 F.3d 156 (3d Cir. 2015).....................................................................................................5

*Shihuan Cheng v. Baran*,
  No. CV 17-2001-RSWL-KSx, 2017 WL 3326451 (C.D. Cal. Aug. 3, 2017) ........................17

*Singh v. Holder*,
  638 F.3d 1196 (9th Cir. 2011) .........................................................................................10, 12

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984)......................................................................................22, 23, 26

*Tilley v. TJX Cos.*,
  345 F.3d 34 (1st Cir. 2003)......................................................................................................3

*Towns of Wellesley, Concord & Norwood v. Fed. Energy Regul. Comm'n*,
  829 F.2d 275 (1st Cir. 1987) (per curiam) ................................................................22, 23, 25

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)........................................................................................................7, 17

*Trump v. Int'l Refugee Assistance Project*,
  137 S. Ct. 2080 (2017) (per curiam) ........................................................................................7

*Union of Concerned Scientists v. Wheeler*,
  954 F.3d 11 (1st Cir. 2020).....................................................................................................15

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977)..................................................................................................................3

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  139 S. Ct. 361 (2018)..............................................................................................................15

*Yong Tang v. Chertoff*,
  493 F. Supp. 2d 148 (D. Mass. 2007) .....................................................................................14

*Zhou v. F.B.I.*,
  No. 07-cv-238, 2008 WL 2413896 (D.N.H. June 12, 2008) ...................................................14

**Statutes**

5 U.S.C. § 553...............................................................................................................................10, 21

5 U.S.C. § 553(a)(1)...................................................................................................................26

5 U.S.C. §555(b) .......................................................................................................................22

5 U.S.C. § 701(a)(1)....................................................................................................................9

5 U.S.C. § 701(a)(2)..............................................................................................................15, 17

5 U.S.C. § 702 .........................................................................................................................5, 8

5 U.S.C. §706(1) .......................................................................................................................22

5 U.S.C. § 706(2)(A)..................................................................................................................21

8 U.S.C. § 1182(d)(5)(A).....................................................................................................1, 6, 12

8 U.S.C. § 1182(d)(5)(A), (2) .....................................................................................................21

8 U.S.C. § 1252.......................................................................................................................9, 14

8 U.S.C. § 1252(a)(2)(B) ......................................................................................................8, 10, 13

8 U.S.C. § 1252(a)(2)(B)(i)..........................................................................................................10

8 U.S.C. § 1252(a)(2)(B)(ii) ................................................................................................ *passim*

Administrative Procedure Act....................................................................................................1, 2

**Other Authorities**

8 C.F.R. §212.5(c), and (3) .........................................................................................................21

Fed. R. Civ. P. 12(b)(1)........................................................................................................4, 18, 27

Fed. R. Civ. P. 12(b)(6)......................................................................................................... *passim*

USCIS Policy Memorandum, PM-602-0085 (June 3, 2013).......................................................20

**INTRODUCTION**

Immigration law requires noncitizens to turn square corners when applying for relief from the U.S. government, and the Administrative Procedure Act requires the government to turn square corners when altering the standards governing those applications. *See Department of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). This is true even when the government alters standards governing applications for discretionary relief. *Id.* And it is true even, and especially, when changing those standards can cost people their lives.

Plaintiffs are Afghans endangered by the Taliban's return to power and U.S.-based loved ones trying to bring them to safety. After the Taliban seized power, Plaintiffs and thousands of other Afghans applied to U.S. Citizenship and Immigration Services for humanitarian parole. Humanitarian parole arises from 8 U.S.C. § 1182(d)(5)(A), which grants the Secretary of Homeland Security the "discretion" to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons . . . any alien applying for admission to the United States . . . ." In September 2021, after initially approving most applications for Afghans, USCIS changed course by changing policy. Compl. ¶¶ 47-57. Specifically, it implemented new standards, under which USCIS would: (1) deny or administratively close applications for all beneficiaries in Afghanistan; (2) deny, except in extreme cases, applications from Afghan beneficiaries located outside of Afghanistan; and (3) refrain from issuing Requests for Evidence or Notices of Intent to Deny, even when additional evidence could demonstrate parole eligibility. Compl. ¶¶ 55, 56, 60-65.

Plaintiffs allege that these policy changes not only risk their lives, but violated the APA. Their Complaint alleges that the new standards governing humanitarian parole are unlawful under the APA because they are arbitrary and capricious (Count I), violate the government's own policies

and the humanitarian parole statute (Count II), fail to comply with notice-and-comment requirements (Count III), and cause unreasonable delay (Counts IV and V).

Yet the government spends much of its motion to dismiss shadowboxing an altogether different lawsuit, one that alleges a right to be granted humanitarian parole. The government contends that, because there is no such right, certain Plaintiffs lack standing. Mot. at 5-7. It contends this Court lacks jurisdiction to decide this case because of statutory provisions limiting review, on the merits, of denials of discretionary relief. *Id.* at 8-14 (citing, *e.g.*, 8 U.S.C. § 1252(a)(2)(B)(ii)). And it contends that Plaintiffs' APA claims must be rejected under the lenient "facially legitimate and bona fide reason" standard that applies only when noncitizens challenge the outcome of a "decision whether to grant a noncitizen entry." Mot. at 15-16. These contentions all fail for the same reason: Plaintiffs do not claim a right to *be paroled*, but instead a right to *be subjected to lawful procedures* when seeking parole. In other words, Plaintiffs recognize that Administrative Procedure Act challenges are appropriately focused on *procedures*, not outcomes.

When the government finally engages with Plaintiffs' actual claims, it does so by insisting that any allegation of new humanitarian parole standards is not "credible." Mot. at 17. But the representations of counsel can never win a motion to dismiss. That is especially true in this Circuit, where APA claims like those at issue here may not be dismissed for lack of factual support unless the government provides the administrative record. *Atieh v. Riordon*, 727 F.3d 73, 76-77 (1st Cir. 2013). In this case, the government has to date resisted doing so.

For these reasons, and as explained below, Plaintiffs have standing, this Court has jurisdiction, the Complaint states valid claims, and the government's motion should be denied.

## ARGUMENT

### I.   THE GOVERNMENT'S PARTIAL STANDING CHALLENGE PROVIDES NO BASIS FOR DISMISSAL

The government argues that the Overseas Afghan Plaintiffs and Diana Doe lack Article III standing. But because precedent dictates that a case may proceed if at least one plaintiff has standing on each claim, and because the government does not argue that all Plaintiffs lack standing, there is no need to address its standing arguments. In any event, the arguments are mistaken. Each Overseas Afghan Plaintiff, plus Diana Doe, has standing to address the lost opportunity to access a fair and lawful humanitarian parole process, denials under an unlawful process, unjustified delay in violation of the APA, and/or the serious on-the-ground harm that each is currently suffering.

### A.   The Court Need Not Decide Standing as to a Subset of Plaintiffs Because Defendants Concede That Some of Them Do Have Standing.

"So long as one petitioner has standing, the proceeding may go forward without any consideration of the standing of co-petitioners." *Tilley v. TJX Cos.*, 345 F.3d 34, 36 (1st Cir. 2003). *See also Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, 976 (1st Cir. 1989) (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (same); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) (same); *Davis v. Grimes*, 9 F. Supp. 3d 12, 24 n.12 (D. Mass. 2014) ("[B]ecause the other individual plaintiffs have standing, [one plaintiff's] lack of standing is not an issue."). Here, the government does not argue that all Plaintiffs lack standing. With the standing of at least some Plaintiffs undisputed, this Court may adjudicate all of their claims.[1]

---

[1]   The government also seeks the dismissal of the Department of State (DOS) as a party, on the theory that Plaintiffs "make no claim that they have been injured by an alleged policy change made by the DOS." Mot. at 8. Plaintiffs defer to the Court regarding the continued participation of DOS in this litigation, noting that the government has pointed to DOS's role in the cases of those whom USCIS approves for humanitarian parole and implicitly cited DOS's closure of the embassy in

**B.    The Overseas Afghan Beneficiaries Have Standing For Multiple Reasons**

Beyond being incapable of halting this case, the government's partial standing challenge is incorrect. To establish standing, a plaintiff must show an injury in fact that is both "concrete and particularized" and "'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). For purposes of Rule 12(b)(1), like Rule 12(b)(6), a court must "construe[] the Complaint liberally and treat[] all well-pleaded facts as true, according the plaintiff[s] the benefit of all reasonable inferences." *Nat'l Ass'n of Consumer Advos. v. Uejio*, 521 F. Supp. 3d 130, 140 (D. Mass. 2021) ("*Uejio*") (quoting *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015)). In other words, "when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).

Here, the Overseas Afghan Plaintiffs have standing because they have suffered injury that is concrete, particularized, and actual: (1) the extinguishment of an opportunity to pursue humanitarian parole according to a process that comports with the law, (2) actual denials issued according to an unlawful process, (3) undue delay in violation of the APA, and (4) ongoing and extreme hardship and risk caused by Defendants' unlawful process and/or undue delay in adjudication. Compl. ¶¶ 1, 3-6, 47-78, 80-81, 94-95, 100-101, 105, 113-118, 120, 133-135, 137-139, 155, 162, 169, 170-172.

At least six courts of appeals have recognized "lost opportunity" injury as sufficient to confer Article III standing in immigration cases. *Patel v. U.S.Citizenship & Immigr. Servs.*, 732 F.3d 633, 638 (6th Cir. 2013) (where visa application filed by employer was denied, the immigrant

Kabul as the reason for USCIS's decision to make grants and conditional grants of humanitarian parole unavailable to Afghans in Afghanistan. Mot. at 3-4.

beneficiary's "lost opportunity is itself a concrete injury–and a favorable decision would redress it."); *Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015) (recognizing lost opportunity as basis for standing, where beneficiary did not receive notice of intent to revoke visa and challenged procedural defects in agency's conduct); *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 162 (3d Cir. 2015) (same, where visa petition denied for unlawfully present immigrant beneficiary); *Musunuru v. Lynch*, 831 F.3d 880, 882 n.1 (7th Cir. 2016) (same); *Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*, 775 F.3d 1255, 1259-60 (11th Cir. 2014) (per curiam) (same, where natives and citizens of India had standing to challenge denial of visa application filed by potential employer).

Eschewing that case law, the government instead cites cases it construes to mean that noncitizens lack standing to challenge "the denial of parole" because they "have no right to enter the United States." Mot. at 5. But these cases concern the scope of noncitizens' constitutional rights vis-à-vis executive action on specific visa applications. Here, Plaintiffs do not claim a right to judicial review of individual parole decisions on the merits, or make a constitutional claim like the ones at issue in *Kleindienst v. Mandel*, 408 U.S. 753 (1972) and its progeny. They do not challenge the *outcome* of any discretionary decision, such as "visa application determinations" at issue in the government's cases. Mot. at 6-7. Instead, Plaintiffs challenge USCIS's policy decision to implement new standards and methods for handling Afghan humanitarian parole applications in an improper and unlawful way—claims that Congress has endorsed for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.

As courts have noted in cases like this one, there is a critical "difference between a challenge to '[an agency's] exercise of discretion' and one to an 'overarching agency policy[.]'" *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp.3d 5, 13 (D. D.C. 2017) ("*Duke*") (finding

5

standing in case involving parole under 8 U.S.C. § 1182(d)(5)(A)). The latter type of challenge seeks review of agency action that works to strip a plaintiff of the opportunity to obtain any kind of outcome—not a *specific* outcome like the government suggests, but rather *some* outcome that is reached according to a lawful process. In other words, the claimed injury here is not the denial of Plaintiffs' individual applications, but rather "the lost opportunity" "to have their . . . applications examined under a lawful *process*, regardless of the *outcome* of the process and notwithstanding that fact that the ultimate decision is discretionary." *Doe v. Mayorkas*, 530 F. Supp. 3d 893, 904 (N.D. Cal. 2021) (citations omitted).

This principle has been recognized in at least one other district specifically involving immigration parole, in which the court agreed that the loss of opportunity to seek parole due to challenged policy changes "suffice[d] to establish a cognizable injury" conferring standing to sue. *Duke*, 291 F. Supp.3d at 14; *see also Ramirez v. U.S. Immigr. & Customs Enforcement*, 338 F. Supp. 3d 1, 24 (D.D.C. 2018) (relying on *Duke* in concluding that plaintiffs "identified cognizable injuries in the form of the loss of opportunity for consideration" under existing legal standard in the face of agency's systematic and widespread failure to comply with that standard in making individual decisions). And at least one case in this district recognized the lost opportunity theory as creating standing in a non-immigration context. *See Uejio*, 521 F. Supp. 3d at 145 (quoting *Teton Historic Aviation Found. v. U.S. Dep't of Defense*, 785 F.3d 719, 724 (D.C. Cir. 2015)) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive the benefit . . . .").

The Overseas Afghan Plaintiffs have standing because they allege that, whether their applications are denied or languishing unadjudicated, the government has denied them the

opportunity to pursue humanitarian parole under a lawful process. That is enough. They also have standing due to the acute hardships and risk they continue to suffer as a result of the government's unlawful actions. Several of the Plaintiffs have already endured violence—including deadly violence—from the Taliban and Taliban allies, directed against them or their close colleagues and loved ones. *See, e.g.*, ECF No. 4, Memo. ISO Mot. to Proceed Under Pseudonym, at 7-8; Compl. ¶¶ 84, 95, 107, 122, 144, 147, 158, 173.

### C.    Diana Doe Also Has Standing Because She Is an Applicant to USCIS for an Immigration Benefit.

Diana Doe too has standing because her injury is concrete, particularized, and actual. The government's contrary argument, including its outsized reliance on *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), and *Adams v. Baker*, 909 F.2d 643 (1st Cir. 1990), is puzzling. The government claims that, "[i]n cases like these, the only possibly proper plaintiffs are 'United States citizens [alleging] violations of their personal rights allegedly caused by the Government's exclusion of particular foreign nationals.'" Mot. at 7 (quoting *Trump v. Hawaii*, 138 S. Ct. at 2416). But that describes Diana Doe. As the petitioner for the Does, each "close friends of her family," Compl. ¶15, she is *herself* the applicant to USCIS for an immigration benefit. As a result, she has a direct and cognizable interest in the claims relating to the lawful and timely adjudication of the eight applications she submitted, along with $4,600 in filing fees.

And even if Diana Doe's claims could be compared to those of a U.S. citizen filing suit based on the denial of visa or other applications that overseas noncitizen applicants had filed for *themselves*—though it cannot—she would still have standing due to her close bona fide relationship with her beneficiaries, including the risk of their injury or death due to Defendants' actions. *Cf. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2089 (2017) (per curiam) ("*Trump v. IRAP*") ("An American individual . . . that has a *bona fide relationship* with a particular

person seeking to enter the country . . . can legitimately claim concrete hardship if that person is excluded."). Defendants have failed to adjudicate Diana Doe's applications lawfully, leading the lives of her loved ones to be threatened. These are concrete injuries sufficient to confer standing.

## II.     THE APA APPLIES TO USCIS'S CHANGES IN HUMANITARIAN PAROLE POLICY, AND THOSE CHANGES ARE SUBJECT TO JUDICIAL REVIEW

Confronted with a complaint laying bare APA violations that have exacerbated human tragedy for Afghan nationals, the government says there is nothing this Court can do about it. The APA generally authorizes lawsuits by anyone "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. But, according to the government, Congress granted it carte blanche to do anything it wishes, for any reason, if it in any way relates to humanitarian parole standards, rules, and policies. It could require applications to be hand-delivered to the top of Mt. Everest. It could consider only applications postmarked February 29. Or it could simply throw them all in the garbage. According to the view espoused in the Motion, no quantum of arbitrariness—or harm to the beneficiaries—could render the government's actions subject to, or reviewable under, the APA.

As discussed below, the government invokes two jurisdictional theories. Both are mistaken. As with the government's standing argument, these theories ignore the distinction between challenging the denial of individual relief in specific cases and challenging changes to policy and practice.

### A.     Title 8, Section 1252(A)(2)(B)(ii) Does Not Strip The Court Of Jurisdiction Over Any of Plaintiffs' APA Claims.

The government primarily relies on 8 U.S.C. § 1252(a)(2)(B). Entitled "Denials of discretionary relief," that provision withdraws jurisdiction to review a judgment, decision, or action "the authority for which is specified . . . to be in the discretion of . . . the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). The government asserts that § 1252(a)(2)(B)(ii)

8

qualifies as a "statute[] preclud[ing] judicial review" under 5 U.S.C. § 701(a)(1), and precludes review here. *See* Mot. 8-11 (not specifying counts), 13-14 (Counts IV and V). That is not so.

### 1.    Section 1252(a)(2)(B)(ii) applies only to review of individual adjudications.

The government's attempt to escape judicial review faces stiff headwinds. "[T]he 'presumption favoring interpretations of statutes [to] allow judicial review of administrative action' is 'well-settled.'" *Kucana v. Holder*, 558 U.S. 233, 251–52 (2010) (quoting *Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63–64); *see Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967) ("*Abbott Labs*"). This presumption "applies even when determining the scope of statutory provisions specifically designed to limit judicial review." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020). Congress is understood to legislate against the backdrop of the presumption, and it therefore takes "clear and convincing evidence" to overcome it. *Id.* Accordingly, it is a "heavy burden" to show that "Congress prohibited all judicial review." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Congressional intent to do so must be established by "'clear and convincing evidence,'" *Abbott Labs*, 387 U.S. at 141, and be "fairly discernible in the statutory scheme." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (quoting *Data Processing Serv. v. Camp*, 397 U.S. 150, 157 (1970)).

Here, the government fails to demonstrate, clearly and convincingly, that Section 1252 strips this Court of jurisdiction to hear challenges to the policies and practices governing humanitarian parole. The overall focus of Section 1252, titled "Judicial review of orders of removal," is on orders of removal and comparable *individual* denials of relief. 8 U.S.C. § 1252. It provides, among other things, procedures by which noncitizens can petition for direct judicial review of certain orders removing them from the United States, *id.* § 1252(b)(1), (2), and sets forth the scope and standard of judicial review, *id.* § 1252(b), for direct challenges to the case-specific

9

determinations made on individual petitions. The consistent focus on denials of *individual* requests for relief provides context for, and extends to, the specific limitation on "Denials of discretionary relief" in Section 1252(a)(2)(B). *Id.*; *see also* 8 U.S.C. § 1252(a)(2)(B)(i) (concerning "the granting of relief"). Section 1252(a)(2)(B)(ii) withdraws judicial review for "any other decision or action" in the discretion of the Secretary of Homeland Security. In plain text, and in context, the "decision[s] or action[s]" over which jurisdiction is being withdrawn are "Denials of discretionary relief" on the merits of an individual's case, rather than policies or practices raising issues of law.[2]

Indeed, the jurisdictional limitations in Section 1252(a)(2)(B) contain an express carveout for legal issues as "provided in subparagraph (D)," which preserves "Judicial review of certain legal claims," such as "constitutional claims or questions of law raised upon a petition for review." *Id.* § 1252(a)(2)(D); *Perez v. Barr*, 927 F.3d 17, 20 (1st Cir. 2019) (stating that subparagraph (D) preserves legal issues); *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011) ("§ 1252(a)(2)(B)(ii) . . . does not limit habeas jurisdiction over questions of law . . ., including . . .'mixed questions of law and fact.'" (citations omitted)). Congress added this carveout in response to the Supreme Court's skepticism of a provision that would improperly limit judicial review of constitutional claims or questions of law—exactly what the government is attempting to do here. *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1071–73 (2020) (recounting history leading to enactment).

Consistent with this statutory text and structure, the overwhelming weight of case law contradicts any suggestion that § 1252(a)(2)(B)(ii) precludes review of claims raising legal challenges to the government's humanitarian parole policies and practices. The Supreme Court

---

[2] Further, according to the Supreme Court, Section 1252(a)(2)(B)(ii) "speaks of authority 'specified'—not merely assumed or contemplated—to be in the [agency's] discretion," and "'[s]pecified' is not synonymous with 'implied' or 'anticipated.'" *Kucana*, 558 U.S. at 243. Here, the government offers no clear and convincing evidence to avoid the APA requirements imposed on all agencies, like following specific procedures to promulgate a rule. *See* 5 U.S.C. § 553.

has explained that Congress's "'judicial review of . . . *a denial*' . . . refer[s] to a single act . . . [and] describes the denial of an individual application." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991). Such language concerns "direct review of individual denials," "rather than . . . general collateral challenges" concerning "practices and policies used by the agency in processing applications." *Id.* Thus, just last month, and *with respect to humanitarian parole*, the Court observed that even when agency action is discretionary it must comply with the APA. *See Biden v. Texas*, 142 S. Ct. 2528, 2543-44 (2022). In sharp contrast with the government's sweeping argument here, the Court explained that parole "authority is *not* unbounded: [the agency] may exercise its discretion to parole applicants 'only' . . .within th[e] statutory framework" set forth in the humanitarian parole statute. *Id.* (emphasis added). Further, "under the APA," any exercise of discretion regarding humanitarian parole "must be reasonable and reasonably explained." *Id.* at 17-18. As the Supreme Court itself has acknowledged: judicial review of claims alleging violations of the APA with respect to humanitarian parole policies, like those advanced here, is available.

In step with this decision, many courts have held that lawsuits challenging policies, procedures, or standards governing the process for making discretionary determinations— including those relating to parole—are not barred by Section 1252(a)(2)(B)(ii).[3/] Where plaintiffs

---

[3/] *See, e.g.*, *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135–36 (D.D.C. 2018) ("[C]ourts have declined to apply [the bar] to claims challenging the legality of policies and processes" "under which [agencies] make[s] parole determinations . . . ."); *Abdi v. Duke*, 280 F. Supp. 3d 373, 381 (W.D.N.Y. 2017) (subsequent history omitted); *Damus*, 313 F. Supp. 3d 317,327 (D.D.C. 2018); *Paiz v. Decker*, 2018 U.S. Dist. LEXIS 217604, at *11 (S.D.N.Y. Dec. 27, 2018); *Mons v. McAleenan*, No. 19-1593, 2019 WL 4225322 (D D.C. Sept. 5, 2019); *see also Doe v. Mayorkas*, 530 F. Supp. 3d 893, 909 (N.D. Cal. 2021) ("[W]hile . . . there is no judicial review for individual visa or refugee applications, this denial of judicial review 'does not apply to challenges to immigration policies . . . .'"); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 373 (S.D.N.Y. 2019) ("[P]laintiffs . . . do not seek review of such individual decisions. Rather, they contest the agency policy on which the revocation decisions rest."); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1071-72 (W.D. Wash. 2017) (stating that although an agency may have "discretion in deciding the

challenge policies, procedures, or standards governing parole determinations, these courts disagree with the government that Congress stripped their jurisdiction. *See, e.g.*, *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 136 (D.D.C. 2018).

Some courts have concluded that Section 1252(a)(2)(B)(ii) bars judicial review of "individual parole decisions," *id.*, namely the "ultimate decision regarding parole" for an individual applicant, *Abdi*, 280 F. Supp. 3d at 381. Likewise, in *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, on which the government relies (Mot. at 10), the First Circuit deemed judicial review unavailable to challenge the "Discretionary denial of relief": a company's complaint that USCIS improperly denied a visa for an individual noncitizen worker. 814 F.3d 481, 483 (1st Cir. 2016). Other cases relied on by the government are in the same mold or even further afield.[4/] At most, these decisions say that applicants cannot go to court to contest "the actual balancing of the merits of each application for parole." *Damus*, 313 F. Supp. 3d at 327. They do *not* say that judicial review is unavailable where plaintiffs "have made explicitly clear that they are not seeking review

---

outcome of a refugee application," it lacks discretion over whether a decision will be made); *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011) ("§ 1252(a)(2)(B)(ii) . . . does not limit habeas jurisdiction over questions of law . . ., including . . . 'mixed questions of law and fact'" (citations omitted)).

[4/]   *See Samirah v. O'Connell*, 335 F.3d 545, 547, 549 n.3 (7th Cir. 2003) (holding that district court lacked jurisdiction over decision to revoke parole for individual noncitizen abroad due to security threat); *Hassan v. Chertoff*, 593 F.3d 785, 789–90 (9th Cir. 2010) (holding that agency's ultimate denial of individual "adjustment of status application on the basis that he poses a threat to national security is a determination committed to . . . discretion," while also concluding on merits that agency "complied with [its] regulations when it revoked [individual's] parole"); *Amanullah v. Nelson*, 811 F.2d 1, 8 (1st Cir. 1987) (not considering jurisdictional issues, discussing displaced version of parole statute, and evaluating merits of due process and habeas claims with respect to validity of regulations and detention of three individual petitioners); *Jean v. Nelson*, 727 F.2d 957, 961 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985) (not considering statutory bar at issue here, operative parole statute, or APA claims); *cf.* 8 U.S.C. § 1182(d)(5)(A) (1982) (displaced version of parole statute using different language to describe standard for parole).

of their individual parole determinations, nor are they seeking" a court order directing the agency to render a final determination in their favor. *See Aracely*, 319 F. Supp. 3d at 136.

Amid this sea of authority indicating that § 1252(a)(2)(B)(ii) is geared toward individual denials of discretionary relief, the government cites only one case purportedly to the contrary. In *New Mexico v. McAleenan*, two states brought APA challenges to a federal agency's decision to end its policy of assisting asylum seekers entering the United States. 450 F. Supp. 3d 1130, 1196 (D.N.M. 2020). The court discussed Section 1252(a)(2)(B)(ii) in two short paragraphs of dicta within a 51-page opinion that found other grounds for concluding that the court lacked jurisdiction. But it emphasized that claims raising "constitutional claims or *questions of law*" are expressly preserved—just as Plaintiffs' claims are here. *See id.* (emphasis added).

### 2.  None of Plaintiffs' Claims Are Barred by Section 1252(a)(2)(B)(ii) Because They Do Not Seek Review of Individual Adjudications.

In light of the statutory text and case law, Section 1252(a)(2)(B)(ii) does not bar any of Plaintiffs' claims because they do not challenge the discretionary denial of any individual's application for humanitarian parole, but instead the legality of the standards that the government uses to adjudicate those applications. Plaintiffs allege that these standards violate the APA because they are arbitrary and capricious (Count I), because they violate the humanitarian parole statute and USCIS's own policy manual (Count II), because they fail to comply with notice-and-comment requirements (Count III), and because they have generated unreasonable delay (Counts IV and V). Plaintiffs do not allege that the government is required to grant them parole, and thus they do not challenge any "Discretionary denial of relief" with the meaning of Section 1252(a)(2)(B).

As in *Damus*, "Plaintiffs are 'challeng[ing] an overarching agency' action as unlawful—in this case, Defendants' systematic failure to follow the" humanitarian parole statute, the agency's own policies, and the APA's notice-and-comment strictures. 313 F. Supp. 3d at 327. And as in

13

*Doe v. Mayorkas*, because "Plaintiffs here challenge the change . . . of a policy and practice," the Court should "not find 8 U.S.C. § 1252(a)(2)(B)(ii), which applies to decisions made to *individual* applications, applicable here to this challenge of immigration policy." 530 F. Supp. 3d at 909.

The government singles out Plaintiffs' claims concerning "the pace of . . . adjudications." Mot. at 13-14. But where an agency has failed to make any decision at all, there has not been any "decision or action" under Section § 1252(a)(2)(B)(ii). Thus, Plaintiffs' claims alleging unlawful delay cannot be barred by Section 1252. *See Doe v. Trump*, 288 F. Supp. 3d 1045, 1071–72 (W.D. Wash. 2017) ("Plaintiffs are challenging the failure to act on . . . applications" under APA); *see Zhou v. F.B.I.*, No. 07-cv-238, 2008 WL 2413896, at *4 (D.N.H. June 12, 2008) (joining the "majority of district courts in the First Circuit that have considered the issue" to hold that delay is not a discretionary decision within meaning of bar).[5/] The government's similar assertions as to Plaintiffs' mandamus claims—which attempt to compel the adjudication of humanitarian parole applications on a case-by-case basis (Compl. ¶¶ 187, 198-200)—must also fail.  The Motion seeks only to dismiss the mandamus claim as it relates to unreasonable delay. Mot. at 14, but the unreasonable delay claims are reviewable because the timing and pace of adjudicating authorizations of noncitizens to enter or remain in the United States is *not* discretionary.  *See, e.g.*, *Zhou*, No. 07-cv-238, 2008 WL 2413896, at *4; *Abdi v. Chertoff*, 589 F. Supp. 2d 120, 121 (D. Mass. 2008); *Yong Tang v. Chertoff*, 493 F. Supp. 2d 148, 150 (D. Mass. 2007).

---

[5/]   The government also targets Plaintiffs' claims challenging the changing standards governing RFEs and NOIDs, but does not invoke Section 1252. And for good reason. Any argument regarding "what the relevant regulation states," Mot. 12, is irrelevant because the Supreme Court construes Section 1252 to encompass only decisions made discretionary by *statute*, not by the agency itself in its regulations or—by the same logic—its policy manual. *Kucana v. Holder*, 558 U.S. 233, 238 (2010). Further, although case law cited by the government is inapposite because it concerns judicial review of individual determinations, it, too, confirms that Section 1252 does *not* "preclud[e] review of the issuing of RFEs . . . ." *Elgin Assisted Living EB-5, LLC v. Mayorkas*, No. 12 cv 2941, 2012 WL 4932661, at *2 (N.D. Ill. Oct. 16, 2012).

In sum, the government has failed to discharge its heavy burden to demonstrate, clearly and convincingly, that Congress intended to bar this Court from even hearing Plaintiffs' claims.

### B.    Title 5, Section 701(a)(2) Does Not Strip The Court Of Jurisdiction Over Any of Plaintiffs' APA Claims.

The government also asserts that certain of Plaintiffs claims are unreviewable by virtue of being "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). Mot. at 8, 11-12, 14. But the government makes no serious attempt to develop this argument beyond repeating its observation that parole determinations, as well as agency decisions whether to issue RFEs or NOIDs, are discretionary. And for good reason: the § 701(a)(2) argument is without merit.

"To 'honor the presumption of [APA] review, [the Supreme Court has] read the exception in § 701(a)(2) quite narrowly.'" *Regents*, 140 S. Ct. at 1905. Section 701(a)(2) bars APA review only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)), or when "the agency action is of a kind 'traditionally regarded as committed to agency discretion.'" *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020) (quoting *Lincoln*, 508 U.S. at 192). The *Regents* Court held that when the government has "created a program for conferring affirmative immigration relief"—a program for exercising enforcement *discretion*—its rescission was nevertheless an "action [that] provide[d] a focus for judicial review." 105 S. Ct. at 1649 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985)).

For similar reasons, Plaintiffs' allegations concerning the *constricting* of a discretionary program—which Defendants did by replacing old standards with new ones—falls outside the § 701(a)(2) bar. Here, the humanitarian parole statute, USCIS's internal Policy Manual (the "Manual"), and the standards applied by USCIS bind agency discretion and provide a focus for

15

judicial review. *See Regents*, 105 S. Ct. at 1649; *see also Haoud v. Ashcroft*, 350 F.3d 201, 206 (1st Cir. 2003) (holding the Board of Immigration Appeals' "own regulation provides more than enough 'law' by which a court could review the Board's decision"). To the extent the government argues otherwise, it once again proceeds as if Plaintiffs challenge individual parole determinations.

That same flaw seems to infect the government's treatment of Plaintiffs' allegations concerning the issuance (or non-issuance) of RFEs or NOIDs. *See* Mot. at 11-13. Again, Plaintiffs do not challenge the *merits* of a particular RFE or NOID decision. Rather, they allege that the policy changes unlawfully fail to comply with the statute and the Manual, including its directives on RFEs and NOIDs. The Manual instructs adjudicators not to deny cases if the application on its face "does not establish eligibility for the benefit sought." Instead, RFEs or NOIDs should issue unless "there is no legal basis for the benefit request and no possibility that additional information or explanation will establish a legal basis for approval." Compl. ¶ 62. The government's assertion that issuing an individual RFE or NOID is not a "final agency action reviewable under § 704 of the APA" is likewise misplaced. Mot. at 13. As noted, Plaintiffs do not challenge the decision to issue an individual RFE or NOID; they challenge the new policy against issuing them to Afghan applicants. Compl. ¶ 60; s*ee R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 376 (S.D.N.Y. 2019) (implementation of a new USCIS policy that led to the denial of applications was final agency action); *Aracely*, 319 F. Supp. 3d at 139 (unwritten policy to reject parole requests, upon consideration of an improper factor, was final agency action); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (unwritten DHS policy of considering deterrence when making custody determinations was final agency action). The one case the government relies on is inapposite because the court considered whether the issuance of an RFE in an individual case—not a policy

16

implementation—was a final agency action. *See Shihuan Cheng v. Baran*, No. CV 17-2001-RSWL-KSx, 2017 WL 3326451, at \*7-8 (C.D. Cal. Aug. 3, 2017).[6/]

## III.    PLAINTIFFS STATE A CLAIM THAT THE GOVERNMENT'S POLICY CHANGES VIOLATED THE APA.

The back half of the Motion seeks dismissal under Rule 12(b)(6). Mot. 15-26. It begins by mistakenly repeating its insistence that Plaintiffs are challenging the outcomes of specific individual parole denials. Mot. at 15-16. They are not. Consequently, the government begins its Rule 12(b)(6) argument by advocating for the wrong legal standard—the "facially legitimate and bona fide" standard described in *Trump v. Hawaii*—which is once again inapposite because it applies to agency prerogatives to decide outcomes and the nature of certain constitutional rights.[7/] So, for example, when Plaintiffs allege that their denial letters lack "individualized explanation," Compl. ¶¶ 134-35, it is not because they ask this Court to deem those denials wrong on the merits. It is because boilerplate explanations may "cloak completely arbitrary and capricious [agency] action," *Garcia v. U.S. Bd. of Parole*, 557 F.2d 100, 103 (7th Cir. 1977), and thus cannot satisfy the correct legal standard: the APA's requirement that an agency take "whatever steps it needs to

---

[6/] To the extent there is any doubt about whether there is a final agency action, the Court should await the administrative record. *See Doe v. Trump*, 423 F. Supp. 3d at 1046.

Plaintiffs' allegations with respect to RFEs and NOIDs also support each other. For example, USCIS's repeated denial of Afghan parole applications without issuing RFEs or NOIDs—even when additional information might have established grounds for approval—indicates that USCIS's policies have in fact changed arbitrarily and capriciously. *See* Compl. at ¶ 63-65. Such policy action violates the APA where, as here, the government "depart[ed] from a prior policy *sub silentio*" or "disregard[ed] rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Section 701(a)(2) does not bar review of that claim.

[7/] *See, e.g., Mandel*, 408 U.S. 753 (1972) (plaintiffs sought to annul exclusion of foreign invitee); *Kerry v. Din*, 576 U.S. 86 (2015) (plaintiff sought to annul exclusion of her Iranian husband); *Trump v. Hawaii*, 138 S. Ct. at 2419 (plaintiffs sought to invalidate exclusion of non-citizens from several Muslim countries); *Amanullah v. Nelson*, 811 F.2d 1, 10 (1st Cir. 1987) (plaintiffs sought writ of habeas corpus releasing them from detention).

provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Dickson v. Sec. of Defense*, 68 F.3d 1396, 1404 (D.C.Cir. 1995).

To the extent the government's Rule 12(b)(6) arguments offer anything new beyond their Rule 12(b)(1) arguments, they are at least doubly mistaken. First, inviting the Court to follow "a primrose path," they ignore the fact that, in this Circuit, dismissal under Rule 12(b)(6) is generally unavailable in APA cases. That is because "the relevant inquiry is—and must remain—not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). Second, even if APA claims could be dismissed without the administrative record (contrary to *Atieh*), the government's arguments cannot secure that dismissal.

### A.    Plaintiffs' APA claims cannot be adjudicated until the government supplies the administrative record.

This is an APA case. Plaintiffs assert four APA violations and two claims seeking relief—mandamus and declaratory—for those violations. Compl. ¶¶ 176-197, 198-203. In response, the government first rebuffed Plaintiffs' repeated requests for the administrative record and now asks the Court, in the absence of that record, to dismiss the Complaint under Rule 12(b)(6), based solely on its allegations. This is the exact opposite of what the First Circuit instructed in *Atieh*.

In *Atieh*, also an APA case, the plaintiffs challenged USCIS' denial of a Jordanian husband's application for a visa based on his marriage to a U.S. citizen. The government moved to dismiss for failure to state a claim, 727 F.3d at 75, and the Atiehs resisted the motion by arguing "that their amended complaint satisfied the plausibility standard" limned by the Supreme Court. *Id.* at 76. Applying the plausibility standard, the district court dismissed the claim. *Id.* at 75.

The First Circuit reversed. It started with the bedrock proposition that, where a district court's jurisdiction "arises under the judicial review provisions of the APA," the court's "review

18

of the agency's decision *must* proceed on the administrative record." *Id.* (emphasis added). The plausibility standard governing Rule 12(b)(6) motions in non-APA cases has no role in this process because "[it] is a screening mechanism designed to weed out cases that do not warrant either discovery or trial." *Id.* at 76. APA review, on the other hand, "involves neither discovery nor trial." *Id.* Thus, the court held "that the plausibility standard does not apply to a complaint for judicial review of final agency action." *Id.* As a result, "the focal point of APA review is the existing administrative record," without which APA claims generally cannot be dismissed. *Id.*

*Atieh* therefore requires this Court to deny the Rule 12(b)(6) portion of the government's motion. If the government had wanted a swift adjudication here, it could have accepted Plaintiffs' repeated entreaties to promptly disclose the administrative record. Instead, it now attempts to put the Rule 12(b)(6) cart before the administrative record horse. That effort is foreclosed. *See Mendez v. Wolf*, No. 3:20-cv-11598-KAR, 2021 WL 877886 (D. Mass. Mar. 9, 2021) (denying motion to dismiss APA claim without examining merits); *Pitman v. U.S. Citizenship & Immigr. Servs.*, No. 17-cv-0166, 2017 WL 5991738, at \*3 (D. Utah Dec. 1, 2017) ("Defendants' dismissal arguments will be more properly addressed after the filing of the administrative record.").

### B.   The Complaint States Claims For Relief Under The APA.

Even if *Atieh* were not the law of this Circuit, and even if the plausibility standard were the relevant benchmark, the Complaint would easily pass muster at this stage. The first three APA claims relate to the allegation that USCIS violated the statute when it "implemented new standards used to adjudicate requests for humanitarian parole on behalf of Afghans." Compl. ¶179. Count IV makes the claim that USCIS has violated the APA by unreasonably delaying action on the vast majority of Afghan parole applications. Compl. ¶¶ 194-197. All are amply supported by factual allegations that must be accepted as true for present purposes.

### 1. Plaintiffs State A Claim That The Government Acted Arbitrarily And Capriciously In Implementing New Standards For Afghan Parole Applicants.

Counts I and III allege that the government has violated (and continues to violate) the APA in its implementation and administration of the new standards. Compl. ¶¶ 176-184, 189-193. Count I asserts a claim for arbitrary and capricious agency action, supported by allegations that USCIS:

(1) departed from prior policy *sub silentio* and implemented new standards without even attempting to demonstrate that there are good reasons for the change, *id.* ¶¶ 55, 178;

(2) failed to consider important aspects of the problem when it abruptly altered policy, including but not limited to the seriousness of the humanitarian crisis that followed the U.S. withdrawal from Afghanistan, and the reliance interests engendered by the government's assurances to Afghans left behind that the humanitarian parole process offered them a way to safety, *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); and

(3) systematically violated USCIS's own binding policies, which require parole adjudicators (a) to ask applicants for additional evidence before issuing a denial unless there is "no possibility" that additional evidence could demonstrate eligibility for parole, USCIS Policy Memorandum, PM-602-0085 (June 3, 2013), USCIS Policy Alert, PA-2021-11 (June 9, 2021), and (b) when denying a parole application, to provide "a careful explanation of the officer's findings and analysis (communicating the positive and negative factors considered and how the officer weighed these factors) . . . " USCIS Policy Manual, Vol. 1, Ch. 8, §D.

In support of this claim, the Plaintiffs allege facts indicating the peril of remaining in, or being returned to, Afghanistan, Compl. ¶¶ 83-89, 95-96, 106-111, 114-118, 122-132, 137-139, 144-152, 158-164, 171, 175; the manner in which the U.S. Government held out the prospect of humanitarian parole to Afghans who were not evacuated in the airlift after the fall of the Afghan government, *id.* at ¶¶ 41-46, and the steps that the Plaintiffs and other similarly-situated Afghans

20

took in reliance on the government's assurances. *Id.* at ¶¶ 49-51, 91. It also alleges that USCIS has repeatedly denied Afghan parole applications without requesting further evidence, *id.* at ¶¶ 64, 133, 169, that it issues such requests to Afghan applicants only under the most extreme circumstances, *id.* at ¶¶ 65, 101, and that it has denied the parole applications of several Plaintiffs, and other Afghans, by issuing boilerplate letters with no meaningful explanation of the denial. *Id.* at ¶¶ 66-67, 134, 169, 182.

### 2.    Count II States a Claim That USCIS Has Violated Its Legal Obligation to Decide Parole Applications on an Individualized Basis.

The Complaint alleges that the new standards have the "purpose, and effect, of making it all but impossible for Afghan beneficiaries to be granted this benefit." Compl. ¶ 179; *see also* ¶¶ 55-60. The categorical nature of the new standards violates the legislative and administrative constraints on the discretion to grant or deny parole applications. By causing its adjudicators to deny parole to Afghan applicants on a blanket basis, USCIS has breached (1) its statutory obligation to make parole decisions "only on a case-by-case basis," 8 U.S.C. § 1182(d)(5)(A), (2) its regulatory obligation to grant or deny parole only "after review of the individual case," 8 C.F.R. §212.5(c), and (3) its own Policy Manual, which requires adjudicators to act on the basis of "all relevant, specific facts and circumstances in an individual case, both favorable and unfavorable to the exercise of discretion." USCIS Policy Manual, Vol. 1, Ch. 9, §B.3; *see* Compl. ¶¶ 35, 55-57, 187. Count II's assertion that the new standards are "not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(A) are therefore plausibly alleged. Compl. ¶¶ 186-188.

### 3.    Count III States a Claim That USCIS Violated the Notice-And-Comment Requirements of the APA.

Count III also challenges a procedural default in the adoption of the new qualifications for Afghan parole applicants, asserting a separate claim for violation of the APA's "notice-and-comment" requirements. 5 U.S.C. § 553. It is supported by factual allegations that the new

standards are substantive (or "legislative") rules because they affect individual and administrative rights, duties, and obligations, Compl. ¶¶ 189-192, and that USCIS did not satisfy the notice-and-comment requirements before implementing the new standards for parole applications from Afghan nationals. *See, e.g. Amalkalani v. McAleenan*, 527 F. Supp. 3d 205, 221 (E.D.N.Y. 2021) ("If a rule alters the rights or obligations of regulated parties . . . it is legislative and therefore must be adopted via notice-and-comment rulemaking.").

### 4.    Count IV States A Claim For Unreasonable Delay.

Count IV alleges an APA claim for unreasonable delay. The statute requires agencies to act with "due regard for the convenience of the parties . . . and within a reasonable time," 5 U.S.C. §555(b), and it authorizes the federal courts to "compel agency action unreasonably delayed." 5 U.S.C. §706(1). Assessing whether the government has satisfied that statutory reasonableness standard is intensely fact-specific. To aid their assessment, courts in this Circuit have applied the five so-called "*TRAC*" factors: (1) "a 'rule of reason' governs the time agencies take to make decisions;" (2) "delays where human health and welfare are at stake are less tolerable than delays in the economic sphere;" (3) "consideration should be given to the effect of ordering agency action on agency activities of a competing or higher priority;" (4) "the court should consider the nature of the interests prejudiced by delay;" and (5) "the agency need not act improperly to hold that agency action has been unreasonably delayed." *Towns of Wellesley, Concord & Norwood v. Fed. Energy Regul. Comm'n*, 829 F.2d 275, 277 (1st Cir. 1987) (per curiam) (citing *Telecomms. Rsch. & Action Ctr. v. FCC* ("TRAC"), 750 F.2d 70, 79 (D.C. Cir. 1984)).

The Complaint alleges that, since at least September 2021, the pace of adjudications of Afghan parole applications has been unreasonably—indeed, unconscionably—slow. Before then, USCIS had "acted with reasonable dispatch to address Afghan humanitarian parole applications." Compl. ¶ 47. Then things changed. For at least two months, from early September to November

22

2021, USCIS stopped adjudicating Afghan parole applications altogether, even as it processed applications from other countries. *Id.* at ¶ 69. When adjudications resumed, they did so at a snail's pace. When this case was filed, USCIS had processed about 2,600 of the more than 45,000 parole applications it had received from Afghan nationals since July 2021. *Id.* at ¶ 71. At this rate, USCIS would finish processing those applications in more than seven years. *Id.* at ¶ 72.

If the *TRAC* factors are relevant at this stage, they uniformly favor a finding of unreasonable delay. Although there is an "economic" component to the delays—USCIS charges $575 per application, and thus has collected millions of dollars from the 45,000 Afghan applicants whose cases mostly remain unadjudicated, Compl. ¶¶ 38, 71, 75—this is overwhelmingly a situation "where human health and welfare are at stake." *Town of Wellesley*, 829 F.2d at 277. The Complaint describes, in detail, the imminent risks to health and welfare faced by Afghan parole applicants in general, and the Plaintiffs in particular: the surveillance, the lurking presence of Taliban agents and informers, the hideouts, the limbo endured in third countries, the threats, the raids, the arrests, the physical attacks, and even the murders. Compl. ¶¶ 27, 80, 84-89, 95-96, 106-111, 114-118, 126, 128, 131, 137-139, 146-149, 152, 155, 158, 161, 170.

The "nature of the interests prejudiced by the delay," *Town of Wellesley*, 829 F.2d at 277, are as significant as life-and-death. The government, meanwhile, has no visible, legitimate interest in delay, and no "competing or higher priority," *id.*, than effecting a potentially safe passage for thousands of Afghans who faithfully served this country's interests. Indeed, with respect to the Afghans rescued by the American evacuation in the summer of 2021, the U.S. acted with alacrity, paroling more than 70,000 of the airlifted Afghans immediately upon their arrival in this country. Compl. ¶ 28. Thus, whether due to "improper" motives or bureaucratic inertia, Plaintiffs assert a viable claim that the government has improperly delayed action on their applications.

23

### C.    The Government's Rule 12(b)(6) Arguments Are Misplaced.

In addition to being unfaithful to *Atieh*'s holding that APA claims generally cannot be dismissed based solely on the allegations of a complaint, the government's Rule 12(b)(6) arguments are not even faithful to the allegations of the actual Complaint in this case.

### 1.    The "Policy" Claims.

The government attempts to rebut Plaintiffs' allegations concerning USCIS's new parole standards, Compl. ¶¶ 53-67, by asserting *as fact* that "there was no new standard." Mot. at 17. With respect to every allegation that USCIS adopted, implemented, and administered new standards for Afghan parole applicants, the government—vividly illustrating why *Atieh* warned against deciding APA cases based on "sheer speculation" about what the administrative record might show, 727 F.3d at 77—simply says, in effect, "No, we didn't." *See* Mot. 17-20.

Indeed, far from making legal arguments that accept the allegations as true, the government goes so far as to contend that "Plaintiffs fail to *credibly* allege any new policy." Mot. at 17 (emphasis added). This is at odds with the government's tacit acknowledgement that, for Afghans, the humanitarian parole application process has been decimated. If the beneficiary is still in Afghanistan, the government concedes that the application will not be considered; if the beneficiary has escaped Afghanistan, the government concedes that it may treat the application as non-urgent. Either way, the Afghan is out of luck. The government frames this state of affairs not as a programmatic change but rather as a change in factual circumstances that applies, across the board, to every Afghan applicant on earth. This is wordplay, not argument, and at this stage of the lawsuit it is completely unsupported by evidence.

With respect to subsidiary facts, the government's approach is no better. For example, Plaintiffs have alleged that they and many others like them relied—tactically, logistically, and financially—on the government's public assurance that humanitarian parole was a legal pathway

to safety for Afghans. Compl. ¶¶ 41-46, 49-51. Plaintiffs have not asserted a standalone reliance claim, but these allegations may support various APA claims, including because they indicate that USCIS failed to consider an important aspect of the problem when implementing new standards, and shed light on the reasonableness of Government's delay in processing the Plaintiffs' parole applications. Again, the government simply insists that "Plaintiffs' claim of a 'reliance interest' in alleged prior parole standards is *not credible*." Mot. at 20 (emphasis added).

Even in cases not controlled by *Atieh*, "credibility determinations are not appropriate at the motion to dismiss stage." *Armstrong v. White Winston Select Asset Funds, LLC*, No. 16-10666, 2020 WL 10316643, at *1 (D. Mass. Mar. 23, 2020) (D. Mass. Mar. 23, 2020). Nor can Rule 12(b)(6) "be used to challenge just certain allegations within a claim," *Reed v. Hammond*, No. C16-5993, 2020 WL 133191, at *4 (W.D. Wash. Jan. 13, 2020), such as Plaintiffs' claims about reliance. They are especially inappropriate when made not based on the administrative record, or on any record evidence, but instead on bare argument. *Gooley v. Mobil Oil Co.*, 851 F.2d 513, 515 n.2 (1st Cir. 1988) ("[R]epresentations in a brief are an impuissant surrogate for a record showing.").

### 2.    The "Delay" Claim.

Because it turns on the issue of "reasonableness," and is subject to a multi-factor analysis, *Town of Wellesley*, 829 F.2d at 277, the unreasonable delay claim asserted in Count IV is the most fact-intensive of all. It is unsuited to resolution now, not only for the reasons stated in *Atieh*, but also in light of decisions holding more specifically that, at this stage, a court "need not consider whether the agency delay . . . is unreasonable" because "such a fact-specific inquiry at this stage would be premature." *Moghaddam v. Pompeo,* 424 F. Supp. 3d 104, 117 (D.D.C. 2020); *see also Mondragon Tinoco v. Mayorkas*, No. 20-cv-4787, 2021 WL 3603373, at *10 (N.D. Ga. Aug. 13,

2021) (holding that it was premature to address *TRAC* factors on a motion to dismiss because "the Court has insufficient information with which to evaluate these factors").[8]

### 3. The "Foreign Affairs Exception"

The government contends that Count III, alleging violation of the APA's notice-and-comment requirements, should be dismissed under "the 'foreign affairs' exception" of 5 U.S.C. § 553(a)(1). Mot. at 23. Courts have recognized, in the immigration context, the "dangers of an expansive reading" of this exception. *City of New York v. Permanent Mission of India*, 618 F.3d 172, 202 (2d Cir. 2010). The foreign affairs exception should therefore be "narrowly construed" and "reluctantly countenanced," *New Jersey Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980), and the burden is "on the agency to establish that notice and comment need not be provided." *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 113-14 (2d Cir. 2018).

Courts have developed tests for assessing the question. Under one test, the government must show that engaging in notice and comment will "provoke definitely undesirable international consequences." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021) (citation omitted). This test is satisfied only by "explain[ing] the detrimental effects of compliance with the APA's requirements." *Id.* A second, narrower "heartland" test is limited to "cases in which a rule itself directly involves the conduct of foreign affairs," such as "rule[s] implement[ing] an international agreement between the United States and another sovereign state." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 54 (D.D.C. 2020).

---

[8] Although *King v. Off. For Civ. Rts. Of U.S. Dep't of Health and Human Servs.*, 573 F. Supp. 2d 425 (D. Mass. 2008) applied the TRAC factors at the motion to dismiss stage, it was decided five years before Atieh and can no longer be considered good law. Cases from the D.C. Circuit, *see, e.g. Brezinski v. U.S. Dep't of Homeland Sec.*, No. 21-376, 2021 WL 4191958, at *4 (D.D.C. Sept. 15, 2021), are similarly inapposite because that circuit does not follow *Atieh. See Asante v. Azar*, 436 F. Supp. 3d 215, 222 n.2 (D.D.C. 2020) (declining to apply *Atieh* because courts in the D.C. Circuit "regularly review motions to dismiss APA actions under the plausibility standard").

The government has satisfied neither test here. Nothing in the motion to dismiss explains—much less demonstrates, with evidence—how complying with the notice-and-comment procedures, and leaving the "old" standards for parole in place in the interim, could have provoked negative international consequences. The need for prompt implementation, and the potential consequences of delay, might have been demonstrable if the new standards had been intended to *speed up* the pace of adjudications, and to ensure that *more* Afghan applicants would obtain relief through the parole mechanism. But the new standards had exactly the opposite purpose and effect.

## CONCLUSION

For the foregoing reasons, the Court should deny Government's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

Respectfully submitted,

/s/ Susan M. Finegan
Susan M. Finegan (BBO #559156)
Susan J. Cohen (BBO #553353)
John F. Quill (BBO #632216)
Andrew H. DeVoogd (BBO #670203)
Andrew N. Nathanson (BBO #548684)
Kenneth P. Monroe (BBO #696381)
Michael P. Molstad (BBO #707524)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
   AND POPEO, P.C.
One Financial Center
Boston, MA 02111
617-542-6000
SMFinegan@mintz.com

27

Matthew R. Segal (BBO #654489)
Adriana Lafaille (BBO #680210)
Areeba Jibril*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
617-482-3170
ALafaille@aclum.org

*Licensed to Practice in California.

Dated:  July 18, 2022

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

DATED: July 18, 2022

/s/ Susan M. Finegan
Susan M. Finegan

28