UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | * | |
| RASUL ROE, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 22-cv-10808-ADB |
| ALEJANDRO MAYORKAS, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |
| | * | |

**<u>MEMORANDUM AND ORDER</u>**

Plaintiffs bring the instant suit challenging action taken by U.S. Citizenship and

Immigration Services ("USCIS"), the U.S. Department of Homeland Security ("DHS"), and the

U.S. Department of State ("DOS") (collectively, "Defendants") under the Administrative

Procedure Act ("APA") and seeking declaratory, injunctive, and mandamus relief.  [ECF No. 1

("Compl.")].  Specifically, Plaintiffs argue that Defendants' change in policy with regard to the

humanitarian parole of Afghan nationals after August 2021 (1) was arbitrary and capricious; (2)

was contrary to law and agency rules; (3) done without the required notice-and-comment period;

and (4) unreasonably delayed or unlawfully withheld adjudication of applications.  [Id. ¶¶ 176

97].

Plaintiffs have twice moved for Defendants to expedite production of the administrative

record, [ECF Nos. 25, 47], and Defendants have moved to dismiss the complaint for lack of

jurisdiction and for failure to state a claim, [ECF No. 40].  For the following reasons, the motion

to dismiss, [ECF No. 40], is <u>GRANTED</u> in part and <u>DENIED</u> in part, and the motions to

expedite, [ECF Nos. 25, 47], are also <u>GRANTED</u> in part and <u>DENIED</u> in part.

I.    **BACKGROUND**

The following facts are taken primarily from the complaint.  As it may on a motion to

dismiss, the Court has also considered "documents incorporated by reference in [the complaint],

matters of public record, and other matters susceptible to judicial notice."  Giragosian v. Ryan,

547 F.3d 59, 65 (1st Cir. 2008) (alteration in original) (quoting Colonial Mortg. Bankers Corp. v.

Lopez-Stubbe, 324 F.3d 12, 20 (1st Cir. 2003)).

A.    **Factual and Legislative Background**

The case centers around the United States' withdrawal from Afghanistan on August 30,

2021, following 20 years of intervention.  See [Compl. ¶ 23].  As international troops departed

the country, the Afghan government collapsed and, by August 15, 2021, Taliban forces had taken

over the country.  [Id. ¶ 24].  With the Taliban suddenly in control, Afghans who had worked

with the U.S. armed forces, and those who had served in military or other government functions

in the U.S.-backed Afghan government, and their families, were in immediate danger.  [Id. ¶ 25].

In the immediate aftermath of its withdrawal, the U.S. evacuated more than 100,000 Afghan

nationals from the country.  [Id. ¶ 28].

On August 23, 2021, Secretary of Homeland Security Alejandro Mayorkas authorized

U.S. Customs and Border Patrol ("CBP"), an agency of DHS, to parole many of these vulnerable

Afghans into the United States under 8 U.S.C. § 1182(d)(5) on a case-by-case basis.  [Compl.

¶ 28].  CBP paroled approximately 70,000 Afghans from U.S. military bases and other sites

around the world into the United States under this directive.  [Id.].  Nevertheless, thousands of

U.S.-allied and other at-risk Afghans were left behind.  [Id. ¶ 29].  Many made it to airports but

could not board flights; others believed trying to reach the airport would be too dangerous and

instead went into hiding.  [Id.].  In the weeks that followed, tens of thousands of vulnerable

Afghans sought help from USCIS through applications for a form of relief called humanitarian parole.  [Id. ¶ 31].

The Immigration and Nationality Act ("INA") sets forth conditions under which a foreign national may be admitted to and remain in the United States.  See 8 U.S.C. § 1101 et seq.  As relevant here, it states that "[t]he Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States[.]"  Id. § 1182(d)(5)(A).  Unlike other forms of relief geared towards seeking entry into the U.S., humanitarian parole does not have rigid eligibility constraints.  [Compl. ¶¶ 34  35].

Humanitarian parole can be granted by different DHS sub-agencies.  [Compl. ¶¶ 34  36].  For example, CBP can grant humanitarian parole to those arriving in person at U.S. ports of entry.  [Id. ¶ 36].  Alternatively, applications for humanitarian parole made on behalf of noncitizens who are outside the United States are processed and adjudicated by USCIS, which was the process used by Plaintiffs.  [Id.].

A noncitizen may self-petition for humanitarian parole by filing with USCIS a Form I-131 Application for Travel Document and a Form I-134 Affidavit of Support from a sponsor who is willing to provide financial support if needed, or any person can apply on behalf of a noncitizen who is overseas.  [Compl. ¶ 38].  USCIS charges an application fee of $575 for every application for humanitarian parole; if multiple adults and children from a single family apply for humanitarian parole, they must each pay the $575 fee.  [Id.].  A grant of humanitarian parole allows noncitizens to enter the United States temporarily, often for one year, during which they may apply for asylum or other immigration benefits, if eligible.  [Id. ¶ 37].

At USCIS, humanitarian parole applications are adjudicated by the agency's Humanitarian Affairs Branch.  [Compl. ¶ 39].  Before the events of August 2021, the office had a small number of adjudicators who processed fewer than 2,000 applications per year on behalf of noncitizens from all over the world.  [Id.].  Applications were typically processed within 90 days of receipt, [Id.], with approximately 500 to 700 applications being approved each year   an approval rate of 25  35%.  [Id.].  Denials are not subject to appeal.  [Id. ¶ 40].

**B.      Humanitarian Parole of Afghans Following Withdrawal**

At a "listening session" hosted by DHS on August 25, 2021, USCIS solicited feedback from over 200 legal service providers and others on effective and efficient ways to process Afghan applications and identified humanitarian parole as among the legal pathways for those fleeing Afghanistan.  [Compl. ¶ 41].  Further, USCIS published a website providing "Information for Afghan Nationals on Parole Into the United States," which instructed that "[i]ndividuals who are outside of the United States may request parole into the United States based on urgent humanitarian or significant public benefit reasons for a temporary period, on a case-by-case basis."  [Id. ¶¶ 42  43].  The website instructed applicants to "[w]rite 'Afghanistan Humanitarian Parole' on the mailing envelope," and "[f]or expedited processing, write the word EXPEDITE in the top right corner of the application in black ink."  [Id. ¶ 44 (alterations in original)].  It told applicants without passports to provide "available identity documentation and an explanation of why they do not have an Afghan passport."  [Id.].  The website further explained that "beneficiaries . . . may need to arrange travel to a U.S. embassy outside of Afghanistan to continue processing their parole request."  [Id. ¶ 45 (alteration in original)].  On August 26, 2021, USCIS also modified its general humanitarian parole webpage by adding a banner that directed Afghan nationals to the agency's new Afghan-specific humanitarian parole webpage.  [Id. ¶ 46].

4

Plaintiffs contend that USCIS approved, or at least conditionally approved, "most if not all" Afghan humanitarian parole applications adjudicated during the initial period following withdrawal.  [Compl. ¶ 47].  As the applications from Afghans increased dramatically, however, Plaintiffs allege that the office was overwhelmed, causing USCIS to pause adjudications for approximately two months, from approximately September to November 2021.  [Id. ¶¶ 49, 52].  It was at this point, Plaintiffs contend, that USCIS abandoned the existing standards for qualifying for humanitarian parole and adopted new ones.  [Id. ¶ 54].

### C.   Alleged Change in Standards and Deviations from the Humanitarian Parole Statute and Agency Rules

According to Plaintiffs, the new standards were implemented to ensure that the majority of Afghan humanitarian parole applications would be denied.  [Compl. ¶¶ 54  55].

First, Plaintiffs contend, "USCIS decided that, as a rule, it would not issue approvals or conditional approvals for noncitizens who were still in Afghanistan."  [Compl. ¶ 55 (emphasis omitted)].  Instead, it issued only "(1) denials, or (2) letters administratively closing an application until such time as USCIS was notified that the beneficiary had left Afghanistan."  [Id.].  The explanation for this change was the sudden absence of a U.S. consulate in Afghanistan.  [Id.].

Second, Plaintiffs allege that USCIS also instructed its adjudicators to only grant applications filed on behalf of persons who had already left Afghanistan "in extreme cases in which beneficiaries faced either imminent harm in the country in which they were present or an imminent risk of being returned to Afghanistan."  [Compl. ¶ 56].

These standards applied retroactively to thousands of already-pending humanitarian parole applications, including those filed by the Plaintiffs.  [Compl. ¶ 57].  USCIS even withdrew approvals or conditional approvals that it had previously granted, contending that they

required re-review under the new criteria.  [Id. ¶ 58].  Plaintiffs, however, were not notified of this change.  [Id. ¶ 59].

Altogether, Plaintiffs allege these new standards meant that those who had already fled Afghanistan would have a reduced chance of receiving humanitarian parole, while those who remained would have no chance of receiving humanitarian parole.  [Compl. ¶ 59].

Plaintiffs allege these policy changes violate the "humanitarian parole statute [which] provides that the agency will make parole decisions 'only on a case-by-case basis'" and a provision requiring individualized review in the USCIS Policy Manual ("Policy Manual"). [Compl. ¶ 187 (quoting 8 U.S.C. § 1182(d)(5)(A)); id. ¶ 188].

Along with this change in criteria for the consideration of applications, Plaintiffs contend that USCIS strayed from its rules and policies regarding requests for additional evidence and issuing denials.  [Compl. ¶ 60].  The Policy Manual, which USCIS requires its adjudicators to follow, instructs adjudicators that where an application "does not establish eligibility for the benefit sought[,]" the officer should issue a Request for Evidence ("RFE") or Notice of Intent to Deny ("NOID") requesting such evidence unless the officer determines that "there is no legal basis for the benefit request and no possibility that additional information or explanation will establish a legal basis for approval."  [Id. ¶ 62 (emphasis omitted) (quoting USCIS, Policy Manual E(6) § F(3), https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-6 (last visited Apr. 28, 2023))].  The Policy Manual, however, also states that "USCIS has the discretion to deny a benefit request without issuing an RFE or NOID."  Policy Manual, E(6) § F.

But, when it came to Afghan applications for humanitarian parole, USCIS instructed adjudicators that they could disregard this Policy directive regarding RFEs and NOIDs, which has resulted in humanitarian parole applications being denied without RFEs or NOIDs issuing

even where the possibility of additional evidence for eligibility may have existed — including the

applications of some Plaintiffs in this case.  [Compl. ¶¶ 64–65].

> Further, regarding denials, the Policy Manual states:
>
> If, after evaluating all evidence submitted (including in response to a[n] [RFE] or
> [NOID], if applicable), the officer determines the requestor is ineligible for the
> benefit sought, the officer denies the benefit request.  Upon denial of a request, the
> officer updates all relevant electronic systems and issues a written decision
> informing the requestor of the reason(s) for denial.

Policy Manual,  E(9) § B; see also [Compl. ¶ 66].  The complaint alleges that Defendants also

deviated from this rule with regard to applications from Afghans, instead providing only a

"boilerplate denial letter" that listed several categories of evidence and provided applicants no

explanation for denial other than "[i]n your case, USCIS did not find sufficient evidence of the

nature noted above to establish eligibility for parole."  [Compl. ¶ 67 (alteration in original)].

> Finally, Plaintiffs allege that USCIS began processing all Afghan humanitarian parole

applications in unreasonable, protracted amounts of time, particularly when compared to the

applications filed on behalf of nationals from other countries.  [Compl. ¶¶ 68–69].  Plaintiffs

assert that prior to August 2021, USCIS's Humanitarian Affairs Branch, would typically process

applications within 90 days.  [Id. ¶ 39].  The complaint contends that, of the more than 45,000

Afghan humanitarian parole applications it has received since July 2021, USCIS has processed

only about 2,600.  [Id. ¶ 71].  Many of these unprocessed applications had been filed more than

eight months before Plaintiffs filed their Complaint.  [Id. ¶ 6].  By comparison, Plaintiffs point to

the agency's adjudication of humanitarian parole process for Ukrainian applicants, where USCIS

processed over 6,000 applications within the first three weeks of the new process being

implemented.  [Id. ¶ 79].

**D.     The Plaintiffs**

The Plaintiffs  are Afghan nationals and their U.S.-based relatives who sought

humanitarian parole in the late summer and fall 2021. [Compl. ¶ 81]. Each requested expedited

treatment of their application.  [Id.].  Some of the original Plaintiffs have been voluntarily

dismissed from the action.[2]  The remaining Plaintiffs as described in the complaint include:

- Plaintiff Malik Moe is a U.S. citizen living in Massachusetts who filed
  humanitarian parole applications on September 24, 2021 for ███████████
  ██████████ Marwa, one of only about 250 female judges in Afghanistan whose
  docket included terrorism cases against Taliban members; Malia, ███████████
  and Medina, ████████  [Compl. ¶¶ 9  10, 105  09].  USCIS has not responded to
  their applications, but Defendants assert  and Plaintiffs do not dispute    that
  USCIS did issue an RFE to Malik Moe for each beneficiary on November 10,
  2022, after the complaint was filed. [ECF No. 55 at 12].

- Plaintiffs Nahid Noe, Naser Noe, Nabi Noe, and Naji Noe are a family of Afghan
  nationals ██████████████████████████████ who self-petitioned to
  USCIS for humanitarian parole on August 31, 2021, but whose applications were
  denied on February 14, 2022. [Compl. ¶¶ 11, 120, 130, 133].  USCIS never asked
  for additional evidence or information in the form of an RFE or NOID before
  denying their applications. [Id. ¶ 133].  At the time of the complaint, they were in
  ████████████████████████████████████ [Id. ¶¶ 11, 140  41].
  Nahid is ██████████████ and trailblazer in Afghan ██████████ who faced
  hostility and threats from people who opposed women holding positions of power,
  while Naser was ██████████████████ and vocal Taliban critic. [Id. ¶¶ 122  24].
  They and ████████████████████ have faced harassment and threats by the
  Taliban. [Id. ¶¶ 128  31, 138  39].

- Plaintiffs Baddar and Basel Boe are ████████ who worked as ██████████
  supporting U.S. troops in Afghanistan. [Id. ¶ 142].  Basel, a lawful permanent
  resident living in Massachusetts, applied for humanitarian parole on September
  10, 2021 for ████████ Badi and Bahar, and ████████ Barakat and Baharat.
  [Id. ¶¶ 13, 143].  On September 14, 2021, Baddar, a U.S. citizen living in New



---

Before the case was reassigned to this session of the Court, Judge Mark L. Wolf granted
Plaintiffs' unopposed motion to proceed under pseudonyms.  See [ECF No. 17].

[2] While these motions were pending, the Court granted motions from Plaintiffs to dismiss the
following five Plaintiffs: Rabi Roe, Rafi Roe, Rasul Roe, Rena Roe, and Permaz Doe. [ECF
Nos. 64, 65].  The "Roe" beneficiaries have been granted parole and have arrived in the U.S., but
Plaintiffs do not concede that approval of their applications occurred "in the normal course."
[ECF No. 62 at 4 n.4 (quoting ECF No. 55 at 25)].

Hampshire, petitioned for ███████████ Baktash, ████████████ Benesh, and ████████████████ Basim, Basir, and Burhan. [Id. ¶¶ 12, 143]. The ████████████ Badi, served as a ██████████████ for the Afghan Government and as a ████████████ alongside the U.S. Military for more than twenty years and became "a prominent figure across Afghanistan" for his high-profile work. [Id. ¶ 144]. Baktash also worked on projects funded by ████████ ████████████████ [Id. ¶ 145]. The Boe family has experienced several threats to their lives due to their association with the U.S. armed forces and their work against the Taliban. See [id. ¶¶ 146  52]. The Boe applications were pending at the time the complaint was filed, but the applications filed by Basel Boe were eventually denied by USCIS on May 27, 2022, and those filed by Baddar Boe were denied on July 7, 2022. [Id. ¶ 154; ECF No. 55 at 12]. They filed administrative motions for reconsideration, which remain pending before USCIS. [ECF No. 55 at 12].

- Plaintiff Diana Doe is a U.S. citizen living in Massachusetts who petitioned for humanitarian parole for Amir Doe and his family  Afsoon, Aazar, Abdul, Afshaneh, Ali, and Alima Doe  "all close friends of her family," on August 23, 2021. [Id. ¶¶ 15  16, 157]. They are all Afghan nationals who have fled to ████████████████████████████████████████ [Id. ¶¶ 16, 170]. Amir was in the Afghan army and ██████████████████████████ ████████ [Id. ¶ 158]. USCIS denied their applications on December 3, 2021 using a template denial letter and without having issued an RFE or an NOID. [Id. ¶ 169].

Plaintiffs allege that, in seeking humanitarian parole from USCIS, they "relied on the existence on a process that would be open and fair." [Compl. ¶ 77]. They did not know that USCIS would "cease treating their applications as urgent and decline to take action for months, or that, if the agency finally did act, it would be under new standards rolled out while their applications were pending" and that those standards would automatically deny applications from any Afghans still in the country and would consider Afghans who fled in only extreme circumstances. [Id. ¶ 81 (emphasis omitted)]. The complaint claims that Plaintiffs and other applicants and beneficiaries paid a total of more than 20 million dollars in application fees and waited for decisions while in hiding from the Taliban or in other countries where they have no long-term prospects. [Id. ¶ 181].

### E.    Procedural Background

Plaintiffs brought the instant action against Alejandro N. Mayorkas, Ur M. Jaddou, and Antony J. Blinken, all named in their official capacities as, respectively, Secretary of Homeland Security, Director of USCIS, and Secretary of State.  [Compl. ¶¶ 18  20].  The complaint asserts four counts under the APA: arbitrary and capricious agency action, 5 U.S.C. § 706(2)(A) (Count I), [id. ¶¶ 176  84]; failure to comply with law and agency rules, 5 U.S.C. § 706(2)(A) (Count II), [id. ¶¶ 185  88]; failure to comply with notice-and-comment requirements, 5 U.S.C. § 553 (Count III), [id. ¶¶ 189  93]; and agency action unlawfully withheld and/or unreasonably delayed, 5 U.S.C. § 706, (Count IV), [id. ¶¶ 194  97].

Counts V and VI seek mandamus relief that would compel USCIS to process the still-pending applications and a declaratory judgment from the Court regarding USCIS's unlawful actions.  [Compl. ¶¶ 198  203].  Plaintiffs also ask the Court to set aside the heightened adjudication standard for Afghan humanitarian parole applications, to vacate each of the denials and remand each matter with an order to promptly and properly re-adjudicate the applications, and to order the Defendants to promptly adjudicate each of the unadjudicated humanitarian parole applications.  [Id. at 36  37].

Plaintiffs moved for expedited production of the administrative record, [ECF No. 25], and shortly thereafter, without producing the record, Defendants moved to dismiss for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), [ECF No. 40], which Plaintiffs have opposed, [ECF No. 44].  Defendants filed a reply, [ECF No. 45], and a hearing was held before the Court on August 2, 2022, see [ECF No. 46; ECF No. 57 (Hearing Transcript)].  While the motions were still pending, Plaintiffs filed a renewed motion to compel expedited production of

the administrative record.  [ECF No. 47].  The Government opposed, [ECF No. 55], and

Plaintiffs replied, [ECF No. 62].

## II.        MOTION TO DISMISS

Defendants have moved to dismiss the complaint on several grounds.  They first argue

that the Court lacks jurisdiction because Defendants' parole decisions as well as the pace of

those parole decisions have been committed to agency discretion under 8 U.S.C.

§ 1182(d)(5)(A), and Congress has precluded judicial review of those decisions and actions

under 8 U.S.C. § 1252(a)(2)(B)(ii) and 5 U.S.C. § 701(a)(1)  (2).  [ECF No. 41 at 2, 9  15].

Then, even assuming *arguendo* that this Court may exercise jurisdiction over the claims,

Defendants contend that Plaintiffs have failed to state a claim under the APA because (1)

Plaintiffs' allegations of "new standards" applied by Defendants to parole decisions merely

describe existing standards, not new ones, and thus raise no legal claim; (2) intermediate steps

are not "final" agency action and are thus unreviewable, 5 U.S.C. §§ 701(a)(2), 704; and (3) the

alleged delay is not unreasonable.[3]  See [id.].

---

[3] Defendants also allege that certain Plaintiffs lack standing, but since Defendants concede that a
group of Plaintiffs do have standing, the Court currently does not need to determine whether
each of the Plaintiffs have standing.  See Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 976
(1st Cir. 1989) ("Where coplaintiffs have a shared stake in the litigation   close identity of
interests and a joint objective   the finding that one has standing to sue renders it superfluous to
adjudicate the other plaintiffs' standing." (citing Watt v. Energy Action Educ. Found., 454 U.S.
151, 160 (1981)) (further citation omitted)); Davis v. Grimes, 9 F. Supp. 3d 12, 24 n.12 (D.
Mass. 2014) ("Plaintiff Thompson may no longer have standing, as he was granted an
unrestricted Class A license on October 3, 2013.  However, because the other individual
plaintiffs have standing, Thompson's lack of standing is not an issue." (citing Montalvo-Huertas,
885 F.2d at 976)); J.D. v. Azar, 925 F.3d 1291, 1323  24 (D.C. Cir. 2019) ("It is settled that in a
case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy,
Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and
standing.  In that event, it is immaterial that other plaintiffs might be unable to demonstrate their
own standing." (first citing Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 53
n.2 (2006); and then citing Bowsher v. Synar, 478 U.S. 714, 721 (1986)) (further citation
omitted)).

Plaintiffs respond that there is no statutory bar to the Court's review of their claims and that Defendants' 12(b)(6) arguments are generally misplaced, but that they have nevertheless sufficiently pled their allegations for relief under the APA to survive the motion to dismiss stage. [ECF No. 44].  Given that many of Defendants' 12(b)(1) and 12(b)(6) arguments raise the same basic question   whether Plaintiffs' claims are amenable to APA review   and require the Court to consider the very existence and scope of the DHS policies challenged by Plaintiffs, the Court reviews them in tandem.[4]

**A.    Jurisdiction**

1.    <u>Legal Standard</u>

"A district court generally has the obligation, when there is any question, to confirm that it has subject matter jurisdiction prior to considering the merits of the underlying controversy." <u>Sinapi v. R.I. Bd. of Bar Exam'rs</u>, 910 F.3d 544, 549 (1st Cir. 2018) (citation omitted).  When evaluating a motion to dismiss pursuant to Rule 12(b)(1) at the pleading stage, granting such a motion "is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." <u>Muniz-Rivera v. United States</u>, 326 F.3d 8, 11 (1st Cir. 2013) (citation omitted).  "When a district court considers a 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." <u>Merlonghi v. United States</u>, 620 F.3d 50, 54 (1st Cir. 2010) (citation omitted).  "In deciding the question, [the Court] may consider whatever evidence has been submitted in the case." <u>Acosta-Ramírez v. Banco Popular de P.R.</u>, 712 F.3d 14, 18 (1st Cir. 2013) (citing <u>Aversa</u>

---

[4] The district court in <u>R.I.L-R v. Johnson</u>, 80 F. Supp. 3d 164, 173 (D.D.C. 2015), observed the same conundrum: "[a]lthough the Court would ordinarily ensure its jurisdiction before turning to the merits, it is confronted here with an underlying factual issue common to both endeavors   namely, the very existence and nature of the DHS policy challenged by Plaintiffs."

v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)) (further citation omitted).  "While the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion," and attaching exhibits to a Rule 12(b)(1) motion does not convert it to a motion for summary judgment.  Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002).

        2.   Discussion

Plaintiffs claim federal jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 1361 (mandamus), [Compl. ¶ 21], and raise claims under the APA, [id. ¶¶ 176  97], which "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702), here, the INA.  Section 701(a) of the APA, however, prohibits judicial review where "statutes preclude judicial review" or where "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(1)  (2).  Defendants assert that both provisions of § 701(a) apply here to bar review. [ECF No. 41 at 2  3].

Section 1252(a)(2)(B)(ii) of the INA, which governs review of DHS's authority to grant humanitarian parole, provides that "no court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security[.]"  8 U.S.C. § 1252(a)(2)(B)(ii).

Section 1182(d)(5)(A) of the INA grants the Attorney General the authority to "in his discretion parole into the United States temporarily under such conditions as he may prescribe

only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States[.]"  8 U.S.C. § 1182(d)(5)(A).

There is a long-standing "presumption favoring judicial review of administrative action" that "can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." Guerrero-Lasprilla v. Barr, 140 S. Ct. 1062, 1069 (2020) (citations omitted).  The Supreme Court has emphasized that it has "consistently applied" this presumption "to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction[,]" including 8 U.S.C. § 1252(a)(2)(B)(ii).  Kucana v. Holder, 558 U.S. 233, 251 (2010) (citations omitted).

Defendants assert that § 1252(a)(2)(B)(ii), read in combination with § 701(a)(1), and § 701(a)(2) bar all possible challenges regarding parole decisions made under § 1182(d)(5)(A). See [ECF No. 41 at 9  12].  Plaintiffs respond that while § 1252(a)(2)(B)(ii) precludes direct challenges to determinations made on individual petitions, see, e.g., Bernardo ex rel. M & K Eng'g, Inc. v. Johnson, 814 F.3d 481, 484, 486 (1st Cir. 2016) (concluding that a decision to revoke a visa petition approval is subject to the Secretary of Homeland Security's discretion pursuant to § 1252(a)(2)(B)(ii) and is therefore not subject to judicial review), it does not strip the Court of jurisdiction to hear challenges to the policies and practices governing humanitarian parole.  See [ECF No. 44 at 17  26].  Additionally, Plaintiffs assert that the exception to reviewability in § 701(a)(2) for agency action "committed to agency discretion by law" does not apply because "the humanitarian parole statute, USCIS's internal Policy Manual . . . , and the standards applied by USCIS" establish "meaningful standard[s] against which to judge the agency's exercise of discretion[.]"  [Id. at 24  25 (citations omitted)].

14

Beginning with § 1252(a)(2)(B)(ii): several courts have agreed with Plaintiffs' interpretation.  "While § 1252(a)(2)(B)(ii) undoubtedly bars judicial review of individual parole decisions, courts have declined to apply it to claims challenging the legality of policies and processes governing discretionary decisions under the INA."  Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 135 (D.D.C. 2018).  In Zadvydas v. Davis, 533 U.S. 678 (2001), for example, the Supreme Court held that § 1252(a)(2)(B)(ii) did not strip federal courts of jurisdiction over claims challenging the extent of the Attorney General's authority to detain a noncitizen indefinitely while they were awaiting removal from the United States because the extent of that authority was non-discretionary.  Id. at 688; see also Damus v. Nielsen, 313 F. Supp. 3d 317, 327  28 (D.D.C. 2018) (holding that claims that are not asking the Court "to review the propriety of any given parole decision, but, instead, 'simply seek compliance with certain minimum procedural safeguards when parole decisions are made' . . . do not fall within the jurisdictional bar of 1252(a)"); Abdi v. Duke, 280 F. Supp. 3d 373, 384 (W.D.N.Y. 2017) (noting that "the ultimate decision regarding parole . . . would plainly fall outside [the] Court's jurisdiction[,]" but "[the plaintiffs] are asking that this Court ensure that [the defendants] comply with certain policies and procedures in making that parole decision   issues that are beyond the jurisdictional bar of § 1252(a)(2)(B)(ii)") (subsequent history omitted); R.F.M. v. Nielsen, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019) ("The plaintiffs do not seek to litigate individual claims but rather a policy the agency uses to adjudicate those claims."); Doe 1 v. Mayorkas, 530 F. Supp. 3d 893, 904 (N.D. Cal. 2021) (finding that § 1252(a)(2)(B)(ii) "applies to decisions made to individual applications" and was not applicable to a "challenge of immigration policy" (emphasis omitted)).

Additionally, courts have found that DHS's discretionary power over the outcome of adjudications does not extend to whether it may suspend adjudications altogether.  See [ECF No.

15

44 at 23].  For example, in the context of 8 U.S.C. § 1157(c)(1), which has permissive language

similar to § 1182(d)(5)(A), <u>see</u> 8 U.S.C. § 1157(c)(1) (the "Attorney General *may*, in the

Attorney General's *discretion* . . . admit any refugee" who fits several criteria (emphasis added)),

a court found that "the Secretary may have discretion over what the decision will be, but not over

whether a decision will be made."  <u>Doe v. Trump</u>, 288 F. Supp. 3d 1045, 1072 (W.D. Wash.

2017) (citing 5 U.S.C. § 555(b)) (subsequent history omitted).  As such, courts have held that

§ 1252(a)(2)(B)(ii) does not bar review of DHS's "failure to act."  <u>Id.</u> at 1071  72; <u>see also</u> <u>Zhou</u>

<u>v. FBI</u>, No. 07-cv-00238, 2008 WL 2413896, at *4 (D.N.H. June 12, 2008) (joining the

"majority of district courts in the First Circuit that have considered the issue" to hold that delay

is not a discretionary decision within the meaning of § 1252(a)(2)(B)(ii), as related to 8 U.S.C.

§ 1255(a), which states that "[t]he status of an alien . . . *may* be adjusted by the Attorney General,

*in his discretion* and under such regulations as he may prescribe" (emphasis added)); <u>Abdi v.</u>

<u>Chertoff</u>, 589 F. Supp. 2d 120, 121 (D. Mass. 2008) (applying reasoning from <u>Tang v. Chertoff</u>,

493 F. Supp. 2d 148 (D. Mass. 2007), to find that "the jurisdiction-stripping language in the INA

only bars review of the 'substance of an adjustment of status decisions,' leaving the 'pacing of

such a decision' subject to judicial review").

      Plaintiffs have been clear that they are not seeking review of their individual parole

determination or asking the Court to grant their parole.  <u>See</u> [ECF No. 44 at 11 ("Plaintiffs do not

claim a right to be paroled, but instead a right to be subjected to lawful procedures when seeking

parole.  In other words, Plaintiffs recognize that [APA] challenges are appropriately focused on

procedures, not outcomes." (emphasis omitted))].  Rather, they are challenging changes in policy

and the Defendants' failure to adjudicate applications, as violative of the APA, § 1182(d)(5)(A),

and USCIS's own Policy Manual, and seeking to ensure compliance with certain minimum

procedural safeguards when parole decisions are made.  See, e.g., Aracely, R., 319 F. Supp. 3d at

136; Duke, 280 F. Supp. 3d at 384.

Defendants respond that Plaintiffs have failed to identify any policy change, that the

parole decisions were made in conformity with the regulations and procedures that pre-existed

September 2021, and that Plaintiffs have done nothing more than "recast" their claims as a

pattern or practice challenge in order to "perform an end-run around" the jurisdictional bar.

[ECF No. 45 at 10  11, 16].  Additionally, Defendants argue Plaintiffs' unreasonable delay

claims are unreviewable because "DHS is not required by § 1182(d)(5)(A) to accept applications

at all   much less adjudicate them   [and therefore] § 1182(d)(5)(A) cannot be read to contain an

implicit 'reasonable time' limitation to act under 5 U.S.C. § 555(b)."  [ECF No. 41 at 14  15].

After considering the arguments put forth by both sides and reviewing the relevant cases,

statutes, guidance, and regulations, the Court agrees with Plaintiffs that § 1252(a)(2)(B)(ii) does

not bar all judicial review of agency action taken under § 1182(d)(5)(A).  Moreover, for the

reasons discussed further below, the Court finds that Plaintiffs have adequately pled policy

claims reviewable under the APA with regard to Defendants' adjudication of in-country Afghan

applications for humanitarian parole following September 2021 as well as with regard to the

unreasonable delay in adjudicating such applications.

As to § 701(a)(2): this "exception to the presumption of reviewability is 'quite

narrow[].'"  Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17  18 (1st Cir. 2020)

(alteration in original) (quoting Dep't of Com. v. New York, 139 S. Ct. 2551, 2568 (2019)); see

also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 370 (2018) ("The few

cases in which we have applied the § 701(a)(2) exception involved agency decisions that courts

have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum

appropriation, or a decision not to reconsider a final action . . . ." (internal citations omitted)).  It applies, as pertinent here, "when the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion[.]'"  Wheeler, 954 F.3d at 17 (quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)).  "[J]udicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes."  Steenholdt v. FAA, 314 F.3d 633, 638 (D.C. Cir. 2003) (citation and internal quotation marks omitted); see also Haoud v. Ashcroft, 350 F.3d 201, 206 (1st Cir. 2003) (holding the Board of Immigration Appeals' "own regulation provides more than enough 'law' by which a court could review the Board's decision").

    Defendants aver that Plaintiffs have failed to identify a "rule or 'statute[]'" that provides the requisite "meaningful standards" to guide the Court's review.  [ECF No. 45 at 9 (citing ECF No. 44 at 24  25) (further citation omitted)].  They dispute Plaintiffs' contention that "'the humanitarian parole statute, USCIS's internal Policy Manual,' and the 'new' standards that allegedly apply to Afghan parole applications" provide these standards, based on their reading of Amanullah v. Nelson, 811 F.2d 1 (1st Cir. 1987), which found that "authority in § 1182(d)(5) [is] 'close to plenary,'" and because the Policy Manual does not specifically require the issuance of RFEs or NOIDs.  [Id. (quoting Amanullah, 811 F.2d at 6) (further citation omitted)].

    Since Amanullah, the Supreme Court has recognized, albeit in dicta, that in the context of parole, DHS's "authority is not unbounded," given that "DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'"  Biden v. Texas, 142 S. Ct. 2528, 2543 (2022) (citation omitted).  Further, the Supreme Court explained that "under the APA, DHS's exercise of discretion within that statutory framework *must be reasonable and reasonably explained*."  Id. at 2543  44 (emphasis added)

(citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983)).

Another district court recently cited to this discussion in Biden v. Texas in support of its finding

that § 701(a)(2) did not bar judicial review of agency action taken pursuant to § 1182(d)(5)(A)

because "the statutes provide guidelines for DHS's parole authority such that there is a

meaningful standard for this Court's review."  Brnovich v. Biden, No. 21-cv-01568, 2022 WL

4448322, at *8 (D. Ariz. Sept. 23, 2022); see also Florida. v. United States, No. 21-cv-01066,

2022 WL 2431414, at *9 (N.D. Fla. May 4, 2022) (finding that § 701(a)(2) did not bar judicial

review of agency action, and noting that while "Congress's failure to define 'urgent humanitarian

reasons' or 'significant public benefit' in § 1182(d)(5)(A) gives [Defendants] discretion to fill in

the gaps[,] . . . Defendants [also] do not have unfettered discretion to define those terms however

they choose; rather, the interpretation must be reasonable" (citation omitted)).  The Court

similarly finds that the guidelines in § 1182(d)(5)(A) provide sufficient guidance such that the

Defendants' actions are not unreviewable under the narrow exception articulated in § 701(a)(2).

Accordingly, the Court finds that Defendants have not presented clear and convincing

evidence that Congress intended to foreclose judicial review of Plaintiffs' claims.  As such, the

Court finds that, at this stage of the litigation, it has jurisdiction.  As it must, the Court will

continue to evaluate its own jurisdiction as the case proceeds.  See Sexual Minorities Uganda v.

Lively, 254 F. Supp. 3d 262, 271 (D. Mass. 2017) ("The ruling that the complaint passed muster

under Fed. R. Civ. P. 12, however, 'd[id] not obviate the district court's continuing obligation to

ensure its own jurisdiction as the case proceed[ed] to discovery.'" (alterations in original)

(quoting Mastafa v. Chevron Corp., 770 F.3d 170, 187 (2d Cir. 2014))), aff'd in part, appeal

dismissed in part, 899 F.3d 24 (1st Cir. 2018).[5]

### B.    Failure to State a Claim

#### 1.    Legal Standard

Generally, the Court reviews motions to dismiss under a plausibility standard.  See Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Under the Federal Rules of Civil Procedure,

"a complaint must provide 'a short and plain statement of the claim showing that the pleader is

entitled to relief.'"  Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015)

(quoting Fed. R. Civ. P. 8(a)(2)).  This pleading standard requires "more than labels and

conclusions," Twombly, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (citation omitted).  Rather, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly,

---

[5] "Rule 12(b)(1) motions challenging subject-matter jurisdiction are divided into two categories:
facial challenges and factual challenges."  Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth., 4
F.4th 63, 69 (1st Cir. 2021) (citation omitted).  Facial challenges "accept[] the plaintiff's version
of jurisdictionally-significant facts as true and address[] their sufficiency, thus requiring the court
to assess whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction."
Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001) (citations omitted).

Factual challenges, on the other hand, "controvert[] the accuracy (rather than the sufficiency) of
the jurisdictional facts asserted by the plaintiff[.]"  Valentin, 254 F.3d at 363.  In the case of
factual challenges, "the plaintiff's jurisdictional averments are entitled to no presumptive
weight[,] [and] the court must address the merits of the jurisdictional claim by resolving the
factual disputes between the parties.  In conducting this inquiry, the court enjoys broad authority
to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to
determine its own jurisdiction."  Id. (citations omitted).  That said, where "the jurisdictional
facts, though genuinely disputed, are inextricably intertwined with the merits of the case . . . the
court may defer resolution of the jurisdictional issue until the time of trial."  Id. at 363 n.3
(citations omitted).

To the extent Defendants challenge the accuracy rather than sufficiency of Plaintiffs' allegations
related to the existence of new standards, and thereby bring a factual challenge, the Court finds
that these jurisdictional facts are "inextricably intertwined" with the merits of the case, and
therefore declines to evaluate these issues at this stage of the litigation.

550 U.S. at 570).

When evaluating the sufficiency of a complaint, the Court "first must 'distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Cardigan Mountain Sch., 787 F.3d at 84 (quoting García Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)) (further internal quotation marks omitted). "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." García Catalán, 734 F.3d at 103 (internal quotation marks and citation omitted). In conducting this analysis, the Court must accept all well-pled facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

The First Circuit instructs, however, that "the plausibility standard does not apply to a complaint for judicial review of final agency action" because "[t]he focal point of APA review is the existing administrative record." Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013) (citation omitted).

> Allowing the allegations of a complaint to become the focal point of judicial review introduces an unnecessary and inevitably unproductive step into the process. The relevant inquiry is and must remain not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision.

Id. at 76 (citation omitted); see also United States v. P.R. Indus. Dev. Co., 368 F. Supp. 3d 326, 338 (D.P.R. 2019) ("The relevant inquiry is whether the administrative record sufficiently supports the agency's decision." (internal quotation marks and citations omitted)), aff'd, 18 F.4th 370 (1st Cir. 2021). Atieh, however, did make clear that this would not apply to cases "where the agency claims that the underlying premise of the complaint is legally flawed (rather than

factually unsupported)."[6] <u>Atieh</u>, 727 F.3d at 76 n.4 (citing <u>Li v. Kerry</u>, 710 F.3d 995, 1000  01 (9th Cir. 2013)).

Plaintiffs argue <u>Atieh</u> bars review of its claims at this stage, without the benefit of the administrative record.  [ECF No. 44 at 27  28].  Defendants insist that <u>Atieh</u> does not apply because they challenge the legal adequacy of Plaintiffs' counts    *i.e.*, whether Plaintiffs have identified a regulatory or statutory authority with which Defendants have not complied, <u>see, e.g.</u>, <u>Li</u>, 710 F.3d at 1000  01 (concluding that plaintiffs failed to state a claim under the APA against USCIS alleging violations of several statutory and regulatory provisions where those provisions did not actually impose the procedural requirements suggested by plaintiffs)    rather than the plausibility or accuracy of Plaintiffs' factual assertions.  [ECF No. 45 at 13  14].  Further, Defendants contend that <u>Atieh</u> does not apply to Plaintiffs' unreasonable delay claim because in the context of agency inaction or delay, "there is no record to review."  [<u>Id.</u> at 20 (first citing <u>Atieh</u>, 727 F.3d 73; and then citing <u>Dastagir v. Blinken</u>, 557 F. Supp. 3d 160, 164 n.5 (D.D.C. 2021))].  Here, to the extent that Defendants' arguments raise issues that may be appropriately considered using the 12(b)(6) plausibility standard, those claims will be reviewed under that standard.

　　　　2.　　<u>Discussion</u>

　　　　　　a.　　Governing Principles

Judicial review of an APA claim "is narrow" because "the APA standard affords great deference to agency decisionmaking and because the [agency's] action is presumed valid . . . ."

---

[6] By contrast, courts in the D.C. Circuit do not suggest that the plausibility standard is inappropriate in APA cases and "regularly review motions to dismiss APA actions under the plausibility standard."  <u>Asante v. Azar</u>, 436 F. Supp. 3d 215, 222 n.2 (D.D.C. 2020) (citation omitted).

Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) (citations omitted).

Under this deferential standard of review, a court may set aside an administrative action only if

that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law[.]"  5 U.S.C. § 706(2)(A).

When an agency decision is challenged as being "arbitrary and capricious[,]" the agency

decision must reflect that the agency "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal quotation marks and

citation omitted).  In the context of a policy change, "the requirement that an agency provide

reasoned explanation for its action would ordinarily demand that it display awareness that

it *is* changing position.  An agency may not, for example, depart from a prior policy *sub

silentio* or simply disregard rules that are still on the books."  FCC v. Fox Television Stations,

Inc., 556 U.S. 502, 515 (2009) (citing United States v. Nixon, 418 U.S. 683, 696 (1974)); see

also Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) ("Agencies are free to change

their existing policies as long as they provide a reasoned explanation for the change." (citations

omitted)).

> [T]he agency need not always provide a more detailed justification than what would
> suffice for a new policy created on a blank slate. Sometimes it must   when, for
> example, its new policy rests upon factual findings that contradict those which
> underlay its prior policy; or when its prior policy has engendered serious reliance
> interests that must be taken into account.

Fox Television Stations, 556 U.S. at 515 (citing Smiley v. Citibank (S.D.), N.A., 517 U.S. 735,

742 (1996)).

Further, "[i]t is well established that an agency acts arbitrarily . . . when it does not follow

its own procedures."  Bos. Dist. Council of Carpenters v. U.S. Dep't of Hous. & Urb. Dev., No.

93-cv-10439, 1993 WL 131445, at *2 (D. Mass. Apr. 13, 1993) (citing United States ex rel.

Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954)); see also Torres v. U.S. Dep't of Homeland

Sec., No. 17-cv-01840, 2017 WL 4340385, at *5  6 (S.D. Cal. Sept. 29, 2017) (holding that

"[the] failure [of Defendants, DHS, USCIS, U.S. Immigration and Customs Enforcement, and

CBP] to follow the termination procedures set forth in the [DACA Standard Operating

Procedures] is arbitrary, capricious, and an abuse of discretion" because "[w]hile Defendants are

granted broad discretion to commence, adjudicate, and execute removal orders, a fundamental

principle of federal law is that a federal agency must follow its own procedures" (citations

omitted)); see also Andriasian v. INS, 180 F.3d 1033, 1046 (9th Cir. 1999) ("It is the failure to

abide by its own regulations that renders the [Board of Immigration Appeals'] decision 'contrary

to law' and therefore an abuse of discretion." (internal citation omitted)).

> b.      Counts I and II

Plaintiffs have alleged that the new standards for Afghan applicants for humanitarian

parole implemented by Defendants are unlawful under the APA because they are arbitrary and

capricious in that they reflect policy changes that were made and applied without "publicly

announcing" them or "providing a reasoned basis" for them.  [Compl. ¶ 180].  Plaintiffs further

assert that these new standards were based, at least in part, on "impermissible considerations[,]"

including "the desire for a standard that would lead to more denials, and the desire to deter more

applicants."  [Id. ¶ 181].  Additionally, Plaintiffs allege that these policies violate the

humanitarian parole statute and the USCIS's own policies.  [Id. ¶¶ 187  88].  Defendants respond

that Plaintiffs have failed to identify any new standard that constitutes a "discrete final agency

action" susceptible to APA review, or any statute, regulation, or policy, violated by the purported

new policy.  [ECF No. 41 at 18  21; ECF No. ECF No. 45 at 11  12, 17  18].  Further, in

Defendants' view, even assuming Plaintiffs have alleged such a standard, the Court should

evaluate it under the deferential "facially legitimate and bona fide" test rather than the APA's arbitrary and capricious, or abuse of discretion, standard, and they contend that any new standard would easily pass this test.  [ECF No. 41 at 16  17; ECF No. 45 at 14  15].

"Failure to allege a written policy is not fatal[,] . . . since agency action need not be in writing to be judicially reviewable as a final action."  Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec., No. 21-cv-10083, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022) (internal quotation marks and citation omitted); see also R.I.L-R, 80 F. Supp. 3d at 184 ("A contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" (quoting Grand Canyon Tr. v. Pub. Serv. Co., 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003))).  "But to sufficiently allege such an action, Plaintiffs must still point to a 'specific "final agency action" [that] has an actual or immediately threatened effect.'"  Greater Bos. Legal Servs., 2022 WL 138629, at *7 (alteration in original) (citation omitted); see also R.I.L-R, 80 F. Supp. 3d at 174  76 (determining that plaintiffs had shown a reviewable unwritten "DHS policy direct[ing] ICE officers to consider deterrence of mass migration as a factor in their custody determinations").  "To assess whether the Complaint shows an unwritten policy, the Court turns to the Complaint's pattern allegations."  Al Otro Lado, Inc. v. Nielsen, 327 F. Supp. 3d 1284, 1320 (S.D. Cal. 2018).

Plaintiffs identify three "new" post-September 2021 policies that they seek to challenge as unlawful.  [Compl. ¶¶ 54  67].  The first is that Defendants decided to deny or administratively close applications for all beneficiaries remaining in Afghanistan.  [Id. ¶ 55].  Defendants do not dispute that this change occurred.  Instead, they aver that "Plaintiffs are incorrect in ascribing agency actions to an Afghan-averse change in agency policy rather than material and obvious changes in the facts on the ground in Afghanistan."  [ECF No. 41 at 19].  The key change which

Defendants state factored into the individual adjudications was the closure of the U.S. Embassy
in Kabul and the resulting suspension of in-country visa services.  To explain why this change
impacted the adjudication of Afghan applications, Defendants point to regulations that require
that approved or conditionally approved applicants receive a document which must be issued by
the nearest embassy and which authorizes travel to the United States.  See 8 C.F.R. § 212.5(f).[7]
Because the Embassy in Kabul was no longer an option, Defendants say this "narrowed the
circumstances in which" Afghan applicants could satisfy this procedural requirement.  [ECF No.
41 at 19].  Plaintiffs, however, allege that the processing of in-country Afghan applications was
continuing even after the embassy closed, seemingly suggesting that the closure of the embassy
is a pretext for the policy change.  [Compl. ¶ 55].  The Court finds that Defendants are
fundamentally challenging Plaintiffs' characterization of why Afghan parole applications were
not being granted in the fall of 2021, which is precisely the type of dispute that Atieh warned is
not suited to resolution without the administrative record.

　　　　Defendants also argue that even if Plaintiffs have alleged a new policy, they still fail to
state a claim because, as a matter of law, there is nothing unlawful about the policy where
Plaintiffs cannot point to a standard Defendants are required to follow.  [ECF No. 45 at 15  18].
In point of fact, however, as discussed above, Plaintiffs do assert that "the agency has substituted
case-by-case adjudication for a categorical rule refusing to approve Afghan humanitarian parole

---

[7] When a humanitarian parole application is conditionally approved, USCIS provides notice of
the decision to a U.S. Embassy or consulate, typically that closest to the beneficiary's residence.
[ECF No. 41 at 4 (citation omitted)].  The conditionally approved applicant must then complete a
Form DS-160 and appear for an appointment with a DOS consular section to verify their identity
and collect biometric data.  [Id. (citation omitted)].  Once the applicant has successfully
navigated this screening process, the U.S. consulate issues travel documents to the beneficiaries,
which does not guarantee parole but does permit them to travel to the United States to be
processed by CBP, who may then parole them and, if paroled, issue documentation regarding the
length of parole period.  [Id. (citation omitted)].

applications for Afghan nationals located in Afghanistan" "[i]n contravention of the requirements set forth in the [humanitarian parole] statute and [the agency's] Policy Manual." [Compl. ¶¶ 187  88].  Specifically, Plaintiffs assert that this policy violates the requirement in § 1182(d)(5)(A) that parole decisions are made "only on a case-by-case basis[,]" [id. ¶ 188]; see also [ECF No. 44 at 30 (same)], and the Policy Manual's requirement that "adjudicators to act on the basis of 'all relevant, specific facts and circumstances in an individual case, both favorable and unfavorable to the exercise of discretion[,]'" [ECF No. 44 at 30 (quoting Policy Manual, 1(9) § B.3) (further citation omitted)].[8]

Defendants liken these to the "vague standards" that the Ninth Circuit found could not serve as the basis for an APA claim in Li.  [ECF No. 45 at 13]; see Li, 710 F.3d at 1001 ("Plaintiffs essentially ask us to hold that USCIS could be acting arbitrarily and capriciously by failing to create a system, or complying with vague standards, not required by law.  We decline their invitation, and we hold that Plaintiffs failed to state a claim against USCIS." (citations omitted)).  The Court disagrees.  In Li, the plaintiffs sought to impose certain affirmative obligations on USCIS beyond those imposed on the agency by law, which are enumerated and "carefully circumscribed[.]"  710 F.3d at 1001.  Here, Plaintiffs do not seek to expand Defendants' obligations; rather they allege that where Defendants have denied or closed essentially all in-country Afghan applications, after so recently approving almost all such

---

[8] Plaintiffs assert that this categorical policy also violates the agency's "regulatory obligation to grant or deny parole only 'after review of the individual case[.]'"  [ECF No. 44 at 30 (quoting 8 C.F.R. § 212.5(c))].  Defendant responds that this regulation applies to "all other arriving aliens, except those detained under § 235.3(b) or (c) of this chapter and paragraph (b) of this section" and Plaintiffs are not "arriving aliens" as defined by 8 C.F.R. § 1.2.  [ECF No. 45 at 17  18].  Because the Court finds that, although a close call, Plaintiffs have adequately alleged a new policy that violates statutory obligations and the agency's own policy manual, it need not address this argument.

applications, see [Compl. ¶ 47], they have not engaged in the required individualized review, and therefore have violated the obligation to do so as set forth in both § 1182(d)(5)(A) and the Policy Manual; see also Damus, 313 F. Supp. 3d at 341 ("In light of the drastic decline in parole-grant rates at the five ICE Field Offices, and the affidavits by the named Plaintiffs and their counsel regarding the processing of their parole applications, this Court finds that the asylum-seekers are able to demonstrate that individualized parole determinations are likely no longer par for the course. The Court therefore finds that Plaintiffs have demonstrated a likelihood of success on the merits of their [ADA] claim that Defendants are not abiding by their own policies and procedures.").

Finally, Defendants assert, again assuming Plaintiffs have alleged a new policy, that the Court's review is subject to an even more deferential standard than that articulated in the APA that is, whether the policy is "facially legitimate and bona fide."  [ECF No. 41 at 16  17; ECF No. 45 at 14  15].  Defendants aver that any new policy would easily pass this low bar.  Plaintiffs respond that the "facially legitimate and bona fide" standard only supplants typical APA review in the context of evaluating "agency prerogatives to decide outcomes and the nature of certain constitutional rights."  [ECF No. 44 at 26].

In reviewing individual denials of parole in Amanullah, the First Circuit declined to apply the APA's abuse of discretion standard and utilized the "facially legitimate and bona fide" standard.  811 F.2d at 10  11.  Although the First Circuit was reviewing individual parole decisions, its explanation for relying on this standard seemed to implicate not only individual decisions but overarching policies as well.  It found that given "the plenary sweep of Congress's power to make policies and rules for the exclusion of aliens[,]" "when 'the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will

neither look behind the exercise of that discretion, nor test it . . . .'" Id. at 10 (second alteration in original) (first citing Kleindienst v. Mandel, 408 U.S. 753, 765  67 (1972); then quoting id. at 770).  That said, as noted above, more recently the Supreme Court has recognized that DHS's "authority is not unbounded[,]" and "under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained."  Texas, 142 S. Ct. at 2543  44 (citing Motor Vehicle Mfrs. Ass'n, 463 U.S. 29).  The Court finds that, at least as to overarching policies like those that Plaintiffs challenge here, the APA's arbitrary and capricious standard applies.

In sum, as to Plaintiffs' alleged policy of categorically denying or administratively closing applications for all beneficiaries remaining in Afghanistan, the Court finds that Plaintiffs have sufficiently alleged a "particularized agency action . . . 'by which rights or obligations have been determined, or from which legal consequences will flow.'"  R.I.L-R, 80 F. Supp. 3d at 184 (quoting Bennett v. Spear, 520 U.S. 154, 177  78 (1997)); see also Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 139 (D.D.C. 2018) ("Plaintiffs allege that Defendants took specific, discrete steps when evaluating their parole status and that those steps have harmed them.  The rejections of Plaintiffs' parole requests   purportedly upon consideration of an improper factor   are agency actions that have actual or immediately threatened effects . . . The Court concludes that Defendants' alleged deterrence policy is susceptible to APA review as a 'final agency action.'"); Manker v. Spencer, No. 18-cv-00372, 2019 WL 5846828, at *11  13 (D. Conn. Nov. 7, 2019) (holding that plaintiffs adequately alleged discrete agency action, as opposed to an impermissibly "broad programmatic attack" where "[e]ach individual member of the certified class of discharged Navy or Marine Corps veterans . . . claim[ed] that the [agency] wrongfully failed to consider or comply with specified statutorily or regulatory factors, with the result" that their

29

applications were "impermissibly denied").  Defendants have failed to identify any "legal flaw[s]" in Plaintiffs' claims as to this policy, and Defendants' challenges to the plausibility of Plaintiffs' factual assertions are not amendable to review without the administrative record.[9]

Plaintiffs' other policy claims, however, are unsuccessful.  Plaintiffs allege that Defendants adopted a policy that would grant humanitarian parole applications from Afghan beneficiaries located outside of Afghanistan only in "extreme cases[.]"  [Compl. ¶ 56].  Plaintiffs have not, however, alleged any facts that would differentiate this standard from the standard authorized by § 1182(d)(5)(A).  First, § 1182(d)(5)(A) grants the authority to consider an applicant for parole based on "urgent humanitarian reasons or significant public benefit[,]" which the statute does not define and leaves to the discretion of the agency.  Leaving for another country may well reduce the urgency of an individual's application so that such an application will only be granted in "extreme cases."  Additionally, unlike the alleged policy to deny or administratively close all in-country Afghan applications, discussed above, this policy does not appear to conflict with statutory or Policy Manual mandates requiring consideration of applications on an individual basis.

Plaintiffs further allege that "USCIS unlawfully decided to amend or ignore the provision of its Policy Manual that requires issuing an RFE or NOID before denying any application for which 'additional evidence could demonstrate eligibility for an immigration benefit.'"  [Compl. ¶ 182]; see also [id. ¶¶ 60  67].  But, neither the plain language of the Policy Manual, nor the

---

[9] Plaintiffs also assert that Defendants failed to provide a "reasoned basis" for the change in policy because Defendants failed to consider Plaintiffs' "reliance interests" on the previous standards.  [Compl. ¶ 180  81].  Defendants argue that Plaintiffs have failed to adequately allege any "reliance interest[.]"  [ECF No. 41 at 21].  Because the Court finds that Plaintiffs have sufficiently alleged their claims independent of any reliance interests, the Court will not address this argument.

regulations which it implements, *requires* officers to issue RFEs or NOIDs.  See, e.g., Policy

Manual, E(6) § F ("Under the regulations, USCIS has the discretion to issue [RFEs] and

[NOIDs] for immigration benefit requests in appropriate circumstances.  USCIS also has the

discretion in some instances to issue a denial without first issuing an RFE or a NOID." (internal

citation omitted)); see also Alvarez Sosa v. Barr, 369 F. Supp. 3d 492, 505 (E.D.N.Y. 2019)

("[I]t is clear from the plain language of [8 C.F.R. § 103.2(b)(8)] that USCIS is not required to

send an RFE or NOID . . . .").  The Policy Manual does state that if:

> the evidence in the record does not establish eligibility for the benefit sought, the
> officer *should* issue an RFE or NOID requesting such evidence unless the officer
> determines that there is no legal basis for the benefit request and no possibility that
> additional information or explanation will establish a legal basis for approval.

Policy Manual, E(6) § F(3) (emphasis added).  The Court finds that this provision, which states

that adjudicators "should" rather than "must" issue RFEs or NOIDs, is insufficient to create a

binding policy which could serve as the basis for an APA violation. [0]  See Beshir v. Holder, 10

F. Supp. 3d 165, 180 (D.D.C. 2014) (finding a USCIS memorandum was a "nonbinding policy

statement" rather than a "binding rule or regulation," in part because "the text [did] not use

mandatory language, 'such as "will" and "must,"' but instead use[d] the word 'should'" (quoting

Wilderness Soc'y v. Norton, 434 F.3d 584, 595 (D.C. Cir. 2006))).  Moreover, Plaintiffs concede

that adjudicators have issued RFEs to Afghan humanitarian parole applicants in limited

circumstances.  [Compl. ¶ 65].

Plaintiffs also aver that USCIS's issuance of "boilerplate" denial letters, rather than

letters detailing individualized reasons for denial, violates the Policy Manual's requirement that

---

[0] Defendants also argue that the issuance of an RFE or NOID is not a final agency action
reviewable under § 704 of the APA.  [ECF No. 41 at 14].  Because the Court separately finds
that Plaintiffs have failed to adequately allege claims related to an alleged RFE/NOID policy, it
need not reach this issue.

an adjudicator "issues a written decision informing the requestor of the reason(s) for denial."

[Compl. ¶¶ 66  67 (citation omitted)].  The Court disagrees.  The complaint includes the

following description of one such letter:

> The denial was a form letter stating, "USCIS generally offers parole based on protection needs only when USCIS finds that the beneficiary is at risk of severe targeted or individualized harm in the country where the beneficiary is located or is at risk of imminent return to a country where the beneficiary would be harmed." USCIS listed certain categories of evidence, including "[d]ocumentation from a credible third-party source specifically naming the beneficiary," "a USCIS grant of a protection-based immigration benefit such as asylum, refugee, or special immigrant status to an immediate family member," "[e]vidence of the beneficiary's particular vulnerabilities," and "[e]vidence of the severity and imminence of the harm the beneficiary fears." Without individualized explanation, the letter stated that "USCIS did not find sufficient evidence of the nature noted above to establish eligibility for parole."

[Id. ¶¶ 134  35 (alterations in original)].  While Plaintiffs understandably would prefer more

"meaningful explanation[s] of . . . denial[s,]" [ECF No. 44 at 30], the Court finds that such letters

satisfy the Policy Manual's requirement that the adjudicator provide "reason(s) for denial."

### c.    Count III

Defendants also contend that even if the Court were to conclude that Plaintiffs have

adequately alleged the promulgation of new standards, their notice-and-comment claim should

be dismissed because the foreign affairs exception applies.  [ECF No. 41 at 22].  "In general, the

APA requires federal agencies to publish notice of proposed rules in the Federal Register and

then allow 'interested persons an opportunity to participate in the rule making through

submission of written data, views, or arguments with or without opportunity for oral

presentation.'"  E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 775 (9th Cir. 2018)

(quoting 5 U.S.C. § 553(c)).  "Under the foreign affairs exception, the APA's notice-and-

comment procedures do not apply 'to the extent that there is involved   a . . . foreign affairs

function of the United States.'"  Id. (alteration in original) (quoting 5 U.S.C. § 553(a)(1)).

Courts have specifically warned of the "dangers of an expansive reading of the foreign affairs exception" in the immigration context.  City of New York v. Permanent Mission of India to the United Nations, 618 F.3d 172, 202 (2d Cir. 2010) ("[I]t would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law."); Yassini v. Crosland, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980).  The First Circuit has not addressed the question of what test should be applied in evaluating the application of the foreign affairs exception.  The Ninth Circuit has held, in the immigration context, that "the foreign affairs exception applies . . . only when ordinary application of 'the public rulemaking provisions [will] provoke definitely undesirable international consequences.'"  E. Bay Sanctuary Covenant, 932 F.3d at 775  76 (second alteration in original) (quoting Yassini, 618 F.2d at 1360 n.4).  The Second Circuit has held that "a case-by-case determination . . . [of] 'definitely undesirable international consequences,' may well be necessary . . . [in] areas of law like immigration that only indirectly implicate international relations," but that "quintessential foreign affairs functions such as diplomatic relations and the regulation of foreign missions are different."  Permanent Mission of India, 618 F.3d at 202.  "Such actions clearly and directly involve a foreign affairs function, and so fall within the exception without a case-by-case iteration of specific undesirable consequences."  Id. (internal quotation marks and citation omitted); see also E.B. v. U.S. Dep't of State, 583 F. Supp. 3d 58, 65 (D.D.C. 2022) ("[T]he foreign affairs function exception covers heartland cases in which the rule itself directly involves the conduct of foreign affairs.").

Defendants concede that "pure immigration law rules" "only indirectly implicate international relations[.]"  [ECF No. 41 at 24 (alteration in original) (second excerpt quoting Permanent Mission of India, 618 F.3d at 202)].  Defendants also assert, however, that any alleged new standard involves the "suspension of operations and visa services at U.S. Embassy

Kabul," thereby implicating a "suspension of a quintessential foreign affairs function."  [Id.].
Again, assuming there was a change in policy, Defendants also aver that this change would have
occurred in the context of a "rapidly evolving security situation involving military operations,
efforts to assist as many employees, contractors, U.S. citizens and Afghan nationals as possible,
and under an impending deadline for withdrawal."  [Id.].  In support of this point, Defendants
cite to Plaintiffs' allegation that many people, both Afghans and U.S. Marines, were killed in the
process of the United States' withdrawal.  [Id. (citing Compl. ¶ 27)].

  The Court finds a showing of "undesirable international consequences" is not necessary
in this context.  There can be no doubt that the sudden withdrawal of U.S. troops from
Afghanistan was a matter of great international consequence or that the closure of the U.S.
Embassy implicated foreign diplomacy.  While, as noted above, the Court will not evaluate the
specific role the Embassy closure played in any change in policy without the administrative
record, the policy change cannot be divorced from this broader context.  Where, as here, actions
involve core foreign policy functions, the Court finds they "fall within the exception" without an
analysis of the "specific undesirable consequences."  Permanent Mission of India, 618 F.3d at
202.

d. Counts IV and V

  Finally, Plaintiffs allege that since at least September 2021, the pace of adjudications of
Afghan parole applications has been unreasonably slow.  "The APA requires courts to 'compel
agency action unlawfully withheld or unreasonably delayed' where the delayed agency action is
'legally required.'"  Chertoff, 589 F. Supp. 2d at 121 (citation omitted).  While Defendants insist
the delay claimed by Plaintiffs is not so "egregious" to warrant a writ of mandamus, [ECF No.

34

41 at 25],   Plaintiffs have alleged that adjudications are slower than they were prior to September 2021 and slower relative to the adjudication of applications from other countries. Resolving whether in fact this delay is "egregious" requires a fact-bound analysis that the Court declines to engage in at this early stage of the litigation.  See Towns of Wellesley, Concord, & Norwood v. Fed. Energy Regul. Comm'n, 829 F.2d 275, 277 (1st Cir. 1987) (citing Telecomms. Rsch. & Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC")); [2] see also Litvin v. Chertoff, 586 F. Supp. 2d 9, 12 (D. Mass. 2008) ("Plaintiff has presented facts that are not patently frivolous and tend to show that the government has delayed adjudication of Plaintiff's naturalization application for about two years and four months since Plaintiff's fingerprinting. The question of whether that delay is unreasonable goes to the merits of the case, not this court's jurisdiction, and is better addressed after Parties have engaged in discovery." (citation omitted)); Moghaddam v. Pompeo, 424 F. Supp. 3d 104, 117 (D.D.C. 2020) ("At the motion to dismiss stage, this Court need not consider whether the agency delay alleged here is unreasonable. Undergoing such a fact-specific inquiry at this stage would be premature." (citations omitted));

---

Defendants also assert that Plaintiffs' claims fail because Defendants do not have a nondiscretionary duty to adjudicate claims.  As discussed above, the Court finds that while Defendants have discretion over the outcome of parole decisions, they do not have the discretion to suspend adjudications altogether.

[12] Courts consider various factors in making this evaluation:

> [T]he Court of Appeals for the District of Columbia Circuit set out guidelines which are relevant to our determination whether [an agency's] delay in issuing a final order is so "egregious" as to warrant mandamus. In pertinent part, they provide that 1) a "rule of reason" governs the time agencies take to make decisions; 2) delays where human health and welfare are at stake are less tolerable than delays in the economic sphere; 3) consideration should be given to the effect of ordering agency action on agency activities of a competing or higher priority; 4) the court should consider the nature of the interests prejudiced by delay; and 5) the agency need not act improperly to hold that agency action has been unreasonably delayed.

Towns of Wellesley, Concord & Norwood, 829 F.2d at 277 (citing TRAC, 750 F.2d at 80).

cf. V.U.C. v. USCIS, 557 F. Supp. 3d 218, 224 (D. Mass. 2021) (holding that plaintiffs failed to

state an unreasonable delay claim where plaintiffs alleged the duration of the delay and nothing

more), appeal dismissed, No. 21-1778, 2022 WL 5028007 (1st Cir. June 14, 2022).

In summary, for the reasons discussed above, as to Counts I and II, the Court DENIES

Defendants' motion to dismiss, as related to the alleged new policy (1) denying or

administratively closing all parole applications for beneficiaries remaining in Afghanistan, and

GRANTS Defendants' motion to dismiss as to the alleged policies (2) granting humanitarian

applications from Afghan beneficiaries located outside of Afghanistan only in "extreme cases,"

and (3) refraining from issuing RFEs or NOIDs to Afghan applicants, and issuing form denial

letters.  Further, the Court GRANTS Defendants' motion to dismiss Count III and DENIES

Defendants' motion to dismiss Counts IV and V.  Finally, as to Count VI, seeking declaratory

relief, the Court DENIES in part and GRANTS in part Defendants' motion to dismiss, in line

with the Court's ruling on Plaintiffs' other claims. [3]

**III.   MOTIONS TO COMPEL EXPEDITED PRODUCTION OF THE RECORD**

District court judges have "broad discretion . . . to manage scheduling" according to the

---

[3] Defendants also assert that Secretary Blinken should be dismissed as a party because Plaintiffs
have not alleged that they have been injured by any policy change made by the DOS.  [ECF No.
41 at 9].  Plaintiffs remark only that:

> Plaintiffs defer to the Court regarding the continued participation of DOS in this
> litigation, noting that the government has pointed to DOS's role in the cases of
> those whom USCIS approves for humanitarian parole and implicitly cited DOS's
> closure of the embassy in Kabul as the reason for USCIS's decision to make grants
> and conditional grants of humanitarian parole unavailable to Afghans in
> Afghanistan.

[ECF No. 44 at 12  13 n.1 (citation omitted)].  Because Plaintiffs do not level specific allegations
against DOS and do not oppose dismissal, the Court will dismiss Secretary Blinken as a
defendant.

needs of a case.  Williams v. Monarch Mach. Tool Co., 26 F.3d 228, 230 (1st Cir. 1994). [4]

To obtain expedited discovery, a party must show good cause.  See Fed. R. Civ. P. 26(d)(1);

Momenta Pharms., Inc. v. Teva Pharms. Indus. Ltd., 765 F. Supp. 2d 87, 88 (D. Mass. 2011) ("In

order for a party to obtain expedited discovery . . . it must show good cause." (citing Fed. R. Civ.

P. 26(b)(1))).  "Good cause exists if the request for expedited discovery is 'reasonable[ ] . . . in

light of all of the surrounding circumstances,' including 'the purpose for the discovery, the

ability of the discovery to preclude demonstrated irreparable harm, the plaintiff's likelihood of

success on the merits, the burden of discovery on the defendant, and the degree of prematurity.'"

Jimenez v. Nielsen, 326 F.R.D. 357, 361 (D. Mass. 2018) (alterations in original) (citing

Momenta Pharms, 765 F. Supp. 2d at 89) (further citation omitted).

　　　　Plaintiffs request the Court to (1) order expedited production of the administrative record

within two weeks of an order on Defendants' motion to dismiss, and (2) order the Defendants to

provide an interim status update (or ongoing updates) to the Court, including an index and

description of the administrative record materials that they have compiled to date, and an

explanation of the scope of the material yet to be compiled.  [ECF No. 48 at 2, 10].

　　　　The Court finds, in considering all surrounding circumstances, that Plaintiffs have shown

there is good cause for expedited production of the administrative record.  Plaintiffs have

adequately alleged a risk of serious harm, and that expediated production will not unduly burden

Defendants, particularly since Defendants have been aware since last summer that the Court

---

 [4] In the context of APA claims, courts have exercised this discretion to compel government defendants to produce the administrative record on an expedited basis.  See, e.g., Saleh v. Pompeo, 393 F. Supp. 3d 172, 181 (E.D.N.Y. 2019) (affirming magistrate judge's recommendation, to which neither party objected, to expedite production of the administrative record within two weeks); Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Rsrv. Sys., 770 F. Supp. 2d 283, 289 (D.D.C. 2011) (granting motion for expedited production of the administrative record within two weeks).

would order production shortly after ruling on the motion to dismiss.  See [ECF No. 48 at 3 (citing ECF No. 50 at 7:7, 7:20  21, 12:10)].  The Court will therefore order expedited production of the administrative record relevant to Plaintiffs' remaining claims.

The Court orders the production of the complete, certified administrative record, within 21 days of this Order, as relevant to Plaintiffs' remaining claims, including Plaintiffs' individual humanitarian parole applications and records relevant to changes in the standards applied to applications from Afghan nationals remaining in Afghanistan and the pace of adjudications of Afghan humanitarian parole applications.

**IV.    CONCLUSION**

Accordingly, Defendants' motion to dismiss is DENIED in part and GRANTED in part, and Plaintiffs' motions for expedited production of the administrative record are DENIED in part and GRANTED in part.  Defendants are ORDERED to produce the administrative record expeditiously in accordance with this Order.  Secretary Blinken is also dismissed as a defendant.

**SO ORDERED.**

April 28, 2023                                      /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE