UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RASUL ROE, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
|  | * | Civil Action No. 22-cv-10808-ADB |
| ALEJANDRO MAYORKAS, *et al.*, | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

The Boe and Noe families ("Moving Plaintiffs") seek a preliminary injunction, "set[ting] aside" the United States Citizenship and Immigration Services' ("USCIS") alleged new "policy for adjudicating humanitarian parole applications of Afghan nationals, implemented in November 2021;" "restor[ing] . . . the adjudication standards in effect on August 31, 2021;" and "order[ing] the agency to adjudicate the parole applications of the Moving Plaintiffs under" the August 31, 2021 adjudication standards. [ECF No. 101 at 1]. For the foregoing reasons, the Moving Plaintiffs' motion for a preliminary injunction is <u>DENIED</u>.

## I.    BACKGROUND

This motion for a preliminary injunction arises from a particularly tumultuous time in recent Afghan history: the aftermath of the United States' withdrawal from the country on August 30, 2021.  [ECF No. 1 ("Compl.") ¶¶ 23–24].  As evacuation flights came to a halt, thousands of Afghans who were left behind, many of whom had served alongside American forces and been part of the American-backed Afghan government, sought help from USCIS through a form of relief called humanitarian parole ("HP").  [Id. ¶¶ 25, 31].  In the span of eight months, from July 2021 to April 2022, USCIS received over 45,600 parole applications for Afghan nationals, with approximately 75% of all requests pertaining to beneficiaries based in Afghanistan.  [USCIS-0745].

The Moving Plaintiffs[1] are Afghan nationals who sought HP in the late summer and fall of 2021 and their U.S.-based relatives.  [Compl. ¶ 81].  They allege that USCIS implemented a new policy in November 2021, "categorically prohibit[ing] the approval of *any* HP application, no matter how worthy of consideration and relief," for any Afghans remaining in Afghanistan.  [ECF No. 102 at 11].  Specifically, the Moving Plaintiffs argue that this purported new policy was contrary to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), in two ways.  First, it violated USCIS' obligation to make parole decisions on a "case-by-case" basis and considering "the totality of circumstances" by weighing positive and negative factors pursuant to 8 U.S.C. § 1182(d)(5)(A)'s statutory requirements and the agency's Policy Manual (Count II).  8 U.S.C. § 1182(d)(5)(A); USCIS Policy Manual Vol. 3, Part F, Chapter 1; USCIS Policy

---

[1] The Moving Plaintiffs are the Boe family (Basel Boe, Badi Boe, Bahar Boe, Barakat Boe, Baharak Boe, Baddar Boe, Baktash Boe, Benesh Boe, Basim Boe, Basir Boe, and Burhan Boe) and the Noe family (Nahid Noe, Naser Noe, Nabi Noe, and Naji Noe).

Manual Vol. 1, Part E, Chapter 8; see [ECF No. 102 at 5–6, 19]. Second, even if the purported new policy was in accordance with the law, it was "arbitrary and capricious" because USCIS did not adopt it through a reasoned decision-making process as required by the APA (Count I). [ECF No. 102 at 5–6, 20].

In response, Defendants assert that parole decisions are not subject to judicial review, and even if they were reviewable, the Moving Plaintiffs' parole petitions were in fact decided individually and therefore in accordance with statutory requirements. [2] [ECF No. 117 ("Opp'n") at 21–25]. Additionally, Defendants argue that even if a blanket policy of denying parole to beneficiaries in Afghanistan existed, such a policy would not have been arbitrary or capricious. [Opp'n at 24]. Because potential parolees in countries with no U.S. government representation, including Afghanistan, are rarely able to complete what is called consular processing,[3] USCIS was well within its authority to allocate its scarce resources "more effectively . . . on those able to complete the process" to secure HP. [Opp'n at 9, 21–22, 24].

---

[2] Defendants are Alejandro N. Mayorkas and Ur M. Jaddou, named in their official capacities as, respectively, Secretary of Homeland Security and Director of USCIS. [Compl. ¶¶ 18–20]. In an April 28, 2023 order on Defendants' motion to dismiss, [ECF No. 69 ("MTD Order")], the Court dismissed U.S. Secretary of State, Antony J. Blinken, as a Defendant, both in his individual and official capacity. [MTD Order at 36 n.13].

[3] Broadly speaking, once a parole request has been approved by USCIS, the agency sends "a parole authorization memo to the U.S. Embassy or Consulate closest to the beneficiary's residence to the Embassy or Consulate identified by the case petitioner with a brief summary of the parole request and of any derogatory case information." [USCIS-0063; see also USCIS-0048 to USCIS-0144 ("HAB Manual")]. The beneficiary then has to complete a Form DS-160 (Application for a Nonimmigrant Visa) and present before a consular office in order to verify their identity, have biometrics collected, and complete additional security vetting. [Id. at USCIS-0064]. If successfully completed, the beneficiary will be issued a boarding foil, allowing them to travel to the U.S. within 30 days of issuance. [Id.]. The Court understands that parole approval is conditioned on the completion of consular processing. See [ECF No. 75-1 ¶ 40 ("USCIS issues only conditional approvals prior to the conclusion of the State Department parole processing steps.")].

**A.    Factual Background**

**1. Statutory Background**

According to 8 U.S.C. § 1182(d)(5)(A), the Secretary of the Department of Homeland

Security ("DHS")

> may . . . in his discretion parole into the United States temporarily
> under such conditions as he may prescribe only on a <u>case-by-case</u>
> <u>basis</u> for <u>urgent humanitarian reasons</u> or <u>significant public benefit</u>
> any alien applying for admission to the United States, but such
> parole of such alien shall not be regarded as an admission of the
> alien and when the purposes of such parole shall, in the opinion of
> the [Secretary of Homeland Security], have been served the alien
> shall forthwith return or be returned to the custody from which he
> was paroled and thereafter his case shall continue to be dealt with
> in the same manner as that of any other applicant for admission to
> the United States.

8 U.S.C. § 1182(d)(5)(A) (emphasis added).[4]

If an applicant is outside of the United States, USCIS, through its Humanitarian Affairs

Branch ("HAB"),[5] processes and adjudicates HP applications.[6]  To initiate the application

process, either a non-citizen abroad may self-petition or someone else may apply for HP on

behalf of a non-citizen.  [Compl. ¶ 38].  In each scenario, the application requires the filing of a

Form I-131 Allocation for Travel Document.  [Id.].

---

[4] Defendants explain that "[a]lthough the statute refers to the Attorney General, in 2002, Congress transferred enforcement of immigration laws to the Secretary of Homeland Security ("Secretary") under the Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002)."  [Opp'n at 6 n.2].

[5] Defendants indicate that "HAB has [] been renamed Parole Operations due to an internal restructuring."  [Opp'n at 5 n.1].  For purposes of the instant motion, the Court will continue to refer to this entity as "HAB."

[6] HP may also be granted by other DHS sub-agencies such as Customs and Border Protection ("CBP"), which can grant HP in person at U.S. ports of entry.  [Compl. ¶ 36; ECF No. 102 at 6]. Moving Plaintiffs availed themselves of the USCIS avenue.

Once applications are submitted, USCIS must, by statute, make parole decisions on a case-by-case basis, requiring an individualized review of each application. 8 U.S.C. § 1182(d)(5)(A); [USCIS Policy Manual Vol. 3, Part F, Chapter 1 ("Parole decisions are discretionary determinations made on a case-by-case basis consistent with the INA"); see also USCIS Policy Manual Vol. 1, Part E, Chapter 8 ("To perform a discretionary analysis, officers must weigh all positive factors present in a particular case against any negative factors in the totality of the record.  The analysis must be comprehensive, specific to the case, and based on all relevant facts known at the time of adjudication."); HAB Manual at USCIS-0079 ("Parole decisions are made on a case-by-case basis, taking into account all factors and considering the totality of the circumstances.")].[7]

When reviewing HP requests, HAB officers apply a two-step analytical framework.[8] [2019 Training Module at USCIS-0369].  "First, [adjudicators] evaluate the evidence to

---

[7] When describing HAB's adjudication process, the parties rely on the HAB Procedures Manual, as revised in 2019 ("HAB Manual" (USCIS-0048 to USCIS-0144)), and the Parole Training Module, also as revised in 2019 ("2019 Training Module" (USCIS-0347 to USCIS-0422)).  The Court, accordingly, relies on the same documents.

[8] The HAB Manual provides that: "[w]hen making a decision on a parole request, officers should:

> • Review the file, including the Form I-131, . . . all supporting documentation provided, and the results of mandatory security checks;
> • Evaluate the evidence to determine the facts. Officers should understand the nature of the parole request and the immigration status of all parties to the case;
> • Considering the totality of the circumstances, apply the two-step parole analytical framework to the facts, analyzing: 1) factors relevant to urgent humanitarian reasons or significant public benefit and 2) factors relevant to discretion; and
> • Determine whether to approve the request for advance authorization of parole."

determine whether the beneficiary has urgent humanitarian reasons or if there is significant public benefit for his or her presence in the United States." [Id.]. Second, HAB officers "[a]nalyze factors relevant to discretion." [Id.].

HP applications may be based on various urgent humanitarian reasons including, as relevant here, protection-based parole requests.[9][10] "Parole requests based on protection . . . typically involve compelling fact patterns of individuals outside of the United States, who may genuinely be at risk of harm, even death, but for whom there may be no legal, timely, or accessible pathway to come to the United States." [2019 Training Module at USCIS-0399]. Most protection-based HP requests fall into one of three categories: natural disasters, civil conflict, or targeted harm. [Id.].

USCIS guidance documents emphasize that "[p]arole is an extraordinary measure used sparingly." [HAB Manual at USCIS-0054; 2019 Training Module at USCIS-0357]. Specifically, for "individuals [who] wish to come to the United States for temporary protection from natural disasters, civil conflicts or other harm, such as threats or persecution . . . parole is only rarely granted . . . , even if urgent humanitarian reasons have been established." [USCIS-

---

[HAB Manual at USCIS-0080].

[9] Grounds for granting HP based on urgent humanitarian reasons include, but are not limited to, medical reasons, family reasons, adoption, participation in legal proceedings, requests to return to the United States after departure without travel documentation, and "in extremely limited circumstances, for protection purposes." [HAB Manual at USCIS-0055].

[10] The alternative ground for granting HP petitions is a "significant public benefit." This is a less common request than urgent humanitarian reasons and "often based on law enforcement and national security considerations." [HAB Manual at USCIS-0081]. As such, "[w]hile the beneficiary may personally benefit from the authorization of parole, the statutory standard focuses on the public benefit in extending parole." [Id.].

0561 ("Documents to Submit in Support of Parole Requests" dated July 1, 2016 (USCIS-0555–84)].[11]

### 2. August 2021: U.S.' Withdrawal from Afghanistan and USCIS' Response

As the Taliban completed their takeover of Afghanistan and regained control of Kabul in mid-August 2021, thousands of Afghans tried to flee the country. [Compl. ¶¶ 24, 26]. As a result, USCIS received a growing number of Forms I-131. [USCIS-0725]. On August 13, 2021, HAB began expediting Afghan applications and officers "were instructed to drop everything, and focus on completing all Afghan parole cases." [USCIS-0973–74]. As the HAB Chief John Bird explained on August 14, the "situation is deteriorating and the embassy might evacuate at any minute." [Id.]. Bird also wrote: "[i]t is a crucial life and death situation for the parole beneficiaries in Afghanistan, and we need to complete these cases as soon as possible." [Id.]. The record suggests that the decision to expedite was "about getting people out on flights," as, at that time, the U.S. was still operating evacuation flights.[12] [USCIS-0740; see also USCIS-0731

---

[11] "Parole does not constitute an admission into the United States." [2019 Training Module at USCIS-0361]. Rather, a grant of HP allows noncitizens to enter the United States temporarily, often limited to one year, during which they may apply for asylum or other immigration benefits. [Compl. ¶ 37].

[12] On August 23, 2021, DHS Secretary Mayorkas, as part of Operation Allies Refuge, authorized CBP under 8 U.S.C. § 1182(d)(5) to parole certain Afghan nationals who were airlifted out of Afghanistan. [Compl. ¶ 28; ECF No. 107 ("Quill Declaration" or "Quill Decl.") ¶ 25]. CBP paroled approximately 70,000 Afghans from US military bases and other sites into the United States. [Compl. ¶ 28]. As the Court understands it, these Afghan nationals did not file applications with USCIS. [Quill Decl. ¶ 25]. USCIS' other initiatives to assist "U.S. allies in Afghanistan" included the Special Immigrant Visa ("SIV") program for "interpreters and other[] [Afghan nationals] who had worked for the U.S. government in Afghanistan for at least a year, a refugee priority program for individuals who worked with U.S. media or nonprofit organizations,

("USCIS prioritized the request for parole for individuals inside Afghanistan during the evacuation")].

On approximately August 26, 2021, USCIS launched a webpage providing "Information for Afghan Nationals on Parole into the United States." See [ECF No. 107-1].  The webpage provided background on HP, explaining that "[i]ndividuals who are outside of the United States may request parole into the United States based on urgent humanitarian or significant public benefit reasons for a temporary period, on a case-by-case basis." [Id. at 2].  This section also indicated that:

> [t]he U.S. government is making every effort to assist individuals who have been granted parole into the United States.  Due to quickly changing circumstances in the region and the closure of the U.S. Embassy in Kabul, beneficiaries may experience delays in processing their cases and may need to arrange travel to a U.S. embassy outside of Afghanistan to continue processing their parole request.

[Id.].[13]  Further, the webpage described how to apply for HP, the eligibility criteria, that "[t]o avoid delays, all relevant supporting evidence to show that the beneficiary qualifies for parole and merits a favorable exercise of discretion must be submitted," and directed applicants who needed "expedited processing . . . [to] write the word EXPEDITE in the top right corner of the application in black ink." [Id. at 3].

_____

and family petitions from immediate family members who were U.S. citizens or lawful permanent residents." [Compl. ¶ 33].

[13] In the hope of getting Afghan beneficiaries on evacuation flights, USCIS began issuing "Parole Conditional Approval Notice[s]" even as consular processing in Afghanistan ceased. See, e.g., [ECF No. 105-2 at 2].  These notices explained that "USCIS recognizes that U.S. Embassy Kabul is closed and all normal consular services in Afghanistan have been suspended until further notice," but that the "parole beneficiary must complete the Department of State ("DOS") DS-160." [Id.].  Recipients of such conditional approvals were instructed to notify USCIS should they be able to present to a U.S. Embassy or consulate in a third country. [Id.].

By August 31, 2021, the U.S. Embassy in Kabul had closed, and the evacuation efforts ended.[14]  See [Opp'n at 10 (citing https://af.usembassy.gov/embassy/ ("The evacuation ended on August 31, 2021 and the U.S. Embassy in Kabul suspended operations.")); USCIS-0718].  On August 31, 2021, HAB staff were told to "no longer expedite parole requests based on being an Afghan national[] in Afghanistan [and instead] . . . return to [the] regular process of expediting based on individualized circumstances."  [USCIS-0740; see also id. ("[W]e can no longer expedite all Afghan parole requests.  The decision to expedite those cases initially was about getting people out on flights and now that the flights have ended, we need to go back to the 'normal' expedite process based on triage, not nationality.")].

### 3. September to October 2021: USCIS Pauses Adjudication of Afghan HP Applications

Despite the U.S.' withdrawal, in early September, USCIS observed that "Afghan applications [were] arriving at an abnormally high rate" and that most were "protection related." [USCIS-0718].  Specifically, by September 1, USCIS had received over 1,000 Afghan HP

---

[14] It is not entirely clear from the corrected certified administrative record, [ECF No. 85], or the parties' briefing, when the U.S. Embassy in Kabul closed.  A Parole Approval Notice dated August 14, 2021, attached to Plaintiffs' motion, states that the Embassy had been "notified of the conditional approval of parole and w[ould] contact the beneficiary to schedule an appointment for identity verification and biometrics collection," suggesting it was still open on that date. [ECF No. 105-1 at 2].  Per a Parole Conditional Approval Notice dated August 27, also attached to Plaintiffs' motion, the Embassy was closed and "normal consular services in Afghanistan ha[d] been suspended until further notice."  [ECF No. 105-2 at 2].  That said, according to Defendants and the U.S. Embassy website, the Embassy suspended operations on August 31, 2021.  See [Opp'n at 10 (citing https://af.usembassy.gov/embassy/ ("The evacuation ended on August 31, 2021 and the U.S. Embassy in Kabul suspended operations."))].

requests.[15]  [USCIS-0725].  Around the same time, HAB's Chief was requesting guidance from

USCIS's International Refuge Affairs Division (IRAD), which houses HAB, in light of some

"specific Afghan adjudication issues."[16]  [USCIS-0715, -0721].

On September 7, just a few days after telling adjudicators to return to regular rather than

expedited processing of Afghan HP requests, they were instructed to "temporarily hold off on

issuing any decisions for Afghan nationals seeking parole."  [USCIS-0721].

---

[15] By comparison, the administrative record indicates that around the same time, that is from July 1 to September 1, 2021, USCIS received approximately 537 non-Afghan HP applications. [USCIS-0725].

[16] In a word document, which appears to have been drafted by Bird, HAB's Chief, and sent to IRAD's Chief, Joanna Ruppel, on September 7, 2021, [USCIS-0715], Bird wrote that "during the last weeks of August," "HAB adjusted the weighing of certain factors to meet the significant public benefit of moving approvable Afghan parole cases forward," and specifically that, "[d]uring the evacuation phase, ending on August 31, HAB weighed the evacuation process heavily, against some traditional evidentiary requirements."  [Id. at 0718].  According to Bird, "[s]ome of the factors that were adjusted to allow this emergent processing," included:

1. Waiving the requirement that parole not circumvent normal immigration processing[.]
2. Waiving the need for Afghan passport information when passports were not available, and emailing petitioners and counsel directly to ascertain whether passports were available, in lieu of the traditional [Request for Evidence] process due to time urgency.
3. Weighing [significant public benefit parole] evacuation issues against traditional protection evidentiary requirements, not requiring third party evidence be submitted to determine whether protection, and not requiring that beneficiaries avail themselves of refugee protection where available.
4. Expediting the review of all Afghan cases above other cases and submitting daily [National Counterterrorism Center] expedite requests to [Fraud Detection and National Security Directorate].

[Id.].  In the same word document, Ruppel commented that "[t]hese are all issues we are working through and discussing with leadership.  For now, we should pause adjudication until we can provide more guidance to adjudicators given that the U.S. military assisted evacuation has ended."  [Id.].

The administrative record suggests that by mid-October USCIS had evolved its approach to Afghan parole applications.  On October 15, IRAD's Chief Ruppel, in an email entitled "Afghan parole updates" and sent to, among others, USCIS Director Jaddou, noted that "IRAD has drafted an SOP [the November 2021 Guidance] for adjudicators that provides how to apply [the] parole analytic framework in the context of the Afghan situation."[17]  [USCIS-0956–57]. Ruppel also wrote that in a single day, on October 12, USCIS had accepted about 1,700 parole requests, a number "similar" to what IRAD typically "received in an entire year."  [Id.].  The "vast majority" of beneficiaries, she further wrote, "are in Afghanistan."  [Id.].[18]

Then, in an October 26 email, Ruppel outlined "next steps," including:

1.  We can move forward to begin to deny cases for those who are ineligible, including the protection cases that do not meet our parole requirements who should seek protection though existing third country protection and refugee processing channels.  We should be sure to include very specific language in our denial letters and about the possibility of contacting the UNHCR and contact info (if we have it for the country where the beneficiary is) or website link.

2.  We should prioritize processing of beneficiaries outside of Afghanistan, but still process some inside Afghanistan.  For example, we could assign 2/3 of the officers adjudicating Afghan cases to those outside of Afghanistan and 1/3 to those in Afghanistan, to the degree we know this information.

3.  We should move forward with the formal clearance process for the analytic framework and guidance in the SOP and ensure we also are transparent with that on the website (e.g., the proposed language we have for the website).

[USCIS-0952].

---

[17] The SOP refers to the November 2021 Guidance.  See [ECF No. 92-2 at 5].

[18] The administrative record further shows that in early October, IRAD was seeking volunteers "from across the agency to help process" HP applications.  [USCIS-0933].

11

### 4. November 2021: USCIS Lifts Adjudication Pause

On November 5, 2021, USCIS lifted the pause on Afghan HP adjudications and issued a new guidance entitled "Parole Requests for Afghan Nationals Interim Policies and Procedures," ("November 2021 Guidance"),[19] which outlined "eligibility considerations . . . specific to parole of Afghan nationals." [November 2021 Guidance at USCIS-0031]. Specifically, the November 2021 Guidance emphasized that:

> Adjudicators must follow the HAB Procedures Manual and the Parole Training Module when adjudicating parole requests for Afghan nationals. Although parole requests may be similar in nature, each application must be evaluated on its own merits taking into account all the factors unique to the specific parole request and considering the totality of the circumstances.

[Id.].[20] The November 2021 Guidance also stated that, in part due to "conditions specific to Afghanistan," adjudicators were to follow "additional guidance specific to parole requests for Afghan nationals." [Id.]. This included "prioritizing relocation to the United States of [several] . . . categories of Afghan nationals who have been able to leave Afghanistan." Further, the November 2021 Guidance explained that "[m]embership in one of [certain] groups . . . should be considered a strong positive factor when assessing urgent humanitarian reasons, significant public benefit, and the exercise of discretion." [Id. at USCIS-0032]. These groups included:

- Immediate relatives of a U.S. Citizen (spouse, unmarried children under 21, and parents);
- Immediate relatives of a U.S. Lawful Permanent Resident (spouse and unmarried children under 21);
- Locally Employed Staff (LES) 3 of U.S. Embassy Kabul and their immediate family (spouse and unmarried children under 21);

---

[19] The November 2021 Guidance encompasses bates numbers USCIS-0031–42.

[20] As the Court understands it, the November 2021 Guidance referred to the HAB Manual and 2019 Training Module.

- Special Immigrant Visa (SIV) applicants who have received Chief of Mission (COM) approval and immediate relatives (spouse and unmarried children under 21) included on their case;
- Immediate relatives of Afghan nationals previously relocated to the United States through [Operation Allies Welcome ("OAW")] (spouse, unmarried children under 21, and, in the case of unaccompanied minors relocated as part of OAW, their primary caregiver, including but not limited to a parent or legal guardian, and the spouse and dependent children under 21 of the primary caregiver); and
- Individuals referred to the U.S. Refugee Admissions Program (US RAP) through a Pl embassy referral or P2 group designation referral *and* **in imminent risk of *refoulement* or serious, targeted harm** in the country outside Afghanistan where they are located.

[Id. (emphasis in the original)].

In addition, the November 2021 Guidance noted that "[p]arole is not intended to replace refugee processing and, wherever possible, it is [U.S. Government] policy to process protection needs through the U.S. Refugee Admissions Program (USRAP)." [November 2021 Guidance at USCIS-0032]. Nevertheless, the Guidance explained that "in some circumstances, the protection needs are so urgent that processing via the USRAP . . . is not a realistic option to accord needed protection," and "[w]hile each case is unique and parole determinations are made based on the totality of the circumstances, USCIS generally approves requests based on protection needs only if there is credible, third-party evidence naming the beneficiary that shows the beneficiary is targeted and at imminent risk of severe harm." [Id.].

As to "[b]eneficiaries still in Afghanistan," the November 2021 Guidance stated that "[s]ince the U.S. Embassy in Afghanistan has suspended operations, including all normal consular services, a beneficiary will be required to leave Afghanistan in order to complete processing of their parole request." [November 2021 Guidance at USCIS-0033]. As such, "[i]f an adjudicator finds that a beneficiary residing in Afghanistan is initially found eligible for

parole, the adjudicator may issue a Parole Notice (Suspension of Processing) stating that USCIS cannot complete processing of the parole request unless and until the beneficiary informs USCIS that they are able to report to a U.S. embassy or consulate." [Id.].

If such a beneficiary is able to report for consular processing, the guidance continued, they should notify IRAD and the "adjudicator should verify that the beneficiary is still eligible for parole and that all required USCIS-initiated security checks are valid. . . . If the adjudicator determines that the beneficiary is still eligible for parole, the adjudicator must re-open the parole request . . . and issue a Conditional Approval Notice." [November 2021 Guidance at USCIS-0039].

That said, the November 2021 Guidance also explained that:

> it may be difficult to assess eligibility based purely on protection needs while an individual is still in Afghanistan, as the adjudicator will not know when or how the beneficiary will leave Afghanistan, where the beneficiary will be once outside of Afghanistan, or the protection that may be available to the beneficiary in that location. Therefore, for Afghan nationals in Afghanistan, parole requests based on protection needs, without other factors, such as the beneficiary's falling into one of the categories of Afghan nationals prioritized by the interagency, family reunification, or urgent medical needs, generally will be denied.

[November 2021 Guidance at USCIS-0033 (emphasis added)]. In these cases,

> beneficiaries should be given denial notices, informing them that 1) their parole applications cannot be approved at this time and that, should they get to a third country, they should contact the United Nations High Commissioner for Refugees (UNHCR) for protection and consideration of refugee resettlement in the United States through the U.S. Refugee Admissions Program; and 2) should they be at imminent risk of severe harm in that third country or forced return to Afghanistan, they should contact USCIS with information on whether they have contacted UNHCR for protection assistance and include any third-party credible evidence of their risk in that third country.

[Id.].  The November 2021 Guidance indicated that "USCIS will consider reopening the denied parole application (for no fee) within a year from the denial and may reconsider their request if sufficient additional new evidence is provided."  [Id.].

### 5. December 2021 – April 2022: USCIS Issues Further Guidance

On December 17, 2021, USCIS issued a revised guidance, the December 2021 Guidance (USCIS-0490–0502), which, the parties agree, [ECF No. 102 at 14; Opp'n at 13–14], was largely the same as the November 2021 Guidance, with "some changes relating to medical screening, . . . and minor tweaks in language," [ECF No. 102 at 14].

The administrative record suggests that USCIS continued to evolve its response to Afghan HP applications.  On February 20, 2022, Ruppel communicated to others at USCIS that Secretary Mayorkas had directed IRAD "to develop a way to better address protection needs of vulnerable Afghans who likely would qualify for protection."[21]  [USCIS-0631].  Several days later, USCIS paused denial notifications "for 1) Afghan parole beneficiaries and 2) beneficiaries of other nationalities whose cases are on targeted harm." [USCIS-0475].  This pause seemingly continued until April 2022.  See [USCIS-0745 ("April 25, 2022 Talking Points" (USCIS-0743–46) (noting that "USCIS has temporarily suspended issuance of denials while USCIS updates its policy to broaden the evidentiary requirements for parole cases based primarily on protection concerns."))]. [22]

---

[21] By February 2022, "DHS ha[d] received several letters from Members of Congress expressing concern over USCIS' denial rate for Afghan nationals applying for parole and the current standard of evidence required for parole requests based on protection needs."  [USCIS-0613].

[22] The April 25, 2022 Talking Points appear to have been drafted for Secretary Mayorkas in preparation for a congressional hearing on Afghan HP denial rates.  [USCIS-0747].

15

On April 25, 2022, USCIS again updated the "Parole Requests for Afghan Nationals Interim Policies and Procedures" guidance document.  [USCIS-0003–13 ("April 2022 Guidance")].  Though much of the April 2022 Guidance was similar to the November and December 2021 Guidance, including the "strong positive factor" associated with membership in certain groups based on interagency priorities such as immediate relatives of a U.S. citizen, [April 2022 Guidance at USCIS-0004], it also made several changes.  For example, with regard to "[b]eneficiaries in a location without consular processing," the April 2022 Guidance explained:

> Parole beneficiaries must report to a U.S. embassy or consulate to complete processing of their parole request, including identity verification, biometrics collection, and confirmation that all medical requirements have been completed.  Since the U.S. Embassy in Afghanistan has suspended operations, including all normal consular services, a beneficiary in Afghanistan who initially appears eligible for parole will be required to arrange their own travel out of Afghanistan in order to complete processing of their parole request.  Afghan beneficiaries who are in another location without a U.S. embassy or consulate that provides visa services, such as Iran or Russia, would similarly need to arrange travel to another country with a U.S. embassy or consulate to complete processing.

[April 2022 Guidance at USCIS-0006].  The April 2022 Guidance thus omitted any reference to parole requests "based purely on protection needs while an individual is still in Afghanistan," which, "without other factors, . . . generally will be denied," [November 2021 Guidance at USCIS-0033], and instead clarified that in cases where such a beneficiary is otherwise eligible for parole:

> [T]he adjudicator may issue an Afghanistan Notice of Continued Parole Processing, which states that the beneficiary must arrange their own travel to a location with a U.S. embassy or consulate to complete processing of their parole request.  The Afghan Notice of Continued Parole Processing should only be issued for cases that initially appear eligible for parole and all biographic vetting, including OAW

16

> NCTC vetting, is complete. Adjudicators are not required to review pre-existing A-files prior to issuing a Notice of Continued Parole Processing unless the A-file is required to determine initial eligibility. The adjudicator should administratively close the case . . . purely for case tracking and workload management purposes.

[April 2022 Guidance at USCIS-0006–07 (emphasis omitted)]. The April 2022 Guidance thereby substituted the "Parole Notice (Suspension of Processing)," [November 2021 Guidance at USCIS-0033], with the "Notice of Continued Parole Processing" for beneficiaries who "initially appear eligible for parole," [April 2022 Guidance at USCIS-0006–07].

The document also directed adjudicators to a version of the Parole Training Module with updated guidance on "targeted harm." See [USCIS-0001, -04]; see also [USCIS-0222–0300 ("2022 Updated Training Module")]. While "[h]istorically, USCIS exercised discretion to approve cases based solely on protection needs only if the petitioner provided credible third-party evidence to establish imminent risk of serious harm," [USCIS-0603 ("Discussion points for Afghan and Ukrainian Parole," dated March 24, 2022 (USCIS-0601–06))], the updated Training Module broadened the evidence adjudicators could consider when evaluating whether there was a credible threat to the beneficiary:

### Factors that are relevant to the Exercise of Discretion

Although consular officers generally interview conditionally approved beneficiaries to verify identity and conduct additional limited vetting, these interviews are not the same type of in-depth interviews required for refugee and asylum applicants. Refugee and asylum interviews provide an opportunity to elicit testimony, verify information, assess an applicant's credibility, and probe any potential derogatory factors that may result in a bar to eligibility, including persecution of others, human rights abuses, terrorism-related inadmissibility grounds, or other national security concerns. Therefore, in order to exercise discretion favorably in parole cases where the finding of urgent humanitarian reasons is based primarily on a claim of targeted harm, there must be sufficiently strong evidence to enable the officer to exercise discretion to approve parole in the absence of an interview that would provide an opportunity to probe credibility and elicit information relevant to the exercise of discretion, such as whether the beneficiary engaged in persecution of others or activities that would raise national security or public safety concerns. The best evidence, where available, is credible, third-party evidence of the threat to the

beneficiary.  If there is no credible, third-party evidence of the threat, there may be other strong evidence, such as reliable country conditions reporting widespread or pervasive, systematic targeting of a group facing serious harm and that individuals who are identified as members of the targeted group are likely at imminent risk of serious harm; reliable evidence of the beneficiary's membership in the targeted group; and reliable evidence that the individual or group imposing serious harm is or likely will become aware of the beneficiary's membership.

[2022 Updated Training Module at USCIS-0283–84 (emphasis added)].

In the April 25, 2022 Talking Points prepared for Secretary Mayorkas in anticipation of a congressional hearing on Afghan HP denial rates,[23] USCIS acknowledged "that most requests for parole for Afghan beneficiaries are denied," emphasizing that "the denial rate is consistent with USCIS historic denial rate for parole requests based primarily on protection concerns." [USCIS-0744].  Nonetheless, the document also provided that the change in evidentiary requirements will likely "result in a higher approval rate." [USCIS-0745].  The document further stated that "[r]egardless of where the Afghan beneficiary is located, USCIS reviews the specific facts of each case individually to determine if there is a well-documented urgent humanitarian reason or significant public benefit to approve parole for an individual." [USCIS-0743].

### 6. Overview: Afghan HP Applications

Although the parties disagree about how the denial rate of Afghan-based HP applications after the November 2021 Guidance compares to USCIS' historic denial rate of protection-based

---

[23] See [USCIS-0743–46].  What appears to be an earlier draft of the talking points, "February XX, 2022," can be found at [USCIS-0613–16].

HP requests, see infra, the Court notes that between July 1, 2021, and January 31, 2022, USCIS received more than 42,000 Form I-131 parole applications for Afghan nationals.[24] [USCIS-0613]. By comparison, between October 1, 2020, and September 30, 2021—partially covering the August and September periods at issue—USCIS received approximately 60 protection-based parole applications from Afghans.[25] [USCIS-0739]. As relevant here, 75% of the applications received were from Afghan-based beneficiaries and the majority were protection-based requests. [USCIS-0614, -0745].

### 7. The Moving Plaintiffs

The Moving Plaintiffs are Afghan nationals and their U.S.-based relatives who sought humanitarian parole in late summer and fall 2021. [Compl. ¶ 81]. Each requested expedited treatment of their application. [Id.].

Plaintiffs Nahid Noe, Naser Noe, Nabi Noe, and Naji Noe are a family of Afghan nationals— ███████████████████████ [Compl. ¶¶ 11, 120, 130, 133; ECF No. 103-1 ("Nahid Noe Decl.") ¶¶ 1, 5]. Prior to the events of this case, Nahid was ██████ ████████ and the Noes split their time between ███████, where Nahid and her husband were ██████████ [Id. ¶ 2]. They were in Afghanistan when the Taliban came to power in August 2021. [Id. ¶ 3]. The Noes unsuccessfully tried to board several evacuation flights. [Id. at ¶¶ 3–4]. On their first attempt to get on a flight out of the country, they were at the airport "when a large explosion and gunfire killed many people." [Id. at ¶ 3].

---

[24] By late April 2022, USCIS had received almost 4,000 additional Afghan HP requests, totaling the number to over 45,600 applications. [USCIS-0745]. At that time, USCIS had processed about 2,800 of these requests and approximately 42,800 remained pending. [Id.].

[25] Out of those, 59 were approved (98% approval rate) and 1 was denied (2% denial rate). [USCIS-0739].

Also in August 2021, the Noes worked with a lawyer in the United States to petition for protection-based HP. [Nahid Noe Decl. ¶ 5; ECF No. 82-46 at 22 (Nabi); ECF No. 82-48 at 22 (Nahid); ECF No. 82-50 at 22 (Naji); ECF No. 82-52 at 22 (Naser)]. Their petitions were received on September 3, 2021. [ECF No. 82-46 at 1 (Nabi); ECF No. 82-48 at 1 (Nahid); ECF No. 82-50 at 1 (Naji); ECF No. 82-52 at 1 (Naser)]. While their applications were being considered, the Noes "stayed at different locations in and outside Kabul and tried to stay safe while . . . wait[ing] for news." [Nahid Noe Decl. ¶ 5].

Nahid, Nabi, and Naser's applications were denied and their denial notices dated all between February 14–16, 2022. [ECF No. 82-46 at 25, 114 (Nabi); ECF No. 82-48 at 25, 110 (Nahid); ECF No. 82-52 at 25, 118 (Naser)]. Naji's application was also denied on June 1, 2022, and the denial notice was dated June 6, 2022. [ECF No. 82-50 at 25, 123 (Naji)]. The officers reviewing their applications found that the "preponderance of the evidence [did not] establish that there [were] urgent humanitarian reason(s) [or] . . . a significant public benefit for the beneficiar[ies] to travel to the U.S." [ECF No. 82-46 at 22–23 (Nabi); ECF No. 82-48 at 22–23 (Nahid); ECF No. 82-50 at 22–23 (Naji); ECF No. 82-52 at 22–23 (Naser)]. The officers did not request additional evidence or information before denying their applications. See generally [ECF No. 82-46 (Nabi); ECF No. 82-48 (Nahid); ECF No. 82-52 (Naser); ECF No. 82-50 (Najir)].

In March 2022, the Noes left Afghanistan for Iran ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. [Nahid Noe Decl. ¶¶ 7, 9]. Following the completion ▮▮▮▮▮ ▮▮▮▮▮, the Noes were not permitted to stay in Iran, [Id. ¶ 10], but while in Iran, Nahid received an invitation from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, [id. ¶ 11]. The family was able to get ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

the U.S. consulate for a ██ visa,"[26] which would have enabled Nahid to accept the ████ position. [Id. ¶¶ 13, 22]. The Noes' ██ visas, however, were denied "because [they] could not show enough ties to [their] country of residence." [Id. ¶ 14]. Seemingly sometime in September 2023, the Noes were able to ███████████████████████████. See [id. ¶¶ 35, 37]. The Court understands that their ██████████████████████. [ECF No. 131 at 1].

Sometime after October 2023, the Noe family reapplied to the U.S. Department of State for a ██ visa. [ECF No. 131 at 1]. The U.S. consulate in ███████████████████ ██████████████████████████████████. [Id.]. Prior to the interview, however, the Noes ██████████████████████████████ ██████ [Id. at 1–2.]. As of the date of this motion, the location of the family is unknown.

Plaintiffs Baddar and Basel Boe are ██████ who worked as ███████ supporting U.S. troops in Afghanistan. [Compl. ¶ 142]. Basel, a lawful permanent resident living in Massachusetts, applied for humanitarian parole for his parents, Badi and Bahar, and his siblings, Barakat and Baharak. [Id. ¶¶ 13, 143]. On September 14, 2021, Baddar, a U.S. citizen living in New Hampshire, petitioned for parole for his ████ ████, Baktash, his sister-in-law, Benesh, and their three children, Basim, Basir, and Burhan. [Id. ¶¶ 12, 143]. The ██████████ Badi, served as a ████████████████████████████████████ alongside the U.S. Military for more than twenty years, becoming "a prominent figure across Afghanistan" for his high-profile work. [Id. ¶ 144]. Baktash also worked on projects funded by the U.S. Army Corps of Engineers. [Id. ¶ 145]. The Boe family, including Badi, Basel, and

---

[26] ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████

Baddar, have experienced several threats to their lives. [Id. ¶ 145]. With the U.S. withdrawal from Afghanistan, the Boe family understood that they "would be among the first to be targeted by the Taliban" due to their association with the U.S. armed forces and their work against the Taliban. [Id. ¶¶ 146–152]. Unable to board any of the evacuation flights, they were in Afghanistan when Baddar and Basel Boe filed the HP applications on their behalf. [Id. ¶ 153].

Badi, Bahar, Barakat, and Baharak's applications were received by USCIS on September 9, 2021. [ECF No. 82-22 at 1 (Badi); ECF No. 82-24 at 1 (Bahar); ECF No. 82-26 at 1 (Baharak); ECF No. 82-30 at 1 (Barakat)]. The applications stated "Protection" and "Family Based" as the basis for parole. [ECF No. 82-22 at 28 (Badi); ECF No. 82-24 at 28 (Bahar); ECF No. 82-26 at 28 (Baharak); ECF No. 82-30 at 28 (Barakat)].

Their applications were denied with the decisions made on May 24, 2022 and the denial notices dated May 27, 2022. [ECF No. 82-22 at 32, 185 (Badi); ECF No. 82-24 at 32, 172 (Bahar); ECF No. 82-26 at 31, 169 (Baharak); ECF No. 82-30 at 30, 158 (Barakat)]. For Badi and Bahar, the adjudicating officers found that the "preponderance of the evidence [did not] establish that there [were] urgent humanitarian reason(s) for the beneficiar[ies] to travel to the U.S," but did "establish that there would be a significant public benefit." [ECF No. 82-22 at 28 (Badi); ECF No. 82-24 at 28 (Bahar)]. For Barakat and Baharak, the officers found that the "preponderance of the evidence [did not] establish "urgent humanitarian reason(s)" or "a significant public benefit." [ECF No. 82-26 at 28 (Baharak); ECF No. 82-30 at 28 (Barakat)].

Baktash, Benesh, Basim, Basir, and Burhan's applications were received September 21, 2021 with "Protection" and "Family Based" again being cited as the circumstances warranting parole. [ECF No. 82-28 at 1, 28 (Baktash); ECF No. 82-32 at 1, 31 (Basim); ECF No. 82-34 at 1, 29 (Basir); ECF No. 82-36 at 1, 28 (Benesh); ECF No. 82-38 at 1, 28 (Burhan)].

22

Their applications were also denied with the decisions made on July 2, 2022 and the denial notices dated five days later on July 7, 2022.  [ECF No. 82-28 at 32, 124 (Baktash); ECF No. 82-32 at 35, 144 (Basim); ECF No. 82-34 at 33, 121 (Basir); ECF No. 82-36 at 32, 142 (Benesh); ECF No. 82-38 at 32, 127 (Burhan)].  The officers found that the "preponderance of the evidence [did not] establish that there [were] urgent humanitarian reason(s) [or] . . . a significant public benefit for the beneficiar[ies] to travel to the U.S."  [ECF No. 82-28 at 28 (Baktash); ECF No. 82-32 at 32 (Basim); ECF No. 82-34 at 29–30 (Basir); ECF No. 82-36 at 29 (Benesh); ECF No. 82-38 at 28–29 (Burhan)].

After the applications filed by Basel Boe were denied by USCIS on May 27, 2022, and those filed by Baddar Boe were denied on July 7, 2022, [Compl. ¶ 154; ECF No. 55 at 12], Basel and Baddar filed administrative motions for reconsideration, which remain pending before USCIS, [ECF No. 55 at 12].  The Court understands that the Boes are, at the time of this motion, ██████████████.  [ECF No. 104-1 ¶ 4 ("Baharak Boe Decl.")]; see also [Compl. ¶ 154].

### B.    Procedural History

On May 25, 2022, Plaintiffs brought the Complaint against Alejandro N. Mayorkas, Ur M. Jaddou, and Antony J. Blinken, all named in their official capacities as, respectively, Secretary of Homeland Security, Director of USCIS, and Secretary of State.  [Compl. ¶¶ 18–20].  The Complaint asserts four counts under the APA: arbitrary and capricious agency action, 5 U.S.C. § 706(2)(A) (Count I), [id. ¶¶ 176–84]; failure to comply with law and agency rules, 5 U.S.C. § 706(2)(A) (Count II), [id. ¶¶ 185–88]; failure to comply with notice-and-comment requirements, 5 U.S.C. § 553 (Count III), [id. ¶¶ 189–93]; and agency action unlawfully withheld and/or unreasonably delayed, 5 U.S.C. § 706(1), (Count IV), [id. ¶¶ 194–97].  Counts V and VI seek mandamus relief that would compel USCIS to process the still-pending applications and a

23

declaratory judgment from the Court regarding USCIS's unlawful actions. [Compl. ¶¶ 198–203].

On April 28, 2023, the Court granted in part and denied in part Defendants' motion to dismiss. [ECF No. 69 ("MTD Order")]. As relevant here, the Court denied Defendants' motion on Counts I and II regarding the alleged new policy denying or administratively closing all parole applications for beneficiaries remaining in Afghanistan. [MTD Order at 36].

In June 2023, Defendants filed the certified administrative record. [ECF Nos. 79, 82–83, 85]. On July 19, 2023, Plaintiffs filed a motion for completion of the administrative record and limited discovery, which Defendants opposed on August 2, 2023. [ECF Nos. 90, 94]. Subsequently, Plaintiffs filed a reply on August 10, 2023. [ECF No. 97].

On October 3, 2023, the Noe and Boe families filed the instant motion for preliminary injunction, [ECF No. 101], Defendants opposed on October 13, 2023, [Opp'n], and the Moving Plaintiffs replied on October 30, 2023, [ECF No. 120 ("Reply")].

## II.    LEGAL STANDARD

The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' that 'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)). Preliminary injunctions function to "preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). As a result, "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." Id. (citing Indus. Bank of Wash. v. Tobriner, 405 F.2d 1321, 1324 (D.C. Cir. 1968)).

24

When deciding whether to grant a motion for preliminary injunction, courts must consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). The First Circuit has held that these four factors "are not entitled to equal weight in the decisional calculus." Id. Rather, the movant's likelihood of success on the merits "is the main bearing wall of the four-factor framework." Id. at 10 (citation omitted). "[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). Therefore, "[i]f the moving party cannot demonstrate that [they are] likely to succeed in [their] quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., 287 F.3d at 9). Likewise, the balance of hardships and public interest factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

As the moving party, Moving Plaintiffs bear the burden of satisfying each of these four elements. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). When, as here, plaintiffs are seeking a mandatory preliminary injunction,[27] "which requires affirmative

---

[27] Moving Plaintiffs describe the injunction they request as prohibitory rather than mandatory. [EFC No. 120 at 12]. They request, however, that their petitions be re-adjudicated under the standard in effect on August 31, 2021, [ECF No. 101 at 1], which would compel USCIS to take a positive action. See Braintree Labs., Inc. v. Citigroup Global Markets, Inc., 622 F.3d 36, 40–41 (1st Cir. 2010); Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879

action by the non-moving party in advance of trial, . . . it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" Braintree Labs. v. Citigroup Global Markets Inc., 622 F.3d 36, 41 (1st Cir. 2010) (quoting Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency, 649 F.2d 71, 76 n.7 (1st Cir. 1981)). This is "[b]ecause a mandatory preliminary injunction alters rather than preserves the status quo." Id.

## III.      DISCUSSION

### A.      Threshold Issue: The Court's Jurisdiction

The APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). Section 701(a) of the APA, however, prohibits judicial review where "statutes preclude judicial review" or where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)–(2).

The relevant jurisdictional statute here is the provision of the Immigration and Nationality Act ("INA"), as amended, see 8 U.S.C. § 1252(a)(2)(B)(ii), that governs judicial review of DHS' authority to grant HP. The statute provides that "no court shall have jurisdiction to review . . . any . . . decision or action of . . . the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of . . . the Secretary of Homeland Security." Id. § 1252(a)(2)(B)(ii). Title 8 further grants the Secretary of Homeland Security "discretion" to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien

_____

(9th Cir. 2009) ("A mandatory injunction 'orders a responsible party to take action.'" (quoting Meghrig v. KFC W., Inc., 516 U.S. 479, 484 (1996))).

applying for admission to the United States". Id. § 1182(d)(5)(A). Defendants argue that Moving Plaintiffs' motion "seek[s] an intrusive reshaping of the Secretary of Homeland Security's discretionary parole authority." [Opp'n at 21]. Specifically, in their motion to dismiss, Defendants claimed that because § 1252(a)(2)(B)(ii) strips courts of the jurisdiction to review discretionary parole decisions, Plaintiffs' cause of action under the APA is withdrawn. [ECF No. 41 at 9–12]. Plaintiffs do not dispute that § 1252(a)(2)(B)(ii) bars judicial review of individual parole decisions but contend that they are challenging the policies and practices governing HP rather than individual decisions. [ECF No. 44 at 11]; see [id. at 17–26]; see also [Reply at 4].

In the MTD Order, the Court agreed with Plaintiffs that § 1252(a)(2)(B)(ii) does not bar all judicial review of agency action under § 1182(d)(5)(A). See [MTD Order at 13–20]. Specifically, the Court observed that several courts have declined to apply § 1252(a)(2)(B)(ii)'s provision of non-reviewability to "claims challenging the legality of policies and processes governing discretionary decisions under the INA." [MTD Order at 15 (quoting Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 135 (D.D.C. 2018))]; see also Zadvydas v. Davis, 533 U.S. 678, 678 (2001) (finding that § 1252(a)(2)(B)(ii) did not preclude courts from challenging the "extent of the Attorney General's" authority to detain a noncitizen indefinitely because the extent of that authority was not an exercise of discretion); Damus v. Nielsen, 313 F. Supp. 3d 317, 327–28 (D.D.C. 2018) ("Plaintiffs are not asking for this Court to review the propriety of any given parole decision, but, instead, 'simply seek compliance with certain minimum procedural safeguards when parole decisions are made' . . . [these] do not fall within the jurisdictional bar of 1252(a)"); Doe 1 v. Mayorkas, 530 F. Supp. 3d 893, 904 (N.D. Cal. 2021) (concluding that

"§ 1252(a)(2)(B)(ii) [] applies to decisions made to <u>individual</u> applications" and is therefore not "applicable here to this challenge of immigration policy.").

The Court further concluded that § 701(a)(2), precluding the judicial review of agency action "committed to agency discretion by law," is "quite narrow." [MTD Order at 17 (quoting <u>Union of Concerned Scientists v. Wheeler</u>, 954 F.3d 11, 17–18 (1st Cir. 2020))]; <u>see also</u> <u>Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.</u>, 139 S. Ct. 361, 370 (2018) ("The few cases in which we have applied the § 701(a)(2) exception involved agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation, or a decision not to reconsider a final action." (citations omitted)). The Court was also satisfied that it had a "meaningful standard" for its review given § 1182(d)(5)(A)'s guideline that discretion may only be exercised on a case-by-case basis. [MTD Order at 18–19 (quoting <u>Brnovich v. Biden</u>, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022))]; <u>see also</u> <u>Union of Concerned Scientists</u>, 954 F.3d at 17 (A commitment to "agency discretion by law" under § 701(a)(2) "exists when agency action is of a kind 'traditionally regarded as committed to agency discretion' <u>or when the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion</u>." (quoting <u>Lincoln v. Vigil</u>, 508 U.S. 182, 192 (1993)) (emphasis added).

The Court similarly rejected Defendants' argument that <u>Amanullah v. Nelson</u> prevented it from reviewing USCIS's purported change in policy. [MTD Order at 18–20]. Instead of the APA's abuse of discretion standard, the First Circuit in <u>Amanullah</u> reviewed individual denials of parole under the deferential "facially legitimate and bona fide reason" standard. 811 F.2d 1, 10 (1st Cir. 1987). It applied that standard in part because of "the plenary sweep of Congress's power to make policies and rules for the exclusion of aliens." <u>Id.</u> (citing <u>Kleindienst v. Mandel</u>,

28

408 U.S. 753, 765–67 (1972)).  "[W]hen 'the Executive exercises'" the authority Congress has conferred by statute "negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it."  Id. (quoting Kleindienst, 408 U.S. at 770).  Defendants continue to insist that under Amanullah, "[p]arole decisions—whether individually or generally— . . . [should] be reviewed under the facially-legitimate and bona fide standard because they are decisions fundamentally about the entry or exclusion of foreign noncitizens."  [Opp'n at 20–21 (citing Kleindienst, 408 U.S. at 769–70)].

The Court was not persuaded by Defendants' arguments as presented in their motions to dismiss and reflected in the Court's MTD Order, nor is it persuaded now that agency action in this arena is unreviewable.  First, Plaintiffs have made it clear in their Complaint and subsequent filings before the Court that they challenge USCIS' purported change in policy rather than individual parole decisions.  See generally [Compl.; ECF Nos. 44, 102; Reply].  As such, they have raised "statutory challenges to the process by which" their HP requests were denied, which is permissible, rather than a challenge to a parole decision, which is not.  Nielsen, 319 F. Supp. 3d at 136.  Second, with the benefit of the administrative record, the Court finds that the instant case does not give rise to a situation where the narrow exception of § 701(a)(2) would apply. Rather, the Court has a meaningful standard — as set forth in the statute, the USCIS Policy Manual, the HAB Manual, and the 2019 Training Module — against which it can review the agency's exercise of discretion.  Steenholdt v. FAA, 314 F.3d 633, 638 (D.C. Cir. 2003) ("[J]udicially manageable standards 'may be found in formal and informal policy statements and regulations as well as in statutes.'" (citation and internal quotation marks omitted)).  Third, in Biden v. Texas, the Supreme Court, albeit in dicta, made clear that DHS' authority to grant parole was not "unbounded."  597 U.S. 785, 806 (2022); see also United Nurses & Allied Pros.

29

v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020) (noting that lower courts "are bound by the Supreme Court's considered dicta" (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991))). Specifically, the Supreme Court observed that § 1182(d)(5)(A) allows DHS to exercise its discretion "only on a case-by-case basis" and that, further, "under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." Biden, 597 U.S. at 806–07 (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983)). The Court therefore remains satisfied, as it was in the MTD Order, that the review of the November 2021 Guidance does not fall within the narrow exception of unreviewability articulated in § 701(a)(2). [ECF No. 69 at 17–20]; Florida v. United States, No. 21-cv-1066, 2022 WL 2431414, at *9 (N.D. Fla. May 4, 2022) (Congress's failure to define "urgent humanitarian reasons" or "significant public benefit" does not mean that defendants have "unfettered discretion to define those terms however they choose"; instead, Defendants' interpretation "must be reasonable.").

Defendants' invocation of the recently decided Department of State v. Muñoz similarly does not change the Court's analysis. 144 S. Ct. 1812, 1821 (2024).[28] In Muñoz, which concerned the scope of a U.S. citizen's constitutional right in relation to her noncitizen spouse being admitted to the country, the Supreme Court, in the context of the consular non-reviewability doctrine, reiterated that "the admission and exclusion of foreign nationals . . . [is] largely immune from judicial control." Id. at 1820 (quoting Trump v. Hawaii, 585 U.S. 667, 702 (2018)); see also Trump, 585 U.S. at 702 ("[T]he action of an executive officer to admit or exclude an alien is final and conclusive." (quoting United States ex rel. Knauff v. Shaughnessy,

---

[28] Defendants submitted Muñoz as supplemental authority. [ECF No. 136].

30

338 U.S. 537, 543 (1950))).  The Supreme Court further stated that judicial review of an

admissibility finding would amount to a "level of judicial involvement in the visa process [that]

would be a significant extension of our precedent."  Id. at 1820 n.2.  As Moving Plaintiffs here

do not directly challenge individual parole decisions, but rather a purported change in policy, the

Court does not find that Muñoz bars judicial review of USCIS' alleged change in policy as it

pertains to Afghan-based HP requests.

Thus, at this juncture, the Court finds no reason to depart from its previous holding

regarding its jurisdiction.

### B.    Likelihood of Success on the Merits

Under the APA, a reviewing court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As a general matter, judicial

review of an APA claim is "narrow" because the "APA standard affords great deference to

agency decisionmaking because the [agency's] action is presumed valid."  Associated Fisheries

of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

### 1. Final Agency Action

The APA entitles any person "suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action" to judicial review.  5 U.S.C. § 702.  Such

review, however, is limited to final agency actions unless otherwise specified by statute.  See id.

§ 704.

An agency action is final if two conditions are met: first, the action must "mark the

'consummation' of the agency's decisionmaking process" and not be "of a merely tentative or

interlocutory nature," and, second, it must be "one by which 'rights or obligations have been

31

determined,' or from which legal consequences will flow." Harper v. Werfel, No. 23-cv-1565, 2024 WL 4274110, at *11 (1st Cir. Sept. 24, 2024) (internal quotation marks omitted) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Brnovich, 630 F. Supp. 3d at 1171 (quoting Oregon Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

For the purposes of the preliminary injunction, the Court is satisfied that the November 2021 Guidance constitutes a final agency action.[29] As to the first Bennett prong, evidence from the administrative record suggests that the November 2021 Guidance was the end "result of an internal agency process." R.F.M. v. Nielsen, 365 F. Supp. 3d 350, 375 (S.D.N.Y. 2019). First, there was a concrete request for guidance on how to deal with Afghan parole applications. See J.L. v. Cissna, 341 F. Supp. 3d 1048, 1067 (N.D. Cal. 2018) (emphasizing, among other things, USCIS's request for additional guidance when conducting the first prong of the Bennett analysis); R.F.M., 365 F. Supp. 3d at 376 (weighing the fact that new policy was issued in response to "requested additional guidance"). In early September, HAB's Chief expressly asked for guidance on Afghan parole applications and, in a document entitled "Request for Guidance," listed several issues "affect[ing] [HAB's] analysis for regular parole [] adjudication." [USCIS-0715, -18]. In response, Ruppel noted that Afghan-specific issues were being "work[ed] through

_____

[29] While Moving Plaintiffs assert that the November 2021 Guidance constitutes a final agency action, [Reply at 4], Defendants' principal argument, discussed supra, is that the November 2021 Guidance is not subject to judicial review. [Opp'n at 20–22]. Separately, Defendants suggest that the last two weeks of August 2021, when USCIS expedited Afghan HP applications in response to the deteriorating situation in Afghanistan, did not constitute agency action. [Id. at 21]. Because Plaintiffs do not challenge Defendants' conduct in August 2021, [Reply at 7], the Court need not address this issue.

and discuss[ed] with leadership." [USCIS-0718]. "For now," she continued, "we should pause adjudication until we can provide more guidance to adjudicators given that the U.S. military assisted evacuation has ended." [Id.]. That request resulted in the November 2021 Guidance. See, e.g., [USCIS-0956–57 (on October 15, Ruppel wrote that "IRAD has drafted [] [the November 2021 Guidance] for adjudicators that provides how to apply [the] parole analytic framework in the context of the Afghan situation.")]. Second, the November 2021 Guidance was neither tentative nor interlocutory; rather, it was the outcome of an internal "review [and clearance] process." R.F.M., 365 F. Supp. 3d at 376; see also [USCIS-0952 (October 26 email from Ruppel confirming that the agency would "move forward with the formal clearance process for the analytic framework and guidance in the [November 2021 Guidance].")]. Third, it was only once the November 2021 Guidance was issued that "the agency began adjudicating cases again," supporting the conclusion that the guidance constituted the culmination of the decision-making process. R.F.M., 365 F. Supp. 3d at 376. In sum, the administrative record reveals that the November 2021 Guidance was "the consummation of the agency's decision-making on the question of how to handle [HP] applications of [Afghan] individuals."[30] Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 41 (D.D.C. 2018).

The November 2021 Guidance also satisfies the second half of the Bennett test. Adjudicators were instructed that they "must follow the additional guidance specific to parole requests for Afghan nationals" as articulated in the November 2021 Guidance.

---

[30] The Court acknowledges that the November 2021 Guidance bears the title "Interim Policies and Procedures." [November 2021 Guidance at USCIS-0031]. That notwithstanding, as a practical matter for the reasons explained supra, the guidance marked the consummation of an internal decision-making process and therefore constitutes a final agency action.

[November 2021 Guidance at USCIS-0031].  See Union of Concerned Scientists v. Wheeler, 377

F. Supp. 3d 34, 42–43 (D. Mass. 2019), aff'd in part, rev'd in part and remanded, 954 F.3d 11

(noting the directive use of mandatory language).  The Guidance, furthermore, had immediate

legal consequences, as once it was issued, the adjudication of Afghan HP applications resumed,

and adjudicators based their decisions at least in part on the instructions articulated in that

guidance.  See Jafarzadeh, 321 F. Supp. 3d at 42 (rejecting government's argument that USCIS's

memorandum did not change the statutory requirements for any immigration benefit or mandate

the outcome of any individual case and therefore had no legal consequences, in part because the

memorandum specified what officers "must" do).  As such, for the purposes of this motion, the

Court concludes that Moving Plaintiffs are likely to succeed on the merits in showing that the

November 2021 Guidance constitutes a final agency action.

### 2. Whether the November 2021 Guidance Was "in Accordance with Law" (Count II)

Moving Plaintiffs argue that they are likely to succeed in demonstrating the November

2021 Guidance's purported bar on approvals for in-country HP requests operated in two main

ways.  [ECF No. 102 at 11].  First, it "generally denied" the approval of in-country protection-

based requests if a beneficiary could not also present other factors, such as falling into one of the

categories of Afghan nationals prioritized by the November 2021 Guidance.  [Id. (citing

November 2021 Guidance at USCIS-0033)].  Because USCIS knew that most Afghan cases were

based on a need for protection, rather than falling into other categories such as seeking medical

treatment or family unification, the November 2021 Guidance meant that "Afghans who sought

HP because they feared death at the hands of the Taliban would presumptively be denied HP."

[Id. at 12].  Second, even requests not included in the "generally deny" categories, that is,

showing protection-based needs plus other factors, "could not and would not be approved," as an adjudicator's only option was to issue a Parole Notice. [Id.]. That notice provided that USCIS could not "complete processing of the parole request unless and until the beneficiary inform[ed] USCIS that they are able to report to a U.S. embassy or consulate." [Id. (quoting November 2021 Guidance at USCIS-0033)].

Plaintiffs emphasize that the November 2021 Guidance had an "immediate and dramatic effect" on HP approval rates. [ECF No. 102 at 13]. While the approval rate for Afghans in August 2021 was between 93% and 95%, it dropped to 1% during the period between the issuance of the November 2021 Guidance and July 2022. [Id. at 13 (citing Quill. Decl. ¶ 37)]. Plaintiffs aver that in the eight-month period following the introduction of the November 2021 Guidance, USCIS issued only seventy-nine conditional approvals and denied approximately 7,300 Afghan applications. [ECF No. 102 at 8, 10; Quill. Decl. ¶ 37 (analysis based on data published by the Center for Investigative Reporting on Humanitarian Parole Adjudications for Afghanistan Nationals)].

Defendants respond that the high approval rate between August 14 and 30, 2021 (seventy-two out of seventy-six Form I-131 humanitarian parole applications), was a result of HAB's efforts to help Afghan beneficiaries get on evacuation flights. [Opp'n at 5]. With the U.S. withdrawal from Afghanistan, however, Defendants argue that USCIS returned to an approval rate of 12%,[31] in line with a historic approval rate of about 13% for protection-based parole requests. [Opp'n at 9, 14; see USCIS-0613–14 (indicating that between July 1, 2021, and

---

[31] Given that most parole requests were based on protection needs, the Court assumes that the 12% approval rate relates primarily to protection-based HP applications. [USCIS-0613–14].

mid-February 2022, USCIS denied about 88% of parole requests, conditionally approved 7%, and closed/suspended 5%)[32]].  Further, Defendants maintain that, where beneficiaries are in countries with no U.S. embassy or consulate, the outright "den[ial of] such cases" has been the "historic practice".  See, e.g., [Opp'n at 12, 25, 29 (citing USCIS-0604 ("Discussion points for Afghan and Ukrainian Parole," prepared by IRAD, dated March 24, 2022))].  Defendants point out that the HAB Procedures Manual and Training Modules consistently highlight that "where protection is the only basis for a parole, [adjudicators] generally may authorize parole only in [] limited circumstances."  [Opp'n at 13 (citing HAB Manual at USCIS-0055)].  They aver that the November 2021 Guidance was a departure from USCIS' "historic practice" in that it suspended rather than denied requests for those preliminarily found eligible.  [Opp'n at 12–13].

As an initial matter, the November 2021 Guidance expressly reaffirmed that "[a]lthough parole requests may be similar in nature, each application must be evaluated on its own merits taking into account all the factors unique to the specific parole request and considering the totality of the circumstances."  [November 2021 Guidance at USCIS-0031].  The Guidance further recognized the reality that "[s]ince the U.S. Embassy has suspended operations, including all normal consular services, a beneficiary will be required to leave Afghanistan in order to complete processing of their parole request."  [Id. at USCIS-0033].  In light of these circumstances, "[i]f an adjudicator finds that a beneficiary residing in Afghanistan is initially found eligible for parole, the adjudicator may issue a Parole Notice (Suspension of Processing) stating that USCIS cannot complete processing of the parole request unless and until the beneficiary informs USCIS that they are able to report to a U.S. embassy or consulate."  [Id.].  In

---

[32] USCIS arrived at a general approval rate seemingly by adding the conditionally approved and closed/suspended percentages together.  [USCIS-0614].

the view of the Court, rather than constituting a categorial denial, this was an approval conditional on consular processing.

Further, based on the administrative record, the November 2021 Guidance did not depart from USCIS practice which emphasized that "parole is generally not used for protection reasons" and that protection-based HPs are "generally . . . authorize[d] [] only in [] limited [] circumstances."  [2019 Training Manual at USCIS-0400]; see also [id. at USCIS-0399 ("[P]rotection-based applications present some of the most difficult cases for [adjudicators,]" given that there "may be no legal, timely, or accessible pathway to come to the United States.")]. The administrative record, moreover, indicates that in general, parole is "not authorized for locations where there is [no] USCIS or US Embassy presence."  [USCIS-0571 ("Protection-Based Parole Request Training Slideshow" (USCIS-0565-88))].[33]  In such situations, parole will, except in very limited circumstances, "only be authorized if [the beneficiary] could get to another location for processing."  [Id.].  The November 2021 Guidance similarly provided that generally a petitioner "initially found eligible for [HP]" could only receive final approval for parole by "report[ing] to a U.S. embassy or consulate."  [November 2021 Guidance at USCIS-0038–39].  This signals that the November 2021 Guidance did not depart from USCIS' prior practice in similar scenarios.

That said, the Court also notes the limitations of the existing administrative record in assessing whether, under the November 2021 Guidance, a beneficiary's eligibility for parole was assessed on a case-by-case basis.  Defendants direct the Court to different findings within the

---

[33] This training module is not clearly dated, but Defendants refer to it as reflecting its "historic practice," [Opp'n at 29], and a later module, which appears to be part of the same document and "course," is dated March 28, 2013, [USCIS-0576].

Basel Boe group, where significant public benefit was found for Badi Boe and Bahar Boe, but not for Baharak Boe and Barakat Boe, in support of their argument that "cases were decided individually." [Opp'n at 23]. The divergent outcomes within the Basel Boe group, however, are of limited assistance to the Court. While they indicate that under Step 1 of the analytical framework adjudicators found that, based on the evidence, there existed a significant public benefit for Badi and Bahar Boe, see [2019 Training Module at USCIS-0369–71], they provide no further insight into whether adjudicators exercised individualized discretion when ultimately denying the Boes' HP requests; that is, whether the applications were denied solely due to lack of consular processing or whether an individualized, case-by-case analysis determined the final outcome,[34] see [ECF Nos. 82-22 at 28; 82-24 at 28–30, 82-26 at 28–29, 82-30 at 28–29 (reasons for denial redacted)].

Nonetheless, at this juncture, the Court finds that the November 2021 Guidance was consistent with USCIS's prior practice of granting HP to individuals without access to consular processing only under "limited circumstances" and therefore did not limit adjudicators' ability to

---

[34] The Court also notes that although inability to complete in-country consular processing appears, based on the record before it, to have been a negative discretionary factor, see [USCIS-0571, USCIS-604], nothing in the administrative record suggests that it was dispositive in terms of denying HP requests. In fact, the 2019 Training Module, which, the Court understands was operative in November 2021, highlights that in exercising discretion, "no single factor is controlling." [2019 Training Module at USCIS-0372]. It goes on to state that the "fact that there are more negative factors than positive factors does not necessarily mean that [the adjudicators] should exercise discretion to deny the parole request." [Id.]. For example, "five or six negative factors in a case," could be outweighed by "[o]ne or two positive discretionary factors," resulting in a finding of urgent humanitarian reasons. [Id.]. Alternatively, "one single negative factor could outweigh numerous positive factors." [Id.]; see also [HAB Manual at USCIS-0081 (Step 2 of the analytical framework "requires [adjudicators to] exercise [] discretion, considering the totality of circumstances," with discretion being "exercised on a case-by-case basis, taking into account and weighing the positive factors in the record against any negative factors, to determine if discretion should be exercised favorably.")].

make parole decisions on a case-by-case basis.  Moving Plaintiffs are thus unlikely to prevail on Count II.

### 3. Whether The November 2021 Guidance Was Arbitrary And Capricious (Count I)

"The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 719 (1st Cir. 1999) (second-level internal quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  "While this is a highly deferential standard of review, it is not a rubber stamp." Id. at 720 (quoting Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)).  The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Id. (quoting State Farm, 463 U.S. at 43).

In the context of a policy change, "the requirement that an agency provide a reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (emphasis omitted). "An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books." Id. (citing United States v. Nixon, 418 U.S. 683, 696 (1974)). That said, agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) (citations omitted).  The agency must further "show that there are good reasons for the new policy," although it need not demonstrate that "the reasons for the new policy are better than the

39

reasons for the old one." Fox Television Stations, 556 U.S. at 515. "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." Id.

Moving Plaintiffs argue that the November 2021 Guidance violated the APA's reasoned decision-making requirement in three ways: USCIS did not (i) provide a reasoned explanation for the new policy; (ii) consider alternatives to categorically denying HP to Afghan-based beneficiaries; and (iii) consider the reliance interests created under the standards in existence in August 2021. [ECF No. 102 at 21, 25]. Defendants reply that there was no "categorical policy of denying parole to beneficiaries," but, even if there had been, the agency decision was rationally based on considerations concerning the allocation of scarce resources given that beneficiaries in countries, such as Afghanistan, with no consular processing were rarely going to be able to complete consular processing. [Opp'n at 24–25]. In response, Moving Plaintiffs argue that the administrative record offers no indication that USCIS weighed resource considerations when issuing the November 2021 Guidance. [Reply at 6].

After carefully examining the administrative record and despite the limited number of documents pertaining to Defendants' decision to issue the November 2021 Guidance, the Court nonetheless finds that Plaintiffs are unlikely to demonstrate that the November 2021 Guidance was arbitrary and capricious. Instead, the November 2021 Guidance reflected what Defendants considered to be the best course of action in the midst of a crisis situation: that is, prioritizing Afghans outside of Afghanistan who were more likely to complete consular processing and then be able to travel to the United States. See, e.g., [USCIS-0952 (email from Ruppel dated October 26 outlining "next steps," including that the agency "should prioritize processing of beneficiaries outside of Afghanistan")]. In the Court's view, the closure of the U.S. Embassy and the

continued, unprecedented influx of Afghan HP applications amply justified the judgments made

by Defendants in managing adjudication requests in the face of a rapidly evolving crisis

situation.[35]

An email by USCIS Director Jaddou in response to draft language on updates to the

Afghan Humanitarian Parole Webpage dated November 1, just a few days before the November

2021 Guidance was issued, appears particularly informative.  [USCIS at 0657–58].  Specifically,

a colleague wrote the following to Jaddou about draft language:

> While we attempt to process all urgent requests for parole quickly, the processing may take several months. We currently are prioritizing the parole applications for Afghan nationals outside of Afghanistan *given the availability of completing processing,* but we continue to process parole applications for individuals in Afghanistan as well.
>
> Perhaps "for afghan nationals outside of Afghanistan *consistent with operational capacity*.["]

[USCIS-0658 (emphasis in original)].  In response, Jaddou explained:

> The point is that we decided to prioritize those outside Afghanistan because they clearly have a <u>much more realistic path</u> to the U.S.  At the same time, <u>we decided to continue processing others</u>.  So I wanted to be clear about why we are prioritizing those outside Afghanistan.

[<u>Id.</u> (emphasis added)]; <u>see also</u> [USCIS-0679 (word document prepared by Ruppel containing

"Notes for meeting with D1,"[36]stating that D1 agrees to "[p]rioritize those outside of

---

[35] <u>See, e.g.,</u> [USCIS-0956–57 (Ruppel remarking in an email that on October 12, USCIS had accepted about 1,700 Afghan parole requests in just one day, a number similar to which IRAD usually receives in a year)].

[36] The Court understands that D1 refers to USCIS Director Jaddou.  <u>See</u> [USCIS-0657, -0682].

Afghanistan by putting more staff on this, but fewer on Afghanistan" and "[b]e sure that [USCIS has] clear info in denial about how to contact UNHCR.")].[37]

This email indicates that the November 2021 Guidance sought to prioritize beneficiaries outside of Afghanistan because Defendants believed they had a "more realistic path" to making it to the United States. It thereby provides further evidence that the guidance "was accompanied by some [contemporaneous] reasoning," Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n, 59 F.3d 284, 292 (1st Cir. 1995), and appears to reflect what the agency "believe[d] . . . to be [a] better" way of handling Afghan HP applications, Ramos v. Nielsen, 321 F. Supp. 3d 1083, 1108 (N.D. Cal. 2018). As such, the Court is satisfied that USCIS had a "reasoned explanation" for the November 2021 Guidance. Fox Television Stations, 556 U.S. at 513–14.

As to the Moving Plaintiffs' argument that Defendants did not consider reasonable alternatives, the Court is deeply sympathetic to Plaintiffs' view that, at the very least, Defendants could have continued to issue Parole Conditional Approval notices, as it had done in August. See, e.g., [ECF No. 105-2]; see also DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 30 (2020) ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" (quoting State Farm, 463 U.S. at 51(second and third alterations in original))). That said, the Court recognizes that an "agency has broad discretion to choose how best to marshal its limited resources and to carry out its delegated responsibilities." Massachusetts v. EPA, 549 U.S. 497, 527 (2007). Here, although it

---

[37] Based on the record, the date of the document is uncertain, but it appears to have been an attachment to email correspondence between Ruppel and her staff occurring sometime between the end of October and early November 2021, in which they discussed updates to the Afghan Humanitarian Parole Webpage. See [USCIS-0082].

42

is a close question, the administrative record suggests that resource allocation factored into Defendants' decision to prioritize applications from Afghan beneficiaries outside of Afghanistan. For example, in an October 15, 2021, email to Jaddou, Ruppel observed that "[at] the current rate of receipts, we would need over 500 adjudication officers to keep up" and "more to address the pending workload of over 16,000 [applications]." [USCIS-0956–57]. Similarly, another document indicates that in late October to early November, USCIS required "about 200 officers just to keep up with incoming Afghan cases." [USCIS-0679]. Thus, it would have been reasonable for Defendants to focus their limited resources on those beneficiaries that would likely be able to successfully complete consular processing and arrive in the United States.[38] See [id. (indicating that D1 (Director Jaddou) "agree[d] [to] prioritize those outside of Afghanistan by putting more staff on [those applications], but fewer on [applications from within] Afghanistan.")].

In view of the rapid U.S. withdrawal from Afghanistan, the halt of evacuation flights, and the continued, large influx of HP applications, USCIS' decision to prioritize non-Afghan based HP applications was "within a zone of reasonableness." FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021) (explaining that arbitrary-and-capricious review requires that agency action must "be reasonable and reasonably explained").[39] Even if reasonable minds could conclude that

---

[38] That said, the Court acknowledges that Afghans outside of Afghanistan endured hardship and uncertainty as Defendants adopted and implemented the November 2021 Guidance. See, e.g., [ECF No. 106 ¶¶ 10–38 (attorney Thrasher recounting her clients' efforts to obtain consular processing in Pakistan once they had fled Afghanistan with a Parole Conditional Approval Notice in hand)].

[39] As to Moving Plaintiffs' argument that Defendants did not consider reliance interests engendered "by the agency's prior policies," [ECF No. 102 at 24–25], HP is "an extraordinary measure used sparingly," [HAB Manual at USCIS-0054]. For protection-based requests in

there were better courses of action,[40] the Court "may not substitute its own policy judgment for that of the agency." Prometheus Radio Project, 592 U.S. at 423.  Given the high deferential standard it must afford to the agency, it is therefore unlikely that Moving Plaintiffs will prevail on Count I.[41]

### C.    Irreparable Harm, Balance of Hardship, and Public Interest

Since Moving Plaintiffs' request is unlikely to succeed on the merits, the Court need not address the remaining preliminary injunction factors.  See Arborjet, 794 F.3d at 173.  The Court nonetheless cannot ignore that Afghanistan has experienced a deepening humanitarian crisis in the aftermath of the U.S withdrawal and the Taliban's resumption of power, including an increase in human rights abuses against women and ethnic minorities, as well as extrajudicial killings and enforced disappearances targeting those, such as the Moving Plaintiffs, associated with the former Afghan government.  [ECF No. 102 at 26–27].  These circumstances present a real risk of irreparable harm and affect the balance of hardship between the parties.  For example, the Boe family, given their well-documented and long-standing role in supporting the former Afghan government and U.S. military, asserts in an affidavit that they have been ████████

---

particular, "even if urgent humanitarian reasons have been established," "parole is only rarely granted."  [USCIS-0561].  This is especially so, as discussed supra, in situations where consular processing is unavailable.  As such, given the unique nature and rarity of HP, the Court is not persuaded that it gives rise to reliance interests as envisioned by Moving Plaintiffs.

[40] See, e.g., [Quill Decl. ¶ 23 (referring to the "Uniting for Ukraine Humanitarian Parole" process which, once a beneficiary was found eligible, provided an electronic travel authorization and permitted travel to the U.S "despite the lack of an active U.S. Embassy in Ukraine.")].

[41] Based on the current record, the Court is unable to assess the impact of the November 2021 Guidance on approval rates for Afghans outside of Afghanistan.  At this juncture, the Court merely notes that Defendants' decision to focus on Afghans outside of Afghanistan passes muster under the APA, despite the sharp drop in overall approval rates.  See [Quill Decl. at 8].

██████ to evade the Taliban's violent reprisals. [ECF No. 102 at 26 (citing Baharak Boe Decl. ¶¶ 3–17)]. Similarly, the Noe family, whose current location is not known, but who are likely in ████████, belong to the ethnic Tajik minority and both Nahid, who was the ███████ ████████████████████████████████, and Naser are ██████ who were critical of the Taliban and ████████████████████████████. [Compl. ¶¶ 122–27]. Given their backgrounds, both families are at risk of irreparable harm and significant hardship by virtue of Taliban retaliation.

Although the Court is not indifferent to the real and immediate danger faced by the Boe and Noe families, it is nonetheless unable to grant injunctive relief given its finding that Moving Plaintiffs are unlikely to succeed on the merits. That said, the Court orders that:

❖ Within <u>30 days</u> of this order, Defendants shall provide a status update on the Boe families' pending motions for reconsideration.

❖ Within <u>14 days</u> of this order, Plaintiffs shall provide a status update on the whereabouts of the Noe family.

## IV.      CONCLUSION

For the foregoing reasons, Moving Plaintiffs' motion, [ECF No. 101], is <u>DENIED</u>.

**SO ORDERED.**

October 2, 2024

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE