**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| RASUL ROE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI L. NOEM, *et al.* <br><br> Defendants. | No. 22-cv-10808-ADB |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**</u>

Dated February 7, 2025

Susan M. Finegan (BBO #559156)
John F. Quill (BBO #632216)
Andrew N. Nathanson (BBO #548684)
Michael P. Molstad (BBO #707524)
Gabriella J. Flick (BBO #710976)
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111
617.542.6000
SMFinegan@mintz.com

Adriana Lafaille (BBO #680210)
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA  02108
617.482.3170
ALafaille@aclum.org

*Counsel for Plaintiffs*

**Table of Contents**

**Page**

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

I.      USCIS's initial approval of humanitarian parole for Afghans in Afghanistan reflected the dire situation faced by these beneficiaries after the return of Taliban rule in August 2021 and the significant public benefit of aiding U.S. allies. .................... 3

II.     USCIS suspended adjudication of Afghan humanitarian parole applications after beginning to receive large numbers of applications. ......................................................... 7

III.    USCIS adopted Afghan-specific humanitarian parole policies that for the first time, barred approvals of Afghan cases and instructed adjudicators to "generally deny" protection-based cases in the absence of special factors. ........................................ 8

IV.     An update to the November 2021 policy did not decrease the denial rate or permit approvals for in country Afghans. ....................................................................... 10

ARGUMENT ............................................................................................................... 11

I.      The November 2021 Policy change was not in accordance with the law. ........................ 12

II.     The Afghan-specific parole policies were arbitrary and capricious. ............................... 14

        A.      USCIS did not consider reasonable alternatives before implementing a new policy for parole applications from Afghanistan. .......................................... 15

        B.      USCIS failed to consider the reliance interests of tens of thousands of Afghans. ................................................................................................. 18

        C.      USCIS failed to provide a reasonable explanation for the new Afghan-specific policies. ...................................................................................... 20

III.    USCIS Unreasonably Delayed the Adjudication of Plaintiffs' Humanitarian Parole Applications. ................................................................................................ 22

CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Biden v. Texas*,
597 U.S. 785 (2022)........................................................................................................13

*California v. BATFE*,
718 F. Supp.3d 1060 (2024) ..........................................................................................12

*City of Cleveland v. Ohio*,
508 F.3d 827 (6th Cir. 2007) ..........................................................................................12

*Ctr. for Sci. in the Pub. Int. v. United States FDA*,
74 F. Supp. 3d 295 (D.D.C. 2014)..................................................................................23

*Damus v. Nielsen*,
313 F. Supp.3d 317 (D.D.C. 2018)..................................................................................12

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)................................................................................................12, 15, 17, 18

*Doe v. Mayorkas*,
585 F. Supp.3d 49 (D. D.C. 2022)..................................................................................12

*Doe v. United States Citizenship & Immigration Servs.*,
239 F. Supp.3d 297 (D. D.C. 2017)................................................................................12

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).........................................................................................................20

*Esch v. Yeutter*,
876 F.2d 976 (D.C.Cir.1989)...........................................................................................10

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).....................................................................................................18, 20

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)..........................................................................................................14

*In re Core Commc'ns, Inc.*,
531 F.3d 849 (D.C. Cir. 2008).........................................................................................22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................................................................12

*Mendez v. Wolf*,
    2021 U.S. Dist. LEXIS 44770 (D. Mass. March 9, 2021) .......................................................12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................................................................14, 15

*Towns of Wellesley, Concord & Norwood v. Fed. Energy Regul. Comm'n*,
    829 F.2d 275 (1st Cir. 1987) (per curiam) ...............................................................................22

*Valley Citizens for Safe Environment v. Aldridge*,
    886 F.2d 458 (1st Cir. 1989) (Breyer, J)..................................................................................10

*Wilkinson v. Legal Servs. Corp.*,
    27 F. Supp.2d 32 (D.D.C. 1998)..............................................................................................12

## **INTRODUCTION**

This case challenges the United States Citizenship and Immigration Services' ("USCIS") November 2021 decision to make humanitarian parole unavailable to Afghan beneficiaries who were in Afghanistan. Following the United States' withdrawal from Afghanistan in 2021 and the immediate collapse of the U.S.-backed government, Afghans who spent decades working with the United States and striving to build up Afghan civil society were faced with the dire prospect of the Taliban returning to power. Reprisals against those who worked with the United States were inevitable and immediate. Not just officials in the U.S.-allied Afghan government, but also soldiers, judges, professors, doctors, and other Afghans were suddenly at severe risk. Women, who for a brief period had been able to pursue their educations and careers, were thrust back into a society in which they could not leave their homes without a male companion. At the precipice of this unimaginable backslide into Taliban rule, many Afghans sought a way to escape.

As the Afghan government collapsed, the United States airlifted thousands of Afghans to safety. Recognizing the significant public benefit and/or urgent humanitarian reasons for parole, Department of Homeland Security Secretary ("DHS") authorized and Customs and Border Protection ("CBP") exercised its discretion to parole over 70,000 Afghans who were flown to the United States. But tens of thousands of Afghans were unable to get on flights. With the Taliban back in power and the airlift terminated, these Afghans, sometimes assisted by their relatives in the United States, searched for a way to reach and obtain safety in the United States.

During this time, U.S. Citizenship and Immigration Services ("USCIS") identified humanitarian parole as a path for Afghans to seek safety in the United States and provided Afghans with information about applying for it. At first, USCIS granted nearly all of humanitarian parole applications for Afghans fleeing the Taliban. For a time, these approvals were connected to the airlift operation, and USCIS expedited cases so that those who were approved might get onto

evacuation flights.  But when the airlift ended, adjudicators continued to find that the cases of Afghans in Afghanistan presented urgent humanitarian reasons and/or a significant public benefit and satisfied the high thresholds for a grant of parole.  Because there was no longer a U.S. embassy or consulate in Afghanistan and the next step in parole processing after a conditional approval is generally to go to a U.S. embassy or consulate, USCIS's approval notices informed parole beneficiaries that they would need to travel to a third country in order to actually be authorized for travel.

But with rising numbers of applications from desperate Afghans and their families, USCIS changed course.  In early September 2021, the agency put an abrupt hold on the adjudication of all applications for humanitarian parole submitted by Afghans.

And in November, USCIS promulgated new criteria for its adjudicators to follow when assessing applications for humanitarian parole submitted for Afghans. Statement of Undisputed Material Fact ("SUMF") ¶ 101. This unprecedented policy, which *applied only to Afghans*, made it so that no one in Afghanistan could be approved for humanitarian parole.  Under the new policy, adjudicators were urged to deny most cases for parole beneficiaries in Afghanistan due simply to the fact that the beneficiaries would eventually have to travel to a third country to complete the parole process at a U.S. consulate.  SUMF ¶ 106.  But that is not all.  Under the November Policy, even when a beneficiary might have merited parole, an adjudicator's only option was to administratively close their case.  SUMF ¶¶ 107-109.  The case would then remain closed and could not be adjudicated unless the beneficiary left Afghanistan.  SUMF ¶ 109.  The November Policy was an unprecedented shift that left adjudicators who held "crucial life and death" cases in their hands with only two choices—deny the case or shelve it.  SUMF ¶ 3.

The new Afghan-specific policy first implemented in November 2021 was both "not in accordance with law" and "arbitrary and capricious." Plaintiffs ask the court to declare the policy unlawful, set it aside, and order a re-adjudication of any denied humanitarian parole applications under the standards in effect prior to the unlawful change in policy. Plaintiffs have also brought claims of unlawful delay and a Writ of Mandamus, for which they request an appropriate remedy consistent with developments in their cases as of the time the Court decides this motion.

## FACTUAL BACKGROUND

I.    **USCIS's initial approval of humanitarian parole for Afghans in Afghanistan reflected the dire situation faced by these beneficiaries after the return of Taliban rule in August 2021 and the significant public benefit of aiding U.S. allies.**

On August 15, 2021, the Taliban took control of Afghanistan from the U.S.-backed government. SUMF ¶ 2. On August 30, 2021, following a two-week operation in which approximately 100,000 Afghans were airlifted from Kabul airport, the United States withdrew its military forces, ending a 20-year intervention in the country. SUMF ¶¶ 1, 13. As conditions in Afghanistan worsened, many U.S.-allied Afghans applied to USCIS for humanitarian parole. SUMF ¶ 50. On August 14, 2021, in light of the "crucial life and death situation for the parole beneficiaries in Afghanistan" the Chief of Humanitarian Affairs Branch ("HAB") at USCIS instructed adjudicators to "drop everything, and focus on completing all Afghan humanitarian parole cases." SUMF ¶ 51.

The humanitarian parole process allows DHS to "parole [any non-citizen] into the United States temporarily under such conditions as [the Secretary of DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5)(A). Humanitarian parole may be granted by DHS sub-agencies, including CBP, which used this authority in its fall 2021 parole of 70,000 Afghans who had been airlifted from Kabul. SUMF ¶ 13. USCIS, another DHS sub-agency, adjudicates humanitarian parole requests

3

for non-citizens overseas through the HAB.  SUMF ¶ 20.  When HAB conditionally approves a humanitarian parole case, an applicant must typically travel to a U.S. embassy or consulate to apply for a boarding foil, a document that would allow the beneficiary to travel to the United States.  SUMF ¶ 46.

Prior to the November 2021 introduction of Afghan-specific guidance challenged in this case, the standards and procedures that adjudicators were required to follow in adjudicating humanitarian parole requests arising from the Taliban's return to power in Afghanistan were contained in a HAB Manual and a 2019 Training Module.  SUMF ¶ 22.  That existing guidance specified that humanitarian parole requests based solely on protection should generally be granted only in "limited circumstances."  SUMF ¶ 31.  Adjudicators received no instruction in August 2021 to deviate from this guidance.  SUMF ¶¶ 73, 85.  Nevertheless, from August 2021 to September 2021, USCIS granted the vast majority of humanitarian parole requests filed on behalf of Afghans in Afghanistan—an indication that the immediate threats of reprisal against U.S. allies after the end of a 20-year U.S. presence was the sort of "limited circumstance" for which humanitarian parole was permissible.  SUMF ¶ 77.

The closure of the embassy in Kabul on August 15, 2021 did not stop USCIS from continuing to process the humanitarian parole applications of desperate Afghans.  SUMF ¶ 57.  Neither the HAB Manual nor the 2019 Training Module provided different standards to be followed when beneficiaries were located in a country without a U.S. consulate, nor did these guidance documents suggest that such cases should be disfavored in any way.  SUMF ¶ 45.  After August 15, 2021, USCIS began using a Conditional Approval Notice specific to Afghans who were approved for humanitarian parole.  SUMF ¶ 58.  The Conditional Approval Notice stated that "USCIS recognizes that U.S. Embassy Kabul is closed and all normal consular services in

4

Afghanistan have been suspended until further notice" and that "[i]f the beneficiary is able to make private arrangements to travel to a third country where there is a U.S. embassy or consular services are available, please notify USCIS immediately[.]" SUMF ¶ 58. If that occurred, "USCIS will work with the Department of State to transfer the parole case so that Consular processing can be completed in the third country" and, critically, "[*p]rovided that USCIS discovers no new information that would impact eligibility for parole, a travel document will be issued* for the parole beneficiary named above." SUMF ¶ 61 (emphasis added). Thus, even though the embassy in Kabul had closed, USCIS could and would continue to determine, on a case-by-case basis, whether Afghans in Afghanistan merited parole for urgent humanitarian reasons or significant public benefit. If individuals who were conditionally approved by USCIS reached a third country with an American embassy or consulate, as long as no new information came to light that warranted denial, a document permitting travel to the United States would then be issued.

Prior to August 30, 2021, USCIS expedited Afghan cases at least in part in order to assist people who might be able to board U.S. evacuation flights. SUMF ¶¶ 51 72, 78. On August 31, 2021, just after the end of the airlift, USCIS adjudicators were told to stop automatically expediting all Afghan cases. SUMF ¶ 72. But USCIS gave no instruction to employ different standards to adjudicate Afghan cases than those that had been used previously. SUMF ¶ 73. Based on existing standards and the dire circumstances facing Afghan parole beneficiaries, USCIS continued to conditionally approve humanitarian parole cases, and to issue the conditional approval notices that instructed beneficiaries regarding consular processing in a third country, until adjudicators were instructed to stop processing Afghan humanitarian parole cases altogether on September 7. SUMF ¶¶ 74, 93. *See* also ECF No. 106-1.

Prior to the pause in adjudicating Afghan cases, USCIS advertised the availability of humanitarian parole to Afghans and U.S.-based advocates, participating in an inter-agency stakeholder call and updating its website to educate Afghans and advocates about the humanitarian parole process. SUMF ¶¶ 64-69. On August 26, 2021, USCIS modified its general humanitarian parole webpage by adding a banner that directed Afghan nationals to a new Afghan-specific humanitarian parole webpage, entitled "Information for Afghan Nationals on Parole into the United States." SUMF ¶ 64. In a section titled "Eligibility," the webpage explained that "USCIS may exercise discretion to authorize parole on a case-by-case basis for individuals with urgent humanitarian or significant public benefit reasons to come to the U.S. for a temporary period." SUMF ¶ 65. The website instructed Afghan applicants to ask "[f]or expedited processing" by writing "the word EXPEDITE in the top right corner of the application in black ink." SUMF ¶ 67. It further explained that "beneficiaries . . . may need to arrange travel to a U.S. embassy outside of Afghanistan to continue processing their parole request." SUMF ¶ 68.

In light of the dire situation of U.S.-allied Afghans, HAB approved nearly every Afghan humanitarian parole case it adjudicated from August 1 to the decision to pause adjudications on September 7. Statistics as of September 1, 2021 revealed that USCIS had approved 95% of Afghan I-131 humanitarian parole applications (72 approved and 4 denied). SUMF ¶ 77. In analyzing the approvals during this period, the Chief of the International Refugee Affairs Division ("IRAD") of USCIS maintained that the standards for determination of eligibility for humanitarian parole that required third-party verification of risk in certain cases had been followed during this period, in which the "[Country of Origin Information] . . . to support evidence of risk for those closely associated with the [U.S. Government] and certain other categories," was so strong and refugee processing would not have provided timely protection. SUMF ¶ 85.

6

**II.    USCIS suspended adjudication of Afghan humanitarian parole applications after beginning to receive large numbers of applications.**

On September 3, the Chief of HAB noted in a "Request for Guidance" that Afghan applications were "arriving at an abnormally high rate."   SUMF ¶ 86.  The request for guidance highlighted key issues impacting adjudications, including the "need to understand" the "weight" of the "significant public benefit" analysis, in light of the "public interest in providing an option for Afghans to leave Afghanistan." SUMF ¶ 86.  The request recognized the relationships of many Afghans to family in the United States and to the U.S. government and U.S. and international nonprofits.  SUMF ¶ 86.  The request also noted the absence of a consulate in Afghanistan, the consequent lack of other immigration processing, and the lack of clarity on how to "weigh protection on an ongoing basis" and "how to consider the weight of 3rd party credible evidence that supports parole on a protection basis."  SUMF ¶ 86.  The IRAD Chief responded that "we should pause adjudication until we can provide more guidance to adjudicators given that the U.S. military assisted evacuation has ended."  SUMF ¶ 92.

On September 7, 2021, USCIS instituted a "temporar[y] hold . . . on issuing any decisions for Afghan nationals seeking parole" because USCIS was going to "revise the approval letter" and "assess whether any additional guidance needs to be provided to adjudicators[.]"  SUMF ¶ 93.  The hold *only* applied to Afghan nationals seeking parole.

The hold followed alarm at USCIS that significant numbers of Afghans were beginning to seek humanitarian parole.  On August 30, 2021, after receiving an inquiry from a lawyer indicating that she was preparing to file over 700 Afghan humanitarian parole cases, the Chief of IRAD wrote: "This is concerning that they are getting ready to process requests for 700 individuals . . ."  Later that morning, USCIS Director Ur Jaddou wrote that "I have a feeling we are about to see a mad rush apply for parole."  SUMF ¶ 75.

7

USCIS's September 7, 2021 decision to stop adjudicating Afghan cases was not communicated to the public, who continued to file applications for Afghans desperately seeking a path to safety. On October 17, 2021, Director Jaddou noted internally that the 16,000 I-131 humanitarian parole applications from Afghans received so far was "overwhelming." SUMF ¶ 97.

The hold on adjudicating humanitarian parole applications for Afghans lasted nearly two months, but when processing resumed, it was under a new Afghan-specific standard that barred the approval of humanitarian parole applications for those in Afghanistan. On October 26, 2021, as the agency prepared to put into effect the new guidance, the Chief of IRAD stated internally that the agency would now "move forward to begin to deny cases for those who are ineligible, including the protection cases that do not meet our parole requirements who should seek protection through existing third country protection and refugee processing channels." SUMF ¶ 100.

### III.    USCIS adopted Afghan-specific humanitarian parole policies that for the first time, barred approvals of Afghan cases and instructed adjudicators to "generally deny" protection-based cases in the absence of special factors.

USCIS's new Afghan-specific guidance was issued on November 5, 2021, USCIS and titled Parole Requests for Afghan Nationals Interim Policies and Procedures (the "November 2021 Policy"). SUMF ¶ 101. Although the November 2021 Policy purported to require "case-by-case" consideration, in practice, it precluded it.

The November 2021 Policy instituted a blanket policy making it so no adjudicator could actually approve such an application. *First*, the November 2021 Policy stated that applications from Afghans in Afghanistan that are based on protection needs "generally will be denied" because the noncitizen would need to leave Afghanistan in order to complete processing at a U.S. consulate, and the "adjudicator will not know when or how the beneficiary will leave Afghanistan, where the beneficiary will be once outside of Afghanistan, or the protection that may be available to the beneficiary in that location." SUMF ¶ 106. Rather than continuing the policy of issuing

8

Conditional Approval Notices for Afghans in Afghanistan based on the risk of harm they faced in Afghanistan, the November 2021 Policy instructed adjudicators to deny applications based on protection needs because the applicant may theoretically not need protection when they left Afghanistan for processing.  SUMF ¶ 106.

*Second,* the instruction to "generally deny" applications, which seemed to leave open the possibility that a protection-based case could be approved, was a farce.  Even if a beneficiary in Afghanistan was found "initially" eligible for parole, they could *not* receive a conditional approval of humanitarian parole under any circumstances, even if the beneficiary demonstrated their willingness and ability to travel to a third country.  SUMF ¶ 107.  Instead, someone who appeared eligible for parole would only be given a letter administratively closing their case and promising an adjudication of it if they later relocated to a third country.  SUMF ¶ 109.  In short, the November 2021 Policy only allowed for two options: an adjudicator was permitted to administratively close a parole request or deny it.

This was a dramatic change from the policy existing prior to November 2021.  The earlier policy permitted Afghans in Afghanistan to be conditionally approved for parole based on their situation *in Afghanistan*, and then travel to a U.S. consulate and be granted a travel document "[p]rovided that USCIS discovers no new information that would impact eligibility for parole."  SUMF ¶ 61.  The later policy only allowed adjudicators who identified meritorious cases to notify the petitioner that the beneficiary "may be eligible," all the while filing the application away for later consideration if an applicant arrived in a third country with a consulate.  SUMF ¶ 109.  Such a beneficiary made that journey at their peril, however, because at that point the adjudicator could find the beneficiary ineligible for parole based on their new situation in the third country and deny the application.  In fact, a USCIS document prepared in anticipation of a stakeholder call held on

November 5, 2021 provides that beneficiaries who make it to a third country "should be aware that the parole request could still be denied." SUMF ¶ 126.

The effect of the November 2021 Policy was drastic. Between November 8, 2021, and April 24, 2022, only 1.8% of the 2,673 Afghan humanitarian parole applications adjudicated were approved (reflecting cases for individuals *outside* Afghanistan) and 6.8% were administratively closed (the option for cases individuals inside Afghanistan). SUMF ¶ 130.[1]

## IV.    An update to the November 2021 policy did not decrease the denial rate or permit approvals for in country Afghans.

On February 23, 2022, following direction from Secretary Jaddou, the Chief of IRAP instructed USCIS staff "to temporarily pause issuance of denials of parole applications for 1) Afghan parole beneficiaries and 2) beneficiaries of other nationalities whose cases are on targeted harm" because USCIS was "reconsidering the evidentiary burden required for protection cases as a matter of discretion[.]" SUMF ¶ 138. During this time, USCIS considered and ultimately updated the evidentiary requirements to prove targeted harm when applying for humanitarian parole.[2] SUMF ¶¶ 139, 145.

On April 25, 2022, USCIS issued an updated Parole Procedures for Afghan Nationals (the "April update") and, a few days later, resumed adjudicating Afghan cases. SUMF ¶ 146. The April update continued to disfavor protection-based claims, while pointing favorably to the categories prioritized by the interagency. Unlike the November 2021 Policy, the April update

---

[1]    Consideration of extra-record information is appropriate when simply reviewing the administrative record is not enough to resolve the case. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989); *Valley Citizens for Safe Environment v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989) (Breyer, J) (explaining additional evidence is a matter of discretion but appropriate in specific circumstances). Here, publicly available statistics provided by USCIS pursuant to a FOIA request that demonstrate the effect of the policies at issue is appropriate. Additionally, an attorney affidavit updating the Court on the clients' current status is necessary for the Court to resolve the Plaintiffs' delay claim.

[2]    The Plaintiffs do not challenge USCIS's updates to the 2019 Training Module that changed the evidentiary requirements to prove targeted harm.

removed all guidance specific to Afghans in Afghanistan and the directive that applicants in Afghanistan would generally be denied if they did not fall into one of the prioritized groups. SUMF ¶ 146.

But the April update continued the bar on approvals, allowing adjudicators of in-country cases to choose only between administrative closure and denial.  Under the April update, the administrative closure notice was renamed a "Notice of Continued Parole Processing," again stating that the beneficiary must arrange their own travel to a location with a U.S. embassy or consulate to complete processing of their parole request.  SUMF ¶¶ 146-47.  The Notice of Continued Parole provided that, once the beneficiary reaches a country with an embassy or consulate, USCIS would reopen the case and determine if the beneficiary "remains eligible for parole[.]"  SUMF ¶ 197.  As under the November 2021 Policy, the Notice of Continued Parole processing was not a conditional approval.  And USCIS considered, but did not adopt, a proposal to instruct adjudicators that they did not have to "reassess the original urgent humanitarian or significant public benefit parole determination."  SUMF ¶ 149.  Thus, the Catch-22 persisted: Afghans could not be approved for humanitarian parole when in Afghanistan, and, if they were found initially eligible and traveled to a third country, their applications could be denied on the ground that their situation in the *third country* did not qualify them for parole.

The denial rate increased after the April 2022 update.  Between the implementation of the April 2022 Policy and July 11, 2022, USCIS approved only 0.6% of the 4,953 cases it adjudicated, and administratively closed only 1.5%.  SUMF ¶ 150.  The remaining 97.9% of cases were denied. SUMF ¶ 150.

## ARGUMENT

Summary judgment is called for where the pleadings and evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "In a case involving review of a final agency action under the APA, the district court 'sits as an appellate tribunal,' as '[t]he 'entire case' on review is a question of law." *Doe v. Mayorkas*, 585 F. Supp.3d 49, 55 (D. D.C. 2022) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). "Summary judgment is [] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Doe v. United States Citizenship & Immigration Servs.*, 239 F. Supp.3d 297, 305 (D. D.C. 2017) (internal quotations omitted).

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Mendez v. Wolf*, 2021 U.S. Dist. LEXIS 44770, at *3-4 (D. Mass. March 9, 2021) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020)). Under the APA, the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(2)(A).

## I.   The November 2021 Policy change was not in accordance with the law.

An agency action must be "in accordance with the law[.]" 5 U.S.C. § 706(2)(A). "'Agency action is 'not in accordance with the law' when it is in conflict with the language of the statute' relied upon by the agency." *California v. BATFE*, 718 F. Supp.3d 1060, 1078 (2024); *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007). *See also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."). In addition to the obligation to follow statutory requirements, "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions," *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp.2d 32, 34 n.3 (D.D.C. 1998), "particularly those that affect individual rights." *Damus v. Nielsen*, 313 F. Supp.3d 317, 337 (D.D.C. 2018).

12

8 U.S.C. § 1182(d)(5)(A) requires USCIS to give individualized consideration to applications for humanitarian parole, authorizing DHS to "parole [any non-citizen] into the United States temporarily under such conditions as [the Secretary of DHS] may prescribe only on a *case-by-case basis* for urgent humanitarian reasons or significant public benefit[.]"   8 U.S.C. § 1182(d)(5)(A) (emphasis added).    The authority granted under § 1182(d)(5)(A) is not "unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis[.]'" *Biden v. Texas*, 597 U.S. 785, 806 (2022).  Consistent with the statutory command, the 2019 Training Module states that "[e]ach decision . . . should be made on a case-by-case basis, taking into account all factors and considering the totality of the circumstances."  SUMF ¶ 25.

The November 2021 Policy violated this command, denying Afghans in Afghanistan (but only Afghans in Afghanistan) any opportunity to be approved for humanitarian parole.  After that change, HAB adjudicators—the officials delegated the statutory task of making "case-by-case" assessments, and instructed by internal guidance to take all factors into account and to consider the totality of the circumstances—lost the ability to do so.

Under the new policies, which HAB adjudicators were told they "must follow," adjudicators were only permitted to deny or administratively close cases for Afghans in Afghanistan.  SUMF ¶¶ 102, 105, 107.  Specifically, the November 2021 Policy stated that Afghans in Afghanistan who applied for parole based on protection needs would be "generally denied" because "the adjudicator will not know when or how the beneficiary will leave Afghanistan" to complete processing, "where the beneficiary will be once outside Afghanistan, or the protections that may be available to the beneficiary in that location."  SUMF at ¶ 106.  In other words, a beneficiary in Afghanistan generally could not be approved for parole based on protection needs because they may theoretically no longer be at an imminent risk of harm if they escape to a

third country for processing. And worse yet, even if an adjudicator found that a protection-based application warranted approval, the best that they could do is issue a Parole Notice (Suspension of Processing) and administratively close the case until the beneficiary made it to a third country. SUMF ¶ 107.

Critically, administrative closure of these cases was *not* an approval. SUMF ¶ 111. Instead, these notices only provided beneficiaries with the opportunity to reopen their administratively closed parole cases and have them adjudicated by USCIS once they reached a third country. SUMF ¶ 113. Unlike the Conditional Approval Notices previously issued, rather than go to a consulate for processing, the application would be adjudicated based on the harm the beneficiary faced in that third country. Because the November 2021 Policy barred the approval of in-country Afghan cases, it violated the case-by-case adjudication requirements of the statute and HAB Manual and replaced it with a policy that prohibited issuing any approvals to Afghans in Afghanistan seeking parole based on protection needs.

## II.    The Afghan-specific parole policies were arbitrary and capricious.

Whenever an agency adopts a new policy, the agency's action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The court may set aside an agency decision as arbitrary and capricious if the agency does not "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). When evaluating the agency's explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*

14

Here, USCIS violated the APA's reasoned-decision making requirement in three ways. First, USCIS did not consider reasonable alternatives to the blanket no approvals policy implemented in November 2021. Second, USCIS failed to acknowledge and account for the reliance interests of tens of thousands of Afghans. Third, USCIS failed to provide a reasonable explanation for the new Afghan-specific policies.

> **A.    USCIS did not consider reasonable alternatives before implementing a new policy for parole applications from Afghanistan.**

When an agency rescinds or replaces "a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Regents*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 42). If an agency changes course without doing such an analysis, it has "entirely failed to consider [that] important aspect of the problem," and its action is arbitrary and capricious. *Id.* (quoting *State Farm*, 463 U.S. at 43).

Prior to barring approvals for in-country Afghans, USCIS failed to consider the possibility of continuing its existing policy, which allowed for conditional approval of in-country Afghan cases. *See, e.g., Regent*, 591 U.S. at 30 (recission of DACA program was arbitrary and capricious where agency failed to consider retaining an element that was "centerpiece" of existing policy). In prior briefing, the government indicated that this option was unavailable to USCIS due to the closure of the embassy in Kabul. ECF No. 41 at 18. But the record shows that prior to the November 2021 Policy, USCIS could and did conditionally approve humanitarian parole applications of Afghans in Afghanistan. USCIS did not stop conditionally approving in country cases after the U.S. embassy in Kabul closed on August 15, 2021. SUMF ¶ 57. Instead, it created a new conditional approval notice that cited the closure of the embassy and alerted applicants to the procedures for completing processing at a U.S. consulate. SUMF ¶ 58. These Conditional Approval Notices stated that "USCIS will work with the Department of State to transfer the parole

15

case so that Consular processing can be completed in the third country" and "[p]rovided that USCIS discovers no new information that would impact eligibility for parole, a travel document will be issued for the parole beneficiary named above."  SUMF ¶ 58.  USCIS continued to use this notice for conditionally approved cases, making no change to it—or to the requirements for conditionally approving humanitarian parole for in-country Afghans—after the airlift ended. Indeed, the administrative record is completely devoid of any change in USCIS's approach to in-country Afghan applicants following the end of the air-lift and prior to the suspension of processing Afghan applications.  USCIS continued to issue conditional approvals to in-country Afghan applicants until the September 7 instruction to hold all adjudications in Afghan cases.  SUMF ¶¶ 74, 93. *See also* ECF No. 106-1 (providing example of conditional approval issued to in-country Afghans on September 3, 2021).

In adopting the November 2021 Policy and its prohibition of approvals of in-country Afghan cases, USCIS did not consider that it could continue issuing conditional approval notices to applicants in Afghanistan while still requiring them to attend a consular interview in order to complete processing.  Instead, under the November 2021 Policy, USCIS stopped issuing conditional approvals to Afghans in Afghanistan with no explanation other than the lack of a consulate and the now-expressed need to consider their need for protection after they arrived in the third country.  The new policy instructed adjudicators that they could either deny in-country Afghan cases or issue a new notice that only existed for Afghan cases entitled "Parole Notice (Suspension of Processing)."  SUMF ¶¶ 106-116.  And after issuing such a notice, USCIS would administrative close the applicant's case.  Applicants who received such a notice could contact

16

USCIS after they reached a third country, at which point the HAB would finally adjudicate their country. [3/]  SUMF ¶¶ 117-118.

USCIS's failure to consider that it could continue to permit adjudicators to conditionally approve meritorious Afghan cases is particularly egregious given that it had only recently acknowledged the "crucial life and death situation for the parole beneficiaries in Afghanistan" and that there was no indication that these risks had abated.  SUMF ¶ 51.  The agency's failure to even consider an obvious alternative—specifically, continuing to do what the agency had already been doing before it issued the new policy—was arbitrary and capricious.  *See, e.g., Regents*, 591 U.S. at 30 (recission of DACA program was arbitrary and capricious where agency failed to consider retaining an element that was "centerpiece" of existing policy).

The same is true for USCIS's instruction to adjudicators to "generally deny" protection-based humanitarian parole of Afghans in Afghanistan except where particular factors were present. USCIS justified this policy change by pointing to the absence of a consulate in Afghanistan and the possibility that Afghans' situations would be different once they got to a consulate.  But, again, USCIS did not appear to consider that it could account for these interests by continuing its existing policy of conditionally approving meritorious cases based on the imminent risk of serious harm they faced *in Afghanistan*, rather than denying these applications on the grounds that an applicant could theoretically no longer be in imminent risk of serious harm once they reach a third country for processing.

---

[3/]    Paradoxically, if an Afghan who received an administrative closure notice wanted to maintain any hope of obtaining humanitarian parole, they would have to travel to a third country where they would be at imminent risk of harm.  Rather than encouraging Afghans to make their way to safe countries where they could finish processing their application, the November 2021 Policy required them to leap out of the frying pan but encouraged them to jump into the fire.

17

**B.    USCIS failed to consider the reliance interests of tens of thousands of Afghans.**

Before an agency makes changes to existing policy, the agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. If the agency's assessment indicates that "prior policy has engendered serious reliance interests that must be taken into account," the agency's reasoned explanation for the policy change must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

In November 2021, USCIS knew that its policy concerning Afghan applicants for humanitarian parole had engendered serious reliance interests. Only three months earlier, in August, the agency had added a special page to its website containing "Information for Afghan Nationals on Parole into the United States." SUMF ¶ 64. A banner on the general humanitarian parole webpage directed Afghan nationals to this new Afghan-specific site (SUMF ¶ 64), which provided instructions on how Afghans in particular could apply for humanitarian parole; among other things, the new webpage explained to Afghan applicants how they could seek expedited processing by writing "EXPEDITE" on their applications. SUMF ¶ 67. USCIS published this webpage after the embassy in Kabul had closed. During this period, moreover, USCIS had approved 95% of Afghan I-131 applications (*see* SUMF ¶ 77), issuing Conditional Approval Notices in the absence of a working consular function in Afghanistan. SUMF ¶ 58.

USCIS quickly recognized that its actions had led masses of Afghans and their supporters to believe that humanitarian parole was a viable option for Afghans. On August 30, 2021, the Chief of IRAP acknowledged that "the fact that we published a factsheet on the USCIS website is being read as a signal that HP is the pathway for people in third countries . . . ." SUMF ¶ 75. Director Jaddou wrote "I have a feeling we are about to see a mad rush to apply for parole." SUMF

18

¶ 76.  The suspicions of USCIS officials were well-founded; by October 17, 2021, before the November 2021 Policy was issued, USCIS had received 16,000 humanitarian parole applications for Afghans and collected millions of dollars in application fees from the Afghan community and its allies.  SUMF ¶ 97.

But while the record reveals USCIS's *awareness* of Afghans' reliance on the viability of their humanitarian parole applications under the existing adjudication standards, it does not reveal that USCIS took this reliance interest into account.  USCIS did not consider, for example, whether the presumed availability of the humanitarian parole process was impacting the way Afghans spent limited resources, and even the decisions of Afghans about whether or not to flee the country— much less take account of these reliance interests in formulating policy changes that were silently put into effect as to thousands of already-pending applications.  Instead of acknowledging and accounting for those reliance interests, USCIS tried to erase its own role in their creation.  A talking points document prepared for Secretary Mayorkas in April 2022 stated that "[i]n the rush to assist vulnerable Afghans in late summer and early fall of 2021, many attorneys and non-governmental organizations provided public guidance on options for entering the United States, including applying for parole through USCIS for urgent humanitarian and significant public benefit reasons." SUMF ¶ 150.  The talking points went on to state that "[m]any petitioners were under the erroneous belief that the USCIS parole process was a good way to help Afghan beneficiaries depart Afghanistan."  SUMF ¶ 150.  The document failed to acknowledge that USCIS had also provided public guidance that held out the availability of humanitarian parole to the Afghan population, and that this belief in the availability of humanitarian parole was "erroneous" only because USCIS had eliminated the possibility of humanitarian parole for Afghans in Afghanistan through its implementation of the November Policy.  In fact, the only indication that USCIS recognized the

19

reliance interests of Afghan applicants came after the November Policy was put in place, when the agency considered (but did not pursue) a proposal to provide refunds to petitioners who had filed fruitless humanitarian parole requests on behalf of Afghan beneficiaries.  SUMF ¶ 131.  Because USCIS failed to weigh the applicants' reliance interests or provide a detailed and contemporaneous explanation required in the face of such interests, the November 2021 Policy is arbitrary and capricious.

### C.   USCIS failed to provide a reasonable explanation for the new Afghan-specific policies.

When making a policy change, an agency must provide a reasoned explanation that, at the very least, demonstrates an awareness that it *is* changing position.  *See Fox Television Stations*, 556 U.S. at 515.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change").  "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *Fox Television Stations*, 556 U.S. at 515 (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

The administrative record in this case reveals that USCIS failed to meet the basic threshold of displaying "awareness" that it changed its position on Afghan humanitarian parole in November 2021.  *Fox Television Stations*, 556 U.S. at 515.  With regard to the decision to make conditional approval entirely unavailable to thousands of applicants who remained in Afghanistan, USCIS showed no awareness that entirely removing the discretion of adjudicators to grant humanitarian parole to applicants regardless of their ability to make it to a consulate was an unprecedented break with existing policy—both as to humanitarian parole generally, and as to Afghan applications filed since the return of the Taliban.  And with regard to the instruction to adjudicators to generally deny applications of in-country Afghans in the absence of limited factors, the record is similarly devoid

20

of any acknowledgement that an instruction that approvals should be rare *as to Afghan applicants in danger of harm from the Taliban* is distinct from a pre-existing general instruction that approvals in cases based only on protection needs should occur in limited circumstances. The latter leaves open the possibility that the life and death situation faced by many Afghan humanitarian parole applicants because of their service and connections to the United States is among the "limited circumstances" for which humanitarian parole is appropriate; the former does not.

But USCIS maintained that it made no change to the standards for Afghans in November 2021. In response to concern by members of Congress about high denial rates after November 2021, the agency maintained that it had made no change to its standards. SUMF ¶ 131. USCIS also provided Congress with approval statistics that pooled together the time period before and after November 2021, and therefore did not show that approvals had fallen dramatically. SUMF ¶ 131. Even after this lawsuit was filed—and before the November 2021 memo was available to Plaintiffs and the Court—the Government continued to maintain its position that no policy change had occurred. *See* ECF No. 52 at 10 ("the same standards that applied in July 2021 are the same standards that apply today); Aug. 2, 2022 Tr. at 6:14-15 ("there has been no policy change").

The administrative record also fails to provide any reasoned explanation for the November 2021 changes. For example, the record contains no explanation at all for why USCIS implemented an unprecedented policy allowing only denials or administrative closure for in country Afghans, after it had previously allowed for Conditional Approvals for individuals that would need to leave Afghanistan to attend a consular interview. Nor does the record provide any reasoned explanation for why—in the face of growing numbers of applications and its own acknowledgement of the life and death situation of these applicants and the lack of refugee processing options that would bring them any timely relief—USCIS chose to change standards to ensure the denial of the vast majority

21

of Afghan applications, and the approval of *none* of the applications of those who were actually

hiding from the Taliban in Afghanistan. USCIS explained only that it "may be difficult to assess

eligibility based purely on protection needs while an individual is still in Afghanistan, as the

adjudicator will not know when or how the beneficiary will leave Afghanistan, where the

beneficiary will be once outside of Afghanistan, or the protection that may be available to the

beneficiary in that location." SUMF ¶ 106. But USCIS did not explain why the uncertain nature

of a beneficiary's departure from Afghanistan—which was equally true prior to the November

2021 Policy—counseled any change to the guidance in the HAB Manual and the 2019 Training

Module, which contained no instruction to disfavor or generally deny cases in which an applicant

would need to travel to another country in order to attend a consular interview.

### III.    USCIS Unreasonably Delayed the Adjudication of Plaintiffs' Humanitarian Parole Applications.

Under 5 U.S.C. § 706(1), a reviewing court may "compel agency action unlawfully

withheld or unreasonably delayed." When considering whether an agency action has been

unlawfully delayed, courts consider the factors set forth in *Telecommunications Research & Action*

*Center v. FCC ("TRAC")*:

> (1) The time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action or agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'

750 F.2d 70, 80 (D.C. Cir.1984) (internal citations omitted). *See also Towns of Wellesley, Concord*

*& Norwood v. Fed. Energy Regul. Comm'n*, 829 F.2d 275, 277 (1st Cir. 1987) (per curiam). The

first TRAC factor is the "most important." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C.

Cir. 2008). It requires the Court to decide "whether the agency's response time . . . is governed by an identifiable rationale." *Ctr. for Sci. in the Pub. Int. v. United States FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014).

Action on the Boe, Moe, and Noe families' cases was unreasonably delayed in violation of the APA. USCIS recognized in August 2021 the need to complete Afghan cases as quickly as possible due to the perilous situation faced by parole beneficiaries in Afghanistan. SUMF ¶ 51. Despite this recognition of the obvious threats faced by those in Afghanistan, after the Plaintiffs and others submitted their applications, USCIS implemented at least two months-long pauses on the adjudication of Afghan humanitarian parole applications, and, even when adjudications resumed, acted at an unreasonably slow pace. As of July 2022, only 7,673 applications for Afghan beneficiaries were adjudicated. SUMF ¶ 150. Responses to hundreds of reconsideration requests were similarly delayed. As of November 2023, 83% of reconsideration requests filed since August 2021 in Afghan humanitarian parole cases were unresolved. SUMF ¶ 154.

The situations of the Boe, Moe, and Noe families have evolved through this litigation, and will undoubtedly continue to evolve between the filing of this brief and the time the Court decides this motion. Plaintiffs will continue to update the Court regarding the status of the Plaintiffs' cases, in order to enable the Court to decide whether delay on any still-pending humanitarian parole matters has been unreasonable as of the time the Court decides this motion.

The Boe family, for example, applied for humanitarian parole in September 2021, and are currently waiting for final adjudication of their applications. SUMF ¶¶ 170-172. At the time the complaint in this case was filed, their applications had been pending for more than eight months. The Boe family's applications were denied in May and July 2022. SUMF ¶¶ 160, 167. The Boes then timely sought reconsideration. SUMF ¶ 170. Their reconsideration requests had been

23

pending for more than two years until the Court ordered a report on their status in October 2024. *See* ECF. No. 141.  USCIS acted on the family's requests for reconsideration in November 2024 and, despite denying the motions for reconsideration, reopened seven of the cases.  SUMF ¶ 170. The agency issued Requests for Evidence, which the Boe family responded to by January 13, 2025. SUMF ¶ 171.

The applications are still pending.  While the Boes are hopeful that their applications will be resolved soon, the three-plus years that the Boe family have waited in hiding in Afghanistan for the final resolution of their applications is unreasonable, especially in light of the constant risks they face in Afghanistan.

## CONCLUSION

For the reasons set forth above, the Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment, set aside the Afghan-specific humanitarian parole guidance implemented by USCIS in November 2021 as arbitrary and capricious and/or not in accordance with law, and require any denied humanitarian parole applications to be timely re-adjudicated under the standards in effect on August 31, 2021, prior to the November 2021 Policy and the September 2021 pause in adjudications.  Plaintiffs also respectfully request that after any grant of summary judgment, they receive an opportunity to supplement their applications for humanitarian parole with updated information, and after any such supplement, that Defendants be required to adjudicate their applications within 14 days.

With regard to Plaintiffs' delay claim, Plaintiffs respectfully request that the Court grant Summary Judgement and order an appropriate remedy with regard to any still outstanding and unreasonably delayed humanitarian parole matter for the Plaintiffs as of the time of the Court's decision on this motion.

24

25

Dated: February 7, 2025

Respectfully submitted,

PLAINTIFFS

By their attorneys,

/s/ *Susan M. Finegan*
Susan M. Finegan (BBO #559156)
John F. Quill (BBO #632216)
Andrew N. Nathanson (BBO #548684)
Michael P. Molstad (BBO #707524)
Gabriella J. Flick (BBO #710976)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
 POPEO, P.C.
One Financial Center
Boston, MA 02111
617.542.6000
SMFinegan@mintz.com

Adriana Lafaille (BBO #680210)
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
617.482.3170
ALafaille@aclum.org

25